**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JACKSON**, *et al.*,<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ISLAMIC REPUBLIC OF IRAN,**<br><br>**Defendant.** | **Civil Action No.: 1:24-cv-02304-BAH** |

**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 55(b)(2) and 28 U.S.C. §§ 1605A & 1608(e), Plaintiffs hereby move for default judgment against Defendant the Islamic Republic of Iran and an award of compensatory and punitive damages. Pursuant to Local Rule 7(a), the grounds for this motion are set forth in the accompanying Memorandum of Points and Authorities.

Dated: March 26, 2026

Respectfully submitted,

*/s/ Aryeh S. Portnoy*

Aryeh S. Portnoy, D.C. Bar No. 464507
John L. Murino, D.C. Bar No. 484818
Emily M. Alban, D.C. Bar No. 977035
Leslie M. Castello, D.C. Bar No. 1735967

CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JACKSON**, *et al.*,<br>**Plaintiffs,**<br>**v.**<br>**ISLAMIC REPUBLIC OF IRAN,**<br>**Defendant.** | **Civil Action No.: 1:24-cv-02304-BAH** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 55(b)(2) and 28 U.S.C. §§ 1605A & 1608(e), Plaintiffs hereby respectfully request this Court to enter default judgment against Defendant the Islamic Republic of Iran and award compensatory damages, punitive damages, and post-judgment interest to Plaintiffs. This Court previously has held Iran liable for the terrorist attack that resulted in Plaintiffs' and numerous other victims' injuries and deaths, and Plaintiffs respectfully request this Court to provide these Plaintiffs the same relief for their injuries as their fellow victims who previously brought suit and to award punitive damages on account of their Defendant's reprehensible and outrageous conduct.

## I. Background and Procedural History

### A. The Attack on Khobar Towers

The Khobar Towers complex was a residential complex in Dahran, Saudi Arabia, which housed forces from a coalition of nations, including U.S. military forces, that were "charged with monitoring Iraq's compliance with United Nations security council resolutions." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54-58 (D.D.C. 2006); *see also* Compl. ¶¶ 1, 89. Those forces were present in Saudi Arabia "with the consent of that host country" and "[t]he

deployment of U.S. troops to the region was considered a peacetime deployment within a friendly host country." *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 251 (D.D.C. 2006) ("*Heiser I*") (citing *Blais*, 459 F. Supp. 2d at 47).

On June 25, 1996, just before 10:00 p.m., terrorists parked "a large gasoline tanker truck . . . alongside the perimeter wall of the Khobar Towers complex." *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 252 (D.D.C. 2006) ("*Heiser I*"); *see also* Compl. ¶ 90. The driver "ran into a waiting car that had pulled up near the truck[] and sped off." *Heiser I*, 466 F. Supp. 2d at 252 (citing *Blais*, 459 F. Supp. 2d at 47-48); *see also* Compl. ¶ 90. "[W]ithin about 15 minutes," the truck bomb exploded with a force that "was the equivalent of 20,000 pounds of TNT," which the U.S. Department of Defense said "was the largest non-nuclear explosion ever up to that time. *Heiser I*, 466 F. Supp. 2d at 252 (citing *Blais*, 459 F. Supp. 2d at 47-48); *see also* Compl. ¶ 91.

The tremendous force of the blast caused extensive damage across several buildings, killing 19 members of the U.S. armed forces and wounding other military personnel and civilians (the "Khobar Towers Attack"). *See Heiser I*, 466 F. Supp. 2d at 248; Compl. ¶ 1.

**B. Defendant Iran's Role in the Khobar Towers Attack**

Iran has been designated a state sponsor of terrorism by the U.S. Department of State since January 19, 1984. *Blais*, 459 F. Supp. 2d at 47 (citation omitted); *see also* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Mar. 23, 2026); Compl. ¶ 86.

As this Court and others in this District have found, Defendant Iran provided material support and resources for the Khobar Towers Attack. *See Heiser I*, 466 F. Supp. 2d at 266-67; *Blais*, 459 F. Supp. 2d at 54-58; *see also* Compl. ¶¶ 3, 94. Iranian officials, acting on behalf of Iran and within the scope of their respective offices, employment, or agency, recruited the individuals who carried out the attack, and provided operational, logistical, and financial support,

and the attack was approved by Iran's Supreme leader and other officials.[1] *See Blais*, 459 F. Supp. 2d at 48; *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶¶ 92-93.

The individuals who carried out the attack had been "recruited principally by a senior official of the [Islamic Revolutionary Guard Corps ("IRGC")], Brigadier General Ahmed Sharifi." *Blais*, 459 F. Supp. 2d at 48; *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 93. At the time of the attack, the IRGC was a military or quasi-military organization "answering directly to the Ayatollah and the mullahs who hold power in Iran." *Heiser I*, 466 F. Supp. 2d at 251-52. Brigadier General Sharifi, on behalf of Iran and the IRGC, "planned the operation and recruited individuals for the operation at the Iranian embassy in Damascus, Syria. He provided the passports, the paperwork, and the funds for the individuals who carried out the attack." *Blais*, 459 F. Supp. 2d at 48; *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 93.

The truck bomb that was used in the Khobar Towers Attack "was assembled at a terrorist base . . . which was jointly operated by the IRGC and by the terrorist organization known as Hezbollah;" and the individuals who carried out the Khobar Towers Attack with Iran's support called themselves "Saudi Hezbollah" *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 93.

Other high-level Iranian officials, including the Iranian Minister of Intelligence and Security, also approved and provided support for the operation; indeed, Iran's Supreme Leader himself, Ayatollah Ali Khamenei, approved the attack. *Blais*, 459 F. Supp. 2d at 48; *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 93.

The courts based these findings, in part, on the testimony of expert witnesses in *Blais* and *Heiser I* and details of a "massive and thorough" FBI investigation. *See Heiser I*, 466 F. Supp. 2d

---

[1] The FSIA provides that a foreign sovereign such as Iran is "vicariously liable for the acts of its officials, employees, or agents." 28 U.S.C. § 1605A(c).

at 250-54, 260-65; *Blais*, 459 F. Supp. 2d at 46 n.4, 48-49; *Gration v. Islamic Republic of Iran*, No. 21-cv-01859, 2023 WL 5221955, at *1 (D.D.C. Aug. 15, 2023); *Schooley v. Islamic Republic of Iran*, No. 17-cv-01375, 2019 WL 2717888, at *1 n.4 (D.D.C. June 27, 2019); *see also* Compl. ¶ 95. Judge Lamberth held 17 days of hearings in *Heiser I* before making his holdings, and also heard additional testimony from expert witnesses in *Blais*. The expert testimony included testimony from Louis Freeh, the Director of the Federal Bureau of Investigation ("FBI") at the time of the Khobar Towers Attack; Dale Watson, who had been the deputy counterterrorism chief of the FBI and later the section chief for all international terrorism; and experts Dr. Patrick Clawson, a scholar of Middle Eastern politics, and Dr. Bruce Tefft, both of whom have frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism. *See Heiser I*, 466 F. Supp. 2d at 250-54, 260-65; *Blais*, 459 F. Supp. 2d at 46 n.4, 48-49; *see also* Compl. ¶ 95. As this Court previously found, "[b]oth Freeh and Watson testified to their conclusions, based on information gathered in their investigations, that 'Iran, [the Ministry of Information and Security ('MOIS')], and IRGC were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah.'" *Estate of Johnson v. Islamic Republic of Iran*, No. 23-cv-01689, 2024 WL 3225954, at 7 (D.D.C. June 28, 2024) (quoting *Heiser I*, 466 F. Supp. 2d at 264) (alteration in original)).

Indeed, the FBI's investigation uncovered "a great deal of information linking [Iran] to the bombing." *Heiser I*, 466 F. Supp. 2d at 248, 252-53; *see also* Compl. ¶ 96. For example, the FBI interviewed six individuals who "admitted to the FBI their complicity in the attack on the Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers," and "also indicated that the selection of the target and the authorization to

proceed was done collectively by Iran," including through Iran's Ministry of Information and Security ("MOIS") and the IRGC. *Heiser I*, 466 F. Supp. 2d at 252-53; *see also* Compl. ¶ 96.

Dr. Clawson and Dr. Tefft also provided expert testimony regarding Iran's responsibility for the Khobar Towers Attack. Dr. Clawson specifically concluded, "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject," that "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Heiser I*, 466 F. Supp. 2d at 253. Dr. Tefft agreed, concluding based on his review of "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA," that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on the Khobar Towers." *Id.* at 253-54.

As a result of Iran's actions, this Court and others in this District have held Iran liable for the Khobar Towers Attack. *See, e.g.*, *Johnson*, 2024 WL 3225954, at *13; *Thole v. Islamic Republic of Iran*, No. 23-cv-00793, 2024 WL 2208208, at *13 (D.D.C. May 16, 2024); *Gration* 2023 WL 5221955, at *28; *Mustard v. Islamic Republic of Iran*, No. 21-cv-00163, 2023 WL 1778193, at *10 (D.D.C. Feb. 6, 2023); *Ackley v. Islamic Republic of Iran*, No. 20-cv-00621, 2022 WL 3354720, at *50 (D.D.C. Aug. 12, 2022); *Blank v. Islamic Republic of Iran*, No. 19-cv-03645, 2021 WL 3021450, at *9 (D.D.C. July 17, 2021); *Christie v. Islamic Republic of Iran*, No. 19-cv-01289, 2020 WL 3606273, at *19 (D.D.C. July 2, 2020); *Aceto v. Islamic Republic of Iran*, No. 19-cv-00464, 2020 WL 619925, at *17 (D.D.C. Feb. 7, 2020); *Schooley*, 2019 WL 2717888, at *73; *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 38 (D.D.C. 2018); *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 10-14 (D.D.C. 2010); *Rimkus v. Islamic*

*Republic of Iran*, 575 F. Supp. 2d 181, 197 (D.D.C. 2008); *Heiser I*, 466 F. Supp. 2d at 266-67; *Blais*, 459 F. Supp. 2d at 54-58.

### C. The Instant Plaintiffs

Plaintiffs are victims of the Khobar Towers Attack and can be divided into two categories:

1. 24 of the Plaintiffs were members of the U.S. Armed Forces who suffered physical, mental, and/or emotional injuries as a result of the Khobar Towers Attack (the "U.S. Servicemember Plaintiffs").

2. 52 of the Plaintiffs are immediate family members of one of the U.S. Servicemember Plaintiffs (the "Family Member Plaintiffs").[2]

Except for one Family Member Plaintiff, all Plaintiffs are, and were at the time of the Khobar Towers Attack, U.S. citizens.

### D. Procedural History

Plaintiffs filed a Complaint against Iran on August 6, 2024. *See* Dkt. No. 1. As discussed in Part II.B.2 below, proper service pursuant to the FSIA was completed on September 28, 2025. *See* Dkt. No. 22. Iran failed to respond, and the Clerk of the Court entered default against Iran on December 9, 2025. Dkt. No. 24.

This Court approved Plaintiffs' requested Administrative Plan on January 14, 2026, authorizing Plaintiffs to submit this motion, along with evidence via sworn affidavits. Minute Order Granting in Part Plaintiffs' Motion for Adoption of Administrative Plan, Jan. 14, 2026.

Consistent with the Court's order, the Plaintiffs are submitting in connection with this motion signed, sworn affidavits, similar to those relied on by this Court in awarding damages to

---

[2] Immediate family members in this context include those who do not fall naturally into one of the categories of immediate family members, but are the "functional equivalents" of such immediate family members, as described in Section II.C.1.b.

other victims of the Khobar Towers Attack, that provide information on each plaintiff, including (1) his or her status as either a deceased or injured victim or a family member of a deceased or injured victim, and (2) the impact of the Khobar Towers Attack, including any physical or psychological injuries stemming from the Attack.

Attached hereto as Exhibit A is Plaintiff's Proposed Findings of Fact and Conclusions of Law based on that evidence, which contains (1) proposed findings of fact regarding each Plaintiff's status as a U.S. Servicemember Plaintiff or Family Member Plaintiff and the injuries each Plaintiff suffered and (2) proposed conclusions of law regarding the quantum of compensatory damages to which each Plaintiff is entitled.

For the reasons set forth herein, Plaintiffs now respectfully request this Court to enter default judgment against Iran for its role in the Khobar Towers Attack with respect to their deaths and/or injuries suffered as a result of the attack, and to award, consistent with the earlier awards of this Court and others in the District, compensatory damages, an equivalent amount of punitive damages, and post-judgment interest.

## II. Argument

### A. Legal Standard for default judgment under the FSIA

As a result of Defendant Iran's failure to appear, the Clerk entered default, and Rule 55(b) therefore entitles Plaintiffs to file this motion seeking default judgment. *See Shatsky v. Palestinian Liberation Org.*, 955 F.3d 1016, 1023 (D.C. Cir. 2020); FED. R. CIV. P. 55(b). Although "resolution of disputes on their merits" is favored, default judgment is available where "'the adversary[ial] process has been halted," including where, as here, the defendant is entirely unresponsive. *Breezee v. Islamic Republic of Iran*, No. 23-cv-3392, 2025 WL 2719250, at *19 (D.D.C. Sept. 24, 2025) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). To enter such a judgment, the Court must determine that there is (1) subject-matter jurisdiction over the

claims, *see James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996); (2) personal jurisdiction over the defendant, *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir, 2005), and (3) evidence showing the defendant is liable, *see* 28 U.S.C. § 1608(e); as shown below, those requirements are met here, and Plaintiffs therefore are entitled to default judgment against Iran.

The FSIA requires that a foreign state's liability must be shown "by evidence satisfactory to the court," 28 U.S.C. § 1608(e), allowing a court to "determine precisely how much and what kinds of evidence the plaintiffs must provide." But because Congress intended the FSIA's state-sponsored terrorism exception "to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins . . . courts have the authority" and—according to the D.C. Circuit's application of Supreme Court precedent, "the obligation—to 'adjust [evidentiary requirements] to . . . differing situations'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047-48 (D.C. Cir. 2014) (alteration in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)); *see also Klapprott v. United States*, 335 U.S. 601, 611 (1949); *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019); *Akins*, 332 F. Supp. 3d at 31. Accordingly, this Court has "broad discretion to determine what degree and kind of evidence is satisfactory," *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (*Owens II*), and should accept as true uncontroverted factual allegations supported by admissible evidence, including affidavits, FED. R. CIV. P. 56(e)(2); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d, 379, 386 (D.D.C. 2015) (citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d, 163, 171 (D.D.C. 2010)). In an FSIA terrorism case, where "firsthand evidence and eyewitness testimony" as to liability "is difficult or impossible to obtain from an absent and likely hostile sovereign," a "lenient [evidentiary] standard is particularly appropriate," and "a factual finding [will] not [be] deemed clearly

erroneous if 'there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted.'" *Owens II*, 864 F.3d at 785 (fourth alteration in original) (quoting *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)); *see also Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018).

It also is well established that, in such proceedings, the formal presentation or "reproduction" of evidence previously submitted in other cases is not required. As the court explained in *Taylor v. Islamic Republic of Iran*, "the formality of evidence reproduced" is unnecessary in default cases, and judicial notice of evidence introduced in related prior litigation is permitted. 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (quoting *Rimkus*, 750 F. Supp. 2d at 172).

Further, as in prior cases decided by this Court arising from the same attack, the factual issues raised by the claims here are identical to those already addressed in the earlier proceedings in *Blais* and *Heiser I* holding Iran liable for the Khobar Towers Attack, where extensive fact evidence and witness testimony demonstrated Iran's provision of material support and resources for the attack. In *Heiser I* alone, the presentation of evidence, including examination of seven expert witnesses, took 17 days (described in more detail in Section I.B, *supra*).

Rule 201 of the Federal Rules of Evidence authorizes a district court to take judicial notice of facts "not subject to reasonable dispute because . . . [they] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2). Courts in this District have applied this rule frequently in the FSIA context to take notice of evidence in other proceedings involving the same attack, the same conduct, and the same defendants, including "proceedings [that] have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)); *see also Breezee*, No. 23-cv-3392, 2025

WL 2719250, at *2 (D.D.C. Sept. 24, 2025) (citing *Han Kim*, 774 F.3d at 1049 (holding that plaintiffs had met their evidentiary burden where the district court took judicial notice of a South Korean court's conviction of a North Korean agent and that was the only evidence linking North Korea to the victim's disappearance)). This approach appropriately "permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them," *Rimkus*, 750 F. Supp. 2d at 172, and is 'both efficient and sufficiently protective of the absent defendant['s] interests,'" *Breezee*, 2025 WL 2719250, at *3.

This Court and others in this District have already determined, in cases arising from the Khobar Towers Attack, that it is appropriate to take judicial notice of the findings of fact from *Blais* and *Heiser I* and, as set forth in Section I.B, *supra*, held Iran liable for the Khobar Towers Attack. Plaintiffs therefore request that this Court do the same and, based on the evidence previously presented, find Defendant Iran liable for the Khobar Towers Attack.

### B. The FSIA's Terrorism Exception revokes Iran's sovereign immunity and confers jurisdiction.

Plaintiffs brought this case pursuant to the FSIA's "Terrorism Exception," 28 U.S.C. § 1605A, which "revoke[s] sovereign immunity protection for terrorist-sponsoring governments." *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 183 (D.D.C. 2013) ("*Doe II*").

#### 1. This Court has subject-matter jurisdiction because Plaintiffs meet the requirements for their claims to be heard and their claims fall within the Terrorism Exception's waiver of sovereign immunity.

This Court may hear Plaintiffs' claims pursuant to the FSIA's Terrorism Exception because Plaintiffs meet all subject matter jurisdiction requirements in that exception.

"[D]istrict courts . . . have original jurisdiction . . . of any nonjury civil action against a foreign state" involving "claim[s] for relief in personam with respect to which the foreign state is

not entitled to immunity" under sections 1605-1607 of the FSIA. 28 U.S.C. § 1330(a).

Although "the FSIA establishes a general rule granting sovereigns immunity from the jurisdiction of the United States courts," the FSIA's terrorism exception withdraws immunity "for lawsuits that seek money damages for personal injury or death from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'" *Borochov v. Islamic Republic of Iran*, 94 F. 4th 1053, 1057 (D.C. Cir. 2024) (quoting the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241); *see also* 28 U.S.C. § 1605A(a)(1), *Mark v. Republic of Sudan*, 77 F.4th 892, 895 (D.C. Cir. 2023). A court therefore has jurisdiction over such claims if the sovereign defendant "was designated as a state sponsor of terrorism at the time of the" act that caused the injuries and "remain[ed] so designated when the claim [was] filed under" the FSIA's terrorism exception and each of "the claimant[s] or the victims was, at the time of the" act that caused the injuries, "a national of the Unted States [or] a member of the [U.S.] armed forces." 28 U.S.C. § 1605A(a)(2)(A)(i)(I), (a)(2)(A)(ii)(I)-(II); *see also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015).

First, as noted above in Section I.B, Iran has been continuously designated as a state sponsor of terrorism since 1984, more than a decade before the Khobar Towers Attack, and was therefore so designated both at the time of the attack and the filing of Plaintiffs' Complaint.

Second, as detailed in the uncontested sworn testimony submitted by Plaintiffs in connection with this motion, all but one Plaintiff was a United States citizen at the time of the Khobar Towers Attack, and the Plaintiff who was not a United States citizen, Judith Moya, bases her claim on her son, Christopher Howard Romero, who was both a U.S. citizen and member of the U.S. armed forces at the time of the Khobar Towers Attack. Exh 1, Plaintiff's Prop. Finding

of Fact, ¶¶ 595, 606-614; Exh. 18, Aff. Christopher Howard Romero, Rep. of Judith Ann Moya, ¶¶ 3-5; *see also, e.g.*, *Breezee*, 2025 WL 2719250, at *21 (holding that there was subject matter jurisdiction where all but one plaintiff was a U.S. citizen and the remaining plaintiff's claims were based on her suffering resulting from the attack on her servicemember and U.S. citizen daughter) (citing *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 35 (D.D.C. 2016)).

"Finally, the evidence presented in *Blais* and *Heiser I*, . . . is sufficient to establish that the plaintiffs' [are] claim[ing] damages 'for personal injury . . . that was caused by an . . . extrajudicial killing" at the Khobar Towers for which the defendant[] provided 'material support or resources,'" and Plaintiffs respectfully request this Court to take judicial notice of that evidence. *Akins*, 332 F. Supp. 3d at 10 (quoting 28 U.S.C. § 1605A(a)(1)).

"Extrajudicial killing" in the FSIA has the same meaning as in the Torture Victim Protection Act of 1991, 28 U.S.C. § 1605A(h)(7), which defines the term as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," 28 U.S.C. § 1350 note § 3(a)); *see also, e.g.*, *Akins*, 332 F. Supp. 3d at 44-45. This Court previously has held that the Khobar Towers Attack "was manifestly an 'extrajudicial killing' that resulted in the deaths of nineteen American military personnel." *Breezee*, 2025 WL 2719250, at *21 (citing *Rimkus*, 750 F. Supp. 2d at 182 (Iran's actions "constituted both an extrajudicial killing and the provision of material support."); *Akins*, 332 F. Supp. 3d at 33-34 (same), *Aceto*, 2020 WL 619925, at *13 (same). "No 'regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples' could have authorized the truck bomb that 'sheared off the face of [a building housing U.S. forces] . . . and reduced most of it to rubble.'" *Akins*, 332 F. Supp. 3d at 34 (quoting *Blais*, 459 F. Supp. 2d at 48).

As this Court has done in previous cases arising from the Khobar Towers Attack, it should take judicial notice of the evidence in *Blais* and *Heiser I* that, as described above, demonstrates that Iran provided "material support and resources" for the act of extrajudicial killing that constituted the Khobar Towers Attack. *See, e.g.*, *Akins*, 332 F. Supp. 3d at 33; *Breezee*, 2025 WL 2719250, at *21. Although a court's decision to take judicial notice "does not conclusively establish the facts found" in the previous case for purposes of the current case, the evidence presented in *Blais* and *Heiser I* is more than sufficient for this Court to "reach [its] own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) *see also Rimkus*, 750 F. Supp. 2d at 172. In particular, the evidence presented in *Blais* and *Heiser I*, is sufficient for this Court to find that "Iran played a key role" in the Khobar Towers Attack because "its agents planned, supported, and 'approved' the attack," *Breezee*, 2025 WL 2719250, at *21 (quoting *Heiser I*, 466 F. Supp. 2d at 252), and because Iran helped "recruit, train, fund, supply, and direct Saudi Hezbollah, including in specific preparation for the attack on the Khobar Towers," *Breezee*, 2025 WL 2719250, at *21 (quoting *Heiser I*, 466 F. Supp. 2d at 262). Accordingly, this Court should find here, as in prior cases, that Iran's material support was "a substantial factor in the sequence of events that led to . . . plaintiffs' injuries," and those injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's provision of material support." *Breezee*, 2025 WL 2719250, at *21 (quoting *Owens II*, 864 F.3d at 794 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).

Because all the requirements of the FSIA terrorism exception are met, this Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1605A.

**2. This Court has personal jurisdiction because Iran has been served under 28 U.S.C. § 1608(a).**

This Court also has personal jurisdiction over Iran because Iran has been served with

process pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608, and Fed. R. Civ. P. 4(j)(1), which directs that service upon a "foreign state or a political subdivision, agency or instrumentality must be served in accordance with 28 U.S.C. § 1608." Plaintiffs have served Iran in accordance with all legal requirements.

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under [the FSIA] where service has been made under section 1608 of [the FSIA]." 28 U.S.C. § 1330(b); *see also Heiser I*, 466 F. Supp. 2d at 255 ("Personal jurisdiction exists over a non-immune sovereign so long as service of process has been made as required by section 1608" of the FSIA." (citation omitted)).

The first two methods of service provided by section 1608(a) of the FSIA were not available, as Iran has "neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017), 28 U.S.C. §§ 1608(a)(1)-(2); *see also* Dkt. No. 19.1.

Accordingly, Plaintiffs first attempted service under § 1608(a)(3). Pursuant to that provision, on August 28, 2024, Plaintiffs requested the Clerk of the Court to mail a copy of the Summons, Complaint, and Notice of Suit (the "Service Documents"), each in English along with a translation into Farsi, the official language of Iran, to the head of the Ministry of Foreign Affairs of Iran. *See* Dkt. Nos. 5, 6. The Clerk certified mailing of the Service Documents via DHL on August 30, 2024. *See* Dkt. No. 7. However, on December 18, 2024, DHL returned the Service Documents to Plaintiffs as undeliverable. *See* Dkt. No. 8.

Plaintiffs next arranged for service to be initiated pursuant to 28 U.S.C. § 1608(a)(4). *See* Dkt. Nos. 9, 10. On November 19, 2024, in accordance with that section and Plaintiffs' request, the Clerk of the Court mailed the Service Documents to the U.S. Department of State for service

on Iran via diplomatic channels. *See* Dkt. No. 11.

However, upon learning that Iran had appointed a new foreign minister, and out of an abundance of caution, Plaintiffs initiated service anew. Again, as the first two methods in section 1608(a) remained unavailable, Plaintiffs re-attempted service under § 1608(a)(3). Plaintiffs requested the Clerk of the Court to reissue the Summons with the name of the new foreign minister, and requested the Clerk to dispatch the Service Documents with the reissued Summons to Iran via mail. *See* Dkt. Nos. 13-14, 16. The Clerk of the Court reissued the Summons on January 23, 2025, *see* Dkt. No. 15, and then mailed a copy of the updated Service Documents to Iran by DHL on February 26, 2025, *see* Dkt. No. 17.

Once again, DHL returned the Service Documents to the Plaintiffs as undeliverable, as the Plaintiffs informed the Court on March 6, 2025. *See* Dkt. No. 18.

Plaintiffs were not, and are not, aware of any alternative means of service by mail under § 1608(a)(3)), and thus were unable to effect service by mail pursuant to that section. *See id.*

Accordingly, on March 10, 2025, Plaintiffs again requested service via diplomatic channels under § 1608(a)(4), *see* Dkt. No. 20, and on March 12, 2025, the Clerk of the Court dispatched the Service Documents to the U.S. Department of State, *see* Dkt. No. 21. On September 28, 2025, the U.S. Department of State, through the Embassy of Switzerland in Tehran, delivered the service documents to Iran's Ministry of Foreign Affairs. *See* Dkt. No. 22.

Iran's Answer or other responsive pleading was due 60 days later, 28 U.S.C. § 1608(d); as the last day of that period, Thursday, November 27, 2025, was a federal holiday, the deadline was the next business day, November 28, 2025, *see* Fed. R. Civ. P. 6(a)(1). To this date, Iran has not filed an Answer or other responsive pleading, and has made no appearance in this action.

As the Supreme Court has held, "[p]ersonal jurisdiction over a foreign sovereign is

'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished" *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 145 S. Ct. 1572, 1580 (2025) (quoting *Samantar v. Yousuf*, 560 U.S. 205, 324, n. 20 (2010)). In other words, "'subject matter jurisdiction plus service of process equals personal jurisdiction." *CC/Devas (Mauritius) Ltd.*, 145 S. Ct. at 1580 (quoting *GSS Group Ltd. v. National Port Auth.*, 680 F. 3d 805, 811 (D.C. Cir. 2012) (internal quotation marks omitted)).

As service under 28 U.S.C. § 1608(a) was properly effected on Iran on September 28, 2025, and as this Court has subject matter jurisdiction over Plaintiffs' claims, this Court can properly exercise personal jurisdiction over Iran as well. *See Akins*, 332 F. Supp. 3d at 34-35; *see also Breezee,* 2025 WL 2719250, at *22 ("Plaintiffs' executed service under 28 U.S.C. § 1608(a)(4) authorizes this Court to exercise personal jurisdiction over Iran.").

### C. Iran is liable to all Plaintiffs under the FSIA and/or other relevant law and judgment therefore should be entered against Iran.

Iran is liable to all U.S. Servicemember Plaintiffs and all Family Member Plaintiffs who are U.S. citizens for their physical, emotional, and economic injuries under the federal private right of action described in 28 U.S.C. § 1605A(c), and Iran is liable to the remaining Family Member Plaintiff under applicable law, as described below.

#### 1. Iran is liable to all U.S. Servicemember Plaintiffs and all U.S. citizen Family Member Plaintiffs pursuant to the private right of action in the FSIA's Terrorism Exception.

The FSIA's Terrorism Exception, 28 U.S.C. § 1605A(c), creates a "[p]rivate [r]ight of [a]ction for "personal injury or death" that may be brought by certain plaintiffs, including "national[s] of the United States" and "member[s] of the [U.S.] armed forces." The statute also provides that "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. *Id.*

As demonstrated in the uncontroverted sworn testimony submitted by Plaintiffs in connection with this motion, all except one of the Plaintiffs here are U.S. citizens, and the U.S. Servicemember Plaintiffs were members of the U.S. armed forces. All U.S. Servicemember Plaintiffs and all Family Member Plaintiffs who are U.S. citizens are entitled to bring claims under the private right of action provision in section 1605A(c) (Count I). Under that provision, all U.S Servicemember Plaintiffs and all U.S. citizen Family Member Plaintiffs bring claims for intentional infliction of emotional distress ("IIED") (Count II); the U.S. Servicemember Plaintiffs also bring claims for Assault and/or Battery (Count III); and the U.S. citizen Family Member Plaintiffs bring claims for solatium and/or loss of consortium (Count IV) (including via survival actions brought by the estates of those U.S. citizen Family Member Plaintiffs who passed away since the Khobar Towers Attack (Count V)).[3]

"Based on the D.C. Circuit's guidance, district courts in this jurisdiction rely on well-established principles of law, such as those found in the Restatement (Second) of Torts . . . to define the elements and scope of these theories of recovery [in cases under the FSIA Terrorism Exception]." *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 43 (internal citations and quotation marks omitted) ("*Barry II*"); *see also Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018) (Courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining

[3] As explained herein, Defendant Iran is liable to Plaintiffs under multiple theories of liability, but Plaintiffs recognize that "the law only confers one recovery" for allegations that arise from the same predicate acts. *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976). Accordingly, although this section discusses each of the theories on which Iran is liable to each Plaintiff, Plaintiffs do not seek double recovery, but only an amount of compensatory damages that appropriately compensates each Plaintiff for his or her injuries, consistent with the framework previously adopted by this and other courts.

damages under § 1605A(c).”). Applying these standards, Plaintiffs may recover for their physical, emotional, and economic injuries based on standard torts including assault and/or battery and intentional infliction of emotional distress (“IIED”).

Once subject matter jurisdiction is established, “‘little else is needed to show that [p]laintiffs are entitled to relief’ under the FSIA’s private right of action.” *Fields*, 2021 WL 9244135, at *10 (quoting *Sotloff*, 525 F. Supp. 3d at 141); *see also Foley*, 249 F. Supp. 3d at 205 (holding that plaintiffs who demonstrated they satisfied the jurisdictional elements of 28 U.S.C. § 1605A(a) had also shown that they were entitled to relief because of the “the overlap between the elements of this cause of action and the terrorism exception to foreign sovereign immunity”); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (concluding that 28 U.S.C. § 1605A(c)’s cause of action requirement is satisfied when jurisdiction is shown under 28 U.S.C. § 1605A(a)). Because the Court has subject matter jurisdiction, Iran is liable to all Plaintiffs pursuant to the private right of action under 28 U.S.C. § 1605A. *Fields*, 2021 WL 9244135, at *10; *see also Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 495-96 (D.D.C. 2021); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86-87 (D.D.C. 2018).

Iran’s liability for the acts giving rise to Plaintiffs’ injuries is firmly established. Judgment in favor of Plaintiffs is also consistent with prior rulings by this Court and would be entirely appropriate and warranted in light of Iran’s repeated refusal to accept the consequences of its murderous exploits targeting innocent Americans. Iran has had numerous opportunities to respond to Plaintiffs’ Complaint—and the other complaints arising from the same attack, which have already resulted in judgment—and proffer any defenses, but has declined to do so. Judgment in favor of Plaintiffs would be entirely in keeping with Congressional intent, in passing the FSIA’s Terrorism Exception and its amendments, to allow all U.S. victims of

murderous attacks perpetrated by state sponsors of terrorism to recover for their injuries. Other victims who were killed or injured alongside Plaintiffs have successfully pursued judgment. Judgment here would give Plaintiffs some similar measure of justice against the terrorist actors who killed and injured them and their loved ones and tore their lives apart.

**a. Iran is liable to certain U.S. Servicemember Plaintiffs for battery and to all U.S. Servicemember Plaintiffs for assault.**

As shown in the uncontroverted sworn testimony submitted by Plaintiffs in connection with this Motion, all U.S. Servicemember Plaintiffs were present at the Khobar Towers complex at the time of the Khobar Towers Attack. The testimony further shows that some U.S. Servicemember Plaintiffs suffered harmful or offensive physical contact, and all suffered imminent apprehension of such contact. Accordingly, Iran is liable to certain U.S. Servicemember Plaintiffs for battery and to all for assault.

Iran is liable for battery to the U.S. Servicemember Plaintiffs who suffered harmful physical contact as a result of the explosion because, in providing material support and resources for the Khobar Towers Attack, Iran acted "intending to cause harmful or offensive contact . . . or an imminent apprehension of such contact," and such harmful contact did in fact "directly or indirectly result[]." Restatement (Second) of Torts § 13 (A.L.I. 1965).

"Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76-77 (D.D.C. 2010) (quoting Restatement (Second) of Torts § 15).

A foreign state that provides material support for terrorist attacks is acting with an intent to cause harmful physical contact, or the imminent apprehension of harmful physical contact. In this case, "Iran acted with intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing." *Breezee*, 2025 WL 2719250, at *23

(citing *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as an act intending to cause harm)).

Accordingly, Iran is liable for battery to each U.S. Servicemember Plaintiff who suffered harmful physical contact, as detailed in the sworn testimony submitted for such Plaintiffs in connection with this Motion, and Iran should be ordered to pay compensatory damages in appropriate amounts based on the framework discussed in section II.D.2 below.

Similarly, Iran is liable for assault to all U.S. Servicemember Plaintiffs because, in providing material support for the Khobar Towers Attack, Iran acted "intending to cause a harmful or offensive contact" with those present at the site of the terrorist attack "or an imminent apprehension of such a contact," and did, in fact, "thereby put [those individuals] in such imminent apprehension." Restatement (Second) of Torts § 21(1).

As courts have held repeatedly, "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76. "Indeed, 'terrorism' is defined to mean 'the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal.'" *Akins*, 332 F. Supp. 3d at *36 (quoting Terrorism, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism).

Further, the Restatement defines "[i]mminence" as meaning "there will be no significant delay. . . . It is enough that one is so close to striking distance that he can reach the other almost at once." Restatement (Second) of Torts § 29. Those 'who were present in the Khobar Towers complex during the attack . . . were all clearly within striking distance, given the impacts of the bomb on the whole Khobar Towers complex, . . . and thus 'were in imminent apprehension of harm.'" *Breezee*, 2025 WL 2719250, at *24 (quoting *Aceto*, 2020 WL 619925, at *15).

As detailed in the uncontroverted sworn testimony submitted in connection with this Motion, each U.S. Servicemember Plaintiff was present at the Khobar Towers complex at the time of the attack and put in imminent apprehension of harmful or offensive physical contact.

Accordingly, Iran is liable for assault to all U.S. Servicemember Plaintiffs, and should be ordered to pay compensatory damages in appropriate amounts based upon the framework discussed in section II.D.2 below.

**b. Iran is liable to all U.S. Servicemember Plaintiffs and all U.S. citizen Family Member Plaintiffs for IIED.**

Iran is liable for IIED to all U.S. Servicemember Plaintiffs and all U.S. citizen Family Member Plaintiffs becuase, in providing material support for the Khobar Towers Attack, Iran engaged in "extreme and outrageous conduct" that "cause[d] severe emotional distress" to those Plaintiffs. *See* Restatement (Second) of Torts § 46(1); *see also Roth*, 78 F. Supp. 3d at 400 (courts in this District have relied on that standard); *Akins*, 332 F. Supp. 3d at *36 (citing the Restatement and *Roth*).

As courts in this District repeatedly have held, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)); *see also, e.g.*, *Roth*, 78 F. Supp. 3d at 400; *Valore*, 700 F. Supp. 2d at 77. Iran's role in the Khobar Towers Attack is precisely the type of extreme and outrageous conduct for which there is liability.

Additionally, as this Court has noted before, because it "targeted a specific, identifiable subset of people," that is, "'the coalition forces . . .' who were housed at the complex[,]" the Khobar Towers Attack, more than other attacks that "'di[d] not differentiate among members of the public,'. . . created a unique insecurity and fear that members of the coalition forces were not

safe . . . even at their living quarters, and would be targeted for further attacks." *Breezee*, 2025 WL 2719250, at *25 (quoting *Ratemo v. United* States, Nos. 19-cv-2067, 19-cv-2068, 19-cv-646 (JDB), 2025 WL 294934, at *5-6 (D.D.C. Jan. 24, 2025)). All U.S. Servicemember Plaintiffs experienced that "unique harm," and that they would suffer such harm "was plainly foreseeable and intended by targeting the exact location where [they] lived." *Id.* This "'unique, foreseeable, and intended' harm[]," directed at the coalition forces specifically, "provides a stronger basis for IIED liability than general harms experienced by the general public writ large." *Id.*

The uncontroverted sworn testimony submitted in connection with this Motion shows that each U.S. Servicemember Plaintiff was present at the Khobar Towers complex at the time of the Khobar Towers Attack and suffered extreme emotional and psychological harm as a result.

Accordingly, Iran is liable for IIED to all U.S. Servicemember Plaintiffs and should be ordered to pay compensatory damages based on the framework discussed in section II.D.2 below.

All Family Member Plaintiffs who are U.S. citizens also are entitled to recover from Iran for its extreme and outrageous conduct. This Court and others in this District have recognized that "[t]he Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) 'the defendant's conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present' and (2) the claimant is a member of the victim's immediate family . . . or the functional equivalent of an immediate family member. *Gration*, 2023 WL 5221955, at *27 (quoting *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26-27 (D.D.C. 2009) ("*Heiser II*")); *see also* Dan B. Dobbs, THE LAW OF TORTS § 307, at 834 (2000); *Republic of Sudan v. Owens*, 194 A.3d 38, 41 (D.C. 2018) ("*Owens III*") (Under D.C. law, a claimant alleging emotional distress arising from a terrorist attack that

injured a family member need not have been present at the scene of the attack to state a cognizable IIED claim.); *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (finding defendant liable for IIED under the FSIA to "members of the victim's household" who were also "viewed as the functional equivalents of immediate family members").

As this Court previously has held, "Defendant's conduct in materially supporting Saudi Hezbollah was 'sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] [wa]s not present,' such that [the U.S. Servicemember Plaintiffs'] immediate family members need not have been at the bombing to recover for their emotional distress." *Breezee*, 2025 WL 2719250, at *27 (quoting *Heiser II*, 659 F. Supp. 2d at 27); *see also Schooley*, 2019 WL 2717888, at *73 (same); *Akins*, 332 F. Supp. 3d at 37-38 (same); Dan B. Dobbs, THE LAW OF TORTS § 307 (2000).

As shown in the uncontroverted sworn testimony submitted by Plaintiffs in connection with this motion, each Family Member Plaintiff is an immediate family member—spouse, child, parent, or sibling—of a U.S. Servicemember Plaintiff in this suit, or are the functional equivalents of such family members and therefore able to maintain claims.

Plaintiffs Anita Cason Lewis, Eileen Patricia Rouse, and Angela Sue Holloway were married to U.S. Servicemember Plaintiffs at the time of the Khobar Towers Attack. As this Court and others in this District have held, "[a] former spouse is considered a member of the victim's immediate family for the purposes of recover in a claim for IIED." *Gration*, 2023 WL 5221955, at *27 (citing *Panahi v. Islamic Republic of Iran*, No. 19-0006 (ABJ), 2020 WL 6591425, at *9 (D.D.C. Oct. 10, 2020)).

Plaintiffs Martha Gray Innmon and Thomas Leopold Moya are each the stepparent of a U.S. Servicemember Plaintiff and the functional equivalent of a parent. "Stepparents may

recover as natural parents where they adopt their stepchild or are otherwise the 'functional equivalents of family members.'" *Gration*, 2023 WL 5221955, at *28 (quoting *Valore*, 700 F. Supp. 2d at 79). This Court and others in this District have held that a stepparent is a "functional equivalent" where the stepchild grew up with the stepparent, as though they constituted a natural family, *Valore*, 700 F. Supp. 2d at 80; where they lived in the same household and the stepparent treated the stepchild as their own family member, *Heiser II*, 659 F. Supp. 2d at 29, including by taking "on various parental responsibilities," *Breezee*, 2025 WL 271925, at *26, such as engaging in parent-child activities together, *Gration*, 2023 WL 5221955, at *28; and where there was a close and loving relationship and the stepparent thought of the stepchild as their child, *id.*

Martha Gray Innmon first developed a relationship with Lonnie Duane Innmon ("Duane") when Duane was about 12 years old. Martha married Duane's father, Lonnie, two years later, and Duane lived with them, alternating with Duane's mother, for the remainder of his childhood until he graduated high school. Martha and Duane had a great and loving relationship dating back to his childhood growing up in the same house. Martha Gray Innmon Decl. ¶ 6-7.

Similarly, Thomas Leopold Moya raised Christopher as his own son from the time Christopher was two years old. Christopher likewise considered Thomas his father. As Thomas testified, "blood could not have made us any closer." Thomas Leopold Moya Decl. ¶ 5-6.

Thus, Martha Gray Innmon and Thomas Leopold Moya are each the functional equivalent of a parent of a U.S. Servicemember Plaintiff and may recover as a natural parent.

The uncontroverted sworn testimony submitted by Plaintiffs in connection with this motion shows that each Family Member Plaintiff "suffered significant emotional consequences from the attack, both in the days spent waiting for news of their loved ones and in the years after the attack," *Breezee*, 2025 WL 2719250, at *27.

As a result of the severe emotional distress caused by the Khobar Towers Attack, some Family Member Plaintiffs suffered certain medical or psychological conditions, including but not limited to alcoholism, depression, high blood pressure, immunocompromisation, inability to nurse, and miscarriage. The Court should take judicial notice of publicly available medical articles and other literature addressing the link between medical conditions and the trauma experienced by the Family Member Plaintiffs, including those attached hereto as exhibits:

- Alcoholism, *see* Exh. 26 (containing the articles The Epidemiology of Post-Traumatic Stress Disorder and Alcohol Disorder; Chronic Stress, Drug Use, and Vulnerability to Addiction; PTSD and Problems with Alcohol Use);

- Depression, *see* Exh. 27 (containing the articles Psychological Trauma, Posttraumatic Stress Disorder and Trauma-Related Depression: A Mini-Review; Common Reactions After Trauma);

- High blood pressure, *see* Exh. 28 (containing the articles Cardiovascular Manifestations of Posttraumatic Stress Disorder; Elevated Stress Hormones Linked to Higher Risk of High Blood Pressure and Heart Events; Posttraumatic Stress Disorder and Cardiovascular Disease);

- Immunocompromisation, *see* Exh. 29 (containing the articles Co-Morbidity of PTSD and Immune System Dysfunction; Innate and Adaptive Immune System Consequences of Post-Traumatic Stress Disorder);

- Inability to nurse, *see* Exh. 30 (containing the articles Breastfeeding in the Context of Trauma and Previous Psychological Experiences: A Narrative Review; 4 Factors that Can Decrease Breast Milk Supply – And How to Replenish It; Parents with PTSD Are More Likely to Struggle With Breastfeeding); and

- Miscarriage, *see* Exh. 31 (containing the article The Association Between Psychological Stress and Miscarriage: A Systemic Review and Meta-Analysis)

Accordingly, Iran is liable for IIED to all Family Member Plaintiffs, and should be ordered to pay compensatory damages based on the framework discussed in section II.D.2 below

#### c. Iran is liable to all U.S. citizen Family Member Plaintiffs for Solatium and/or Loss of Consortium.

Claims for solatium and/or loss of consortium are based on the "mental anguish, bereavement and grief resulting from" the death or injury of an immediate family member."

*Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018).

Although IIED and solatium are separate grounds for recovery, each authorized by the FSIA, "[i]n the context of a suit under the FSIA, courts in this Circuit have found IIED and solatium claims to be 'indistinguishable.'" *Lelchook v. Syarian Arab Republic*, No 16-cv-1550, 2019 WL 4673849, at *4 (D.D.C. Sept. 25, 2019) (quoting *Heiser II*, 659 F. Supp. 2d at 27 n.4)); *see also Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 94, 115 (D.D.C. 2015) ("Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED.").

Accordingly, for the same reasons above, Iran is liable to all Family Member Plaintiffs who are U.S. citizens, and should be ordered to pay compensatory damages for solatium in appropriate amounts based upon the framework discussed in section II.D.2 below.

**2. Iran is liable to the remaining Family Member Plaintiff for IIED and/or moral damages under applicable law.**

One Plaintiff, Judith Moya, is not a U.S. citizen and may not bring a federal claim under the private right of action in 28 U.S.C. § 1605A(c), but, because her claim is based on injuries to Christopher Howard Romero, who is a United States citizen and was, at the time of the Khobar Towers Attack, a U.S. citizen and member of the U.S. armed forces, *see* Exh, 1, Plaintiff's Prop. Finding of Fact, ¶¶ 595, 606-614; Exh. 18, Aff. Christopher Howard Romero, Rep. of Judith Ann Moya, ¶¶ 3-5, Judith Moya may bring her claims so long as "such a derivative action is authorized under 'applicable state and/or foreign law,'" *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 41 (D.D.C. 2016) (quoting *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012)). Under the FSIA, even if the private right of action is not available, a non-immune foreign state"'shall be liable in the same manner and to the same extent as a private individual under like circumstances'" and a "plaintiff[] may bring state or foreign law claims that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Republic*

*of Iran*, 573 F.3d 85, 841 (D.C. Cir. 2009) (quoting 28 U.S.C. § 1606).

To determine what law would govern a foreign family member's claim, "the Court must apply the choice of law rules of the forum state." *Fritz*, 320 F. Supp. 3d at 89; *see also Estate of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 165 (D.D.C. 2024). District of Colombia choice-of-law rules require a court to "first determine 'whether the jurisdictions' laws present no conflict, a false conflict, or a true conflict.'" *Thuniebat*, 167 F. Supp. 3d at 41-42 (quoting *Barimany v. Urban Place LLC*, 73 A.3d 964, 967 (D.C. 2013)). If the laws of the possible jurisdictions would produce identical results, there is no conflict. *Thuniebat*, 167 F. Supp. 3d at 42 (citing *USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008)). If there is no conflict, D.C. law, as the law of the forum, governs. *Thuniebat*, 167 F. Supp. 3d at 42 (citing *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013); *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C. 1970)). There is a false conflict if "'the policy of one jurisdiction would be advanced by application of its laws, and the policy of the other jurisdiction would not be advanced by the application of its law.'" *Thuniebat*, 167 F. Supp. 3d at 42 (quoting *Barimany*, 73 A.3d at 967) (additional quotation marks removed). If there is a false conflict, the law to be applied is that of the jurisdiction whose policy would be advanced.

If there is a true conflict, D.C. choice-of-law rules use a "governmental interests" approach, "under which [courts] evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review" and also considering the factors enumerated in the Restatement, that is, "a) the place where the injury occurred; b) the place where the conduct caused the injury occurred; c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered." *Thuniebat*,

167 F. Supp. 3d at 42 (internal quotation marks removed; *see also Jones v. Clinch*, 73 A.3d 80, 82 (D.C. 2013), Restatement (Second) of Conflict of Laws § 145.

Although non-U.S. foreign law, as the law of the place of the tort, is a possible source of law, courts in this District routinely have held that domestic law is the appropriate source of law for terrorism cases such as this one. *See, e.g.*, *Oveissi*, 573 F.3d at 843 (D.C. Cir. 20019) ("We have no doubt that the United States has a strong interest in applying its domestic law to terrorist attacks on its nationals, especially when, as was the case in *Dammarell*, the attacks are 'by reason of their nationality.'" (quoting *Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224, 2005 WL 756090, at *20 n.16 (D.D.C. Mar. 29, 2005)); *Abedini v. Islamic Republic of Iran*, 422 F. Supp. 3d 118, 134-135 (D.D.C. 2019) (The governmental interests analysis "easily favors applying U.S. law" and, when an emotional injury of the type suffered by a family member is "caused by distant conduct" spanning multiple years, considerations of certainty, predictability, and uniformity also favor the application of D.C. law.); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011) ("Consistent with *Dammarell* and other FSIA cases, United States domestic law remains more appropriate in state-sponsored terrorism cases than foreign law. Furthermore, in light of the 2008 amendments to FSIA that seek to promote uniformity and extend access to U.S. federal courts to foreign national immediate family members of victims of terrorism, the law of the forum state, the District of Columbia, should provide the rule of decision."). This is especially true where, as here, "the injuries . . . are the result of a state-sponsored terrorist attack on members of the United States armed forces and American military operations." *Fouty*, 743 F. Supp. 3d at 166 (D.D.C. 2024) (citing *Owens v. Islamic Republic of Iran*, 826 F. Supp. 2d 128, 155 (D.D.C. 2011) ("*Owens I*")); *see also Wang v. Islamic Republic of Iran*, No. CV 22-583 (TJK), 2025 WL 785736, at *10 (D.D.C. Mar. 12,

2025) ( "[T]he FSIA's goal of deterring 'outlaw states' from behavior like Iran's points towards domestic rather than Iranian law in this lawsuit premised on a "state-sponsored terrorist attack on" a U.S. 'citizen[ ],' 'particularly' because the 'attack [was] directed against' the U.S.'s 'national interests.'" (alteration in original, quoting *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 65 (D.D.C. 2006)); *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 139 (D.D.C. 2019) ("In cases such as this, where the victim was targeted because of his or her relationship to the United States government, the Court should apply the 'law of the seat of the federal government.'" (quoting *Fritz*, 320 F. Supp. 3d at 91)).

Applying domestic law leaves two possibilities: the law of D.C. or the law of the Plaintiff's domicile at the time of the Khobar Towers Attack, California. *See* Exh. 1, Plaintiff's Prop. Finding of Fact, at ¶ 606; Exh. 18, Aff. Christopher Howard Romero, Rep. of Judith Ann Moya, ¶ 6. As D.C. and California law would produce identical results, there is no conflict.

The D.C. Court of Appeals has affirmed that, under D.C. law, immediate family members of victims killed or injured in a terrorist attack may bring claims for intentional infliction of emotional distress, thereby "deter[ring] foreign states from sponsoring terrorism and allow[ing] deserving plaintiffs to hold culpable defendants accountable for their conduct." *Owens III*, 194 A.3d 38, 45 (D.C. 2018). That court held that a plaintiff suffering emotional distress arising from a terrorist attack that injured or killed a family member need not have been present at the scene of the attack to bring an IIED claim. *See id.* at 42-45); *see also Barry II*, 437 F. Supp. 3d at 51. The D.C. Circuit itself then adopted that ruling, emphasizing the D.C. Court of Appeals' conclusion that "'acts of terrorism are, by their very nature, designed to create maximum emotional impact, particularly on third parties.'" *Owens v. Republic of Sudan*, 924 F.3d 1256, 1261 (D.C. Cir. 2019) ("*Owens IV*") (quoting *Owens III*, 194 A.3d at 43). Accordingly, Iran

would be liable to Judith Moya under D.C. law.

Iran also would be liable to Judith Moya under California law. California recognizes the tort of IIED in the same way as D.C. law: a plaintiff can recover for severe or extreme emotional distress caused by a defendant's extreme and outrageous conduct committed with the intention of causing, or reckless disregard of the probability of causing, such emotional distress. *See e.g., Palacios v. County of San Diego,* 20-CV-450-MMA, 2020 WL 4201686 (S.D. Cal. 2020); *Evans v. City of San Diego*, 913 F. Supp. 2d 986, 1000 (S.D. Cal. 2012); *Schwartz v. Lassen Cnty. ex rel. Lassen Cnty. Jail (Det. Facility)*, 838 F. Supp. 2d 1045, 1061 (E.D. Cal. 2012); *Hughes v. Pair*, 209 P.3d 963, 976 (Cal. 2009)); *see also Christensen v. Superior Court*, 820 P.2d 181, 202 (Cal. 1991); *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982). As explained above in section II.C.1, Iran's conduct in providing material support and resources for the Khobar Towers Attack was extreme and outrageous conduct that was intended to, and did, cause such extreme emotional distress. California law, like D.C. law, does not require physical presence if the relevant conduct was directed at the plaintiff, *Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 800 (C.D. Cal. 2024) (citing *Christensen*, 820 P.2d 181) ("Under California law, to establish a claim for intentional infliction of emotional distress, defendant's outrageous conduct must be directed at the plaintiff, ***or*** occur in the presence of a plaintiff of whom the defendant is aware." (emphasis added)). Presence is "unnecessary in situations where the defendant is aware of the high probability that the defendant's acts will cause a plaintiff severe emotional distress." *Heiser I*, 466 F. Supp. 2d at 305. As courts have repeatedly held, terrorist attacks such as the Khobar Towers Attack are directed not only at those who are present, but also at third parties, including the families of those present. *See, e.g.*, *id.*; *Owens IV*, 924 F.3d at 1261. Accordingly, Iran would be liable to Judith Moya under California law, and there is no conflict with D.C. law.

Even assuming *arguendo* that these laws would not produce identical results, there would only be a false conflict, as it would not advance the public policy of any jurisdiction to apply a rule that would bar recovery for victims of terrorism. Favoring tortfeasors over victims may advance some public policy when the tortfeasors are also domiciliaries or residents, but Defendant Iran has no such connection to any of the relevant jurisdictions. *See Thuneibat*, 167 F. Supp. 3d at 44. Accordingly, even if the law of California would limit a family member's recovery, it would not advance the public policy of that jurisdiction to apply such a rule, and the law of D.C. should be applied instead.[4]

Under D.C. choice-of-law rules, therefore, Iran is liable to Plaintiff Judith Moya for her injuries arising from the Khobar Towers Attack.

**3. All Estate Plaintiffs have standing to bring claims.**

The claims of certain Family Member Plaintiffs who have died since the Khobar Towers Attack are brought by their estates. Courts in this District typically look to the state law governing an estate to determine the standing of an estate to maintain a decedent's claim. *See, e.g.*, *Barry*, 437 F. Supp. 3d at 36. All states at issue here except one have explicitly recognized the standing of an estate to bring the type of claims Plaintiffs bring here. Accordingly, this Court, like others in this District, should award damages to each of the "estates of deceased relatives of victims of terrorist attacks" from those states. *Estate of Johnson*, No. 23-1689, at *33.

---

[4] Further, courts in this District also have held that "as a general rule, the law of the forum governs, 'unless the [other U.S. state] has a greater interest in the controversy.'" *Owens I*, 826 F. Supp. 2d at 154 (quoting *Kaiser-Georgetown Cmty. Health Plan v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985)). Although Plaintiffs are aware of a decision holding that the law of the Plaintiffs' domiciles was more appropriate, *see Roberts v. Islamic Republic of Iran*, No. 20-cv-1227, 2023 WL 4351468, at *4 (D.D.C. July 5, 2023), that holding appears to be an outlier, as demonstrated by the cases cited above. Therefore, even assuming *arguendo* that there is a true conflict between California and D.C. law, this Court should apply D.C. law; alternatively, were this Court to apply California law, Plaintiff Judith Moya would still be entitled to recover.

As discussed below, Nevada has not explicitly recognized the standing of an estate to bring such claims, but this Court should hold that Nevada would not interpret its law to preclude the estate of a deceased relative of a victim of a terrorist attack from recovering.

**a. The Estate of Latricia Renell Small has standing under Tennessee law to bring claims.**

The claims of Latricia Renell Small are brought by her estate, which is governed by the law of Tennessee.

Tennessee law provides that "[n]o civil action commenced, whether founded on wrongs or contracts, . . . shall abate by the death of either party, but may be revived; nor shall any right of action arising hereafter based on the wrongful act or omission of another, . . . be abated by the death of the party wronged; but the right of action shall pass in like manner as the right of action described in § 20-5-106. TN Code § 20-5-102 (2024).

Because Latricia Renell Small had claims under the FSIA, her estate has standing under Tennessee law to bring those claims in this case.

**b. The Estates of Margaret Barile and Robert Morris Treadway, Sr., have standing under North Carolina law to bring claims.**

The claims of Margaret Barile and Robert Morris Treadway, Sr. are brought by their respective estates, which are governed by the law of North Carolina.

As Judge Lamberth held in *Taylor v. Islamic Republic of Iran*, based on the North Carolina statute still in effect today, the estate of a deceased relative of a victim of a terrorist attack had standing because "North Carolina law provides that '[u]pon the death of any person, all demands whatsoever, and rights to prosecute or defend any action . . . existing in favor of or against such person . . . shall survive to and against the personal representative . . . of his estate.'" 811 F. Supp. 2d 1, 13 (D.D.C. 2011) (quoting N.C. Gen. Stat. § 28A-18-1 ) (modification in

original); *see also Gunn v. Islamic Republic of Iran*, No. CV 21-1187 (RC), 2024 WL 3566173, at 9 (D.D.C. July 29, 2024) (same). As Judge Lamberth further noted, North Carolina courts have interpreted this provision as "ensur[ing] that 'a civil action based upon personal injury survives the death of the plaintiff.'" *Taylor*, 811 F. Supp. 2d at 13 (D.D.C. 2011) (quoting *McGowen v. Rental Tool Co.*, 109 N.C. App. 688, 428 S.E.2d 275, 276 (N.C. Ct. App. 1993) and citing *Schronce v. Coniglio*, 124 N.C. App. 216, 476 S.E.2d 366, 367 (N.C. Ct. App. 1996)).

Because Margaret Barile and Robert Morris Treadway, Sr. had claims under the FSIA, each of their estates has standing under North Carolina law to bring those claims in this case.

**c. The Estate of Melisa Jolene Padgett-Branch has standing under Georgia law to bring claims.**

The claims of Melisa Jolene Padgett-Branch are brought by her estate, which is governed by the law of Georgia.

As Judge Lamberth held in *Anderson v. Islamic Republic of Iran*, based on the Georgia statute still in effect today, "[t]he Georgia Civil Practice Act makes clear that '[n]o action for a tort shall abate by the death of either party,' Ga. Code. Ann. § 9-2-41, and that 'the cause of action shall . . . survive to . . . the legal representative of the deceased party'. *Id.* at § 9-2-40." 753 F. Supp. 2d 68, 82-83 (D.D.C. 2010) (alteration in original); *see also Nalley v. Langdale*, 734 S.E.2d 908, 919-920 (Ga. App. 2012) (same).

Because Melisa Jolene Padgett-Branch had claims under the FSIA, her estate has standing under Georgia law to bring those claims in this case.

**d. The Estates of Mary Ida Branch and Loretta Josephine Vigil have standing under New Mexico law to bring claims.**

The claims of Mary Ida Branch and Loretta Josephine Vigil are brought by their respective estates, which are governed by the law of New Mexico.

The question of whether a personal injury claim based on intentional conduct survives the

death of the victim is not settled under New Mexico law, but this Court should hold that New Mexico law would allow an estate of a deceased relative of a victim who was present at a terrorist attack to pursue the decedent's claim.

In evaluating the survival of a decedent's claims, the New Mexico Court of Appeals has held "the 'ancient' common law rule" that personal injury claims do not survive "is inapplicable" where an injured victim has passed away from causes unrelated to that injury and "adopt[ed] a [then] 'new' common law rule" that "[a]n action to recover damages for [a victim's] injuries between the [relevant tort] and his unrelated death survive[] that death." *Rodgers v. Ferguson*, 556 P.2d 844, 849-50 (N.M. 1976). As part of this holding, that court held that "the reason for the [common law] rule [against survival] ceased to exist once damage awards were recognized as compensatory." *Id.* at 847. Although the court's holding was limited to negligence, and was in part based on the court's analysis that the common law rule against the survival of causes of action did not apply to negligent torts since those torts did not exist when the common law rule developed, the court equally based its holding on the fact that "there is no reason for such a rule in connection with compensatory damages." *Id.* Further, despite stating that negligence torts developed after the common law rule against survival, the court later stated that it "recognize[d] that a damage claim based on [the plaintiff's] personal injuries [due to the defendant's negligence] did not survive his death at common law," but nonetheless " held that there is no reason to apply such a rule in New Mexico." *Id.* at 849.

Similarly, and consistent with the holding in *Rodgers*, the New Mexico Court of Appeals also has held that the phrase "cause of action for personal injuries" in N.M. Stat. § 37–2–1 carries its natural meaning and encompasses all personal injury claims—including those based on intentional conduct such as assault—rejecting as irrational any distinction between negligent

intentional tort claims for survival purposes (albeit in the context of assessing the survival of claims following the death of the tortfeasor, which is explicitly addressed in that statute). *Padilla v. Estate of Griego*, 830 P.2d 1348, 1351–52 (N.M. Ct. App. 1992).

Further, there is no reason to believe that it would advance New Mexico public policy to extinguish claims against state sponsors of terrorism, instead of allowing an estate to bring such claims, especially where all the other state referenced herein allow such recovery in favor of their residents (as discussed in the sections above and below).

Accordingly, this Court should hold that New Mexico law would provide that a New Mexico estate would have standing to bring claims for a deceased relative of a victim present at a terrorist attack,[5] and, because Mary Ida Branch and Loretta Josephine Vigil had claims under the FSIA, this Court should hold that each of their estates has standing under New Mexico law to bring those claims in this case.

**e. The Estates of Lonnie Laprelle Innmon Jr. and Vickie Lynn McCurdy have standing under Texas law to bring claims.**

The claims of Lonnie Laprelle Innmon Jr. and Vickie Lynn McCurdy are brought by their respective estates, which are governed by Texas law.

As Judge Lamberth noted in *Taylor*, based on the Texas statute still in effect today, Texas law provides that "[a] cause of action for personal injury . . . does not abate because of the death of the injured person.'" 811 F. Supp. 2d at 13 (quoting Tex. Civ. Prac. & Rem. § 71.021(a))

---

[5] Although the Tenth Circuit has held otherwise, that analysis appears to be based on interpreting the holding of *Rodgers* as based only on the emergence of negligent torts after the establishment of the common-law rules regarding claim survival, but, as explained, the New Mexico court in *Rodgers* relied equally on its conclusion that there was no basis for the common-law rule once damages awards were recognized as compensatory and therefore no reason to prevent an estate from recovering such damages for a decedent's injuries. Alternatively, if this Court determines that an estate would not have standing under New Mexico law, this Court should instead apply D.C. law, as the law of the forum, for the reasons discussed in section II.C.2 above.

(alteration in original); *see also Maxwell v. Islamic Republic of Iran*, No. 22-cv-00173-RC, 2024 WL 1342775, at *29 (D.C.C. Mar. 29, 2024) ("Texas state law provides that a so-called 'survival' 'cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person.'" (quoting Tex. Civ. Prac. & Rem. § 71.021(a))). Accordingly, "'[a] decedent's personal injury action therefore survives death and may be prosecuted on [his or her] behalf.'" *Taylor*, 811 F. Supp. 2d at 13 (quoting *Elliott v. Hollingshead*, 327 S.W.3d 824, 833 (Tex. App. 2010) (first alteration in original)); *see also Maxwell*, No. 22-cv-173, 2024 WL 1342775 at *29 (same).

Because Frederick Lonnie Laprelle Innmon Jr. and Vickie Lynn McCurdy had claims under the FSIA, each of their estates has standing under Texas law to bring those claims in this case.

**f. The Estate of Frederick Antonio Robinson has standing under Virginia law to bring claims.**

The claims of Frederick Antonio Robinson are brought by his estate, which is governed by Virginia law.

As courts in this District repeatedly have held, based on the Virginia statute still in effect today, "Virginia law allows a decedent's estate to maintain any cause of action that the decedent would have been able to assert during his or her life (e.g., battery or IIED)." *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 297 (D.D.C. 2005) (citing Va. Code § 8.01-25); *see also Lelchook v. Syrian Arab Republic*, No. 16-cv-1550, 2019 WL 2191177, at *1 (D.D.C. Mar. 25, 2019), *Maxwell*, No. 22-cv-00173-RC, 2024 WL 1342775 at *29. Furthermore, "Virginia permits the personal representative of a deceased individual to bring an action against any person or persons (including corporations or other legal entities) whose wrongful conduct caused the decedent's death." *Dammarell*, 404 F. Supp. 2d at 297; *see also Maxwell*, No. 22-cv-

00173-RC, 2024 WL 1342775 at *28.

Because Frederick Antonio Robinson had claims under the FSIA, his estate has standing under Virginia law to bring those claims in this case.

**g. The Estate of Ula G. Evans has standing under Indiana law to bring claims.**

The claims of Ula G. Evans are brought by her estate, which is governed by Indiana law.

Indiana law provides that estate representatives "may maintain an action against the wrongdoer to recover all damages resulting before the date of death from those injuries that the decedent would have been entitled to recover had the decedent lived." IN ST 34-9-3-4.

Because Ula G. Evans had claims under the FSIA, her estate has standing under Indiana law to bring those claims in this case.

**h. The Estates of Nathaniel Robinson, Pamela Denise Bradley, Sidney Garcia Robinson, and Chandra Lynn Wheaton have standing under Mississippi law to bring claims.**

The claims of Nathaniel Robinson, Pamela Denise Bradley, Sidney Garcia Robinson, and Chandra Lynn Wheaton (a/k/a Chondra Lynn Wheaton) are brought by their respective estates, which are governed by Mississippi law.

Mississippi law provides that estate representatives "may commence and prosecute any personal action whatever, at law or in equity, which the testator or intestate might have commenced and prosecuted." MS Code § 91-7-233 (2024).

Because Nathaniel Robinson, Pamela Denise Bradley, Sidney Garcia Robinson, and Chandra Lynn Wheaton (a/k/a Chondra Lynn Wheaton) each had claims under the FSIA, each of their estates has standing under Mississippi law to bring those claims in this case.

**i. The Estate of Judith Ann Moya has standing under Nevada law to bring claims**

The claims of Judith Ann Moya are brought by her trust, to which they were assigned

prior to her death and which is governed by Nevada law.

Nevada law provides that "no cause of action is lost by reason of the death of any person, but may be maintained by or against the person's executor or administrator." NV Rev Stat § 41.100 (2024).

Because Judith Ann Moya had claims under the FSIA, and assigned those claims to her trust, her trust has standing under Nevada law to bring those claims in this case.

**j. The Estate of Willard Lee Wells has standing under Pennsylvania law to bring claims**

The claims of Willard Lee Wells are brought by his estate, which is governed by Pennsylvania law.

As Judge Lamberth held in *Taylor*, based on the Pennsylvania statute still in effect today, the estate of a deceased relative of a victim of a terrorist attack had standing because "The provisions of Pennsylvania's code concerning estates provides that "[a]ll causes of action or proceedings shall survive as provided in [§ 8302]," 20 Pa. Cons. Stat. § 3371, and that separate provision specifies that "[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant."" 811 F. Supp. 2d 13 (quoting 42 Pa. Cons. Stat. § 8302) (modification in original)); *see also Maxwell*, 2024 1342775, at *11 (same).

Because Willard Lee Wells had claims under the FSIA, his estate has standing under Pennsylvania law to bring those claims in this case.

**D. Plaintiffs are entitled to damages.**

Under the FSIA, Plaintiffs are entitled to compensatory and punitive damages resulting from the terrorist acts on which their claims are based.

**1. Plaintiffs have proven the damages to which each is entitled.**

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must

prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages.'" *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)).

A party seeking damages from a defaulting sovereign "must prove damages 'in the same manner and to the same extent' as any other default winner." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 243 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). "[P]laintiffs may present such evidence in the form of affidavits" and "the Court may accept any uncontroverted evidence presented by plaintiffs as true." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C. 2009); *see also Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 163 (D.D.C. 2013); *Heiser*, 466 F. Supp. 2d 255; *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). "To determine the 'reasonable estimate' of damages, 'courts may look to expert testimony and prior awards for comparable injury.'" *Fields*, 2021 WL 9244135, at *12 (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017)).

As explained above, Plaintiffs have shown that Iran is liable to them because their "injuries were reasonably certain and were the intended consequences of [Iran's] material support of Saudi Hezbollah." *Breezee*, 2025 WL 2719250, at *28. Although the damages suffered in such attacks are "by their nature, 'unquantifiable,'" *Fields*, 2021 WL 9244135, at *14 (quoting *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015)), courts in this Circuit "often apply a standardized framework known as the *Heiser* damages framework," as described in more detail in the section below. *Id.* (citing *Heiser*, 466 F. Supp. 2d at 269). This

Court has applied that framework in multiple other cases arising from the Khobar Towers Attack, and, Plaintiffs respectfully submit, should do the same here. *See, e.g.*, *Johnson*, 2024 WL 3225954, at *13; *Blank*, 2021 WL 3021450, at *9. Indeed, as this Court has noted, most recently in *Breezee*, the "*Heiser* [] framework for solatium damages has been a generally used guide for assessing damages." 2025 WL 2719250, at 30.

Both *Breezee* and this case involve identical underlying facts and circumstances and similar injuries and therefore the well-established *Heiser* framework is the proper basis for assessing the damages to be awarded to Plaintiffs.[6] The *Heiser* framework provides baseline figures and a basic methodology by which to ascertain the "appropriate measure of damages" both for directly-injured victims and for "the family members of victims who died" or were injured in a terrorist attack. *Barry II*, 437 F. Supp. 3d at 53 (quoting *Lelchook v. Syrian Arab Republic*, No. CV 16-1550, 2019 WL 4673849, at *4 (D.D.C. Sept. 25, 2019) (internal quotation marks omitted); *see also, e.g.*, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51, 54 (D.D.C. 2007); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85-86 (D.D.C. 2010); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57-58 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 27 n.4 (D.D.C. 2009). "Under the *Heiser* framework, a court begins with baseline amounts and may adjust upward or downward to account for individual circumstances." *Barry II*, 437 F. Supp. 3d at 53. Accordingly, pursuant to the FSIA, Iran is liable for money damages, including "solatium, pain and suffering, and punitive

---

[6] The *Heiser* framework applies to all Plaintiffs, regardless of whether they have a private right of action under 28 U.S.C. § 1605A(c) or an IIED claim under District of Columbia or other law. *See Barry II*, 437 F. Supp. 3d at 51-58 (applying the *Heiser* framework to all plaintiffs, and noting that the Terrorism Exception's private right of action overlaps with IIED and wrongful death claims).

damages." The sworn testimony submitted by Plaintiffs in connection with this motion proves each Plaintiff's injuries. That evidence and the below framework establishes the "appropriate measure" of pain and suffering and solatium damages to which each Plaintiff is entitled.

**2. Plaintiffs are entitled to compensatory damages for their injuries.**

Plaintiffs are entitled to compensatory damages, including "solatium, [and] pain and suffering[.]" 28 U.S.C. § 1605A(c); *see also Fields*, 2021 WL 9244135, at *12; *Barry II*, 437 F. Supp. 3d at 60-61; *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 76 (D.D.C. 2010); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 77-78 (D.D.C. 2010); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 28-29 (D.D.C. 1998).

As demonstrated in Sections II.C.1 and 2, above, Iran is liable to all Plaintiffs for a combination of assault, battery, IIED, and solatium and/or loss of consortium, subject to a "single recovery framework" that compensates them for their physical, mental, and emotional suffering. Under the *Heiser* framework, the "'baseline assumption' is that "'persons suffering injuries in terrorist attacks," such as the U.S. Servicemember Plaintiffs here, "'are entitled to $5 million in damages,'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)), which may be adjusted upward or downward based on an individual plaintiff's circumstances. "[S]evere instances of psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, . . . or were mistaken for dead," would justify an upward departure. *Kaplan*, 213 F. Supp. 3d at 35. A downward departure might be warranted for more "minor shrapnel injuries" or less severe mental or emotional injuries, in the absence of other factors justifying the baseline or higher award. *Id.* This Court also has used the "objective metric" of VA disability ratings to assess the severity of injuries. *See, e.g.*, *Breezee*, 2025 WL 2719250, at *29, *Schooley*, 2019 WL 2717888, at *74. The VA's disability rating represents:

> the "agency's official determination regarding the extent of disabling injury . . . [and] includes both mental and physical injuries, facilitat[ing] an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that individuals with similar injuries receive similar awards."

*Breezee*, 2025 WL 2719250, at *29 (quoting *Schooley*, 2019 WL 2717888, at *74).

This Court typically has awarded the $5,000,000 baseline to plaintiffs with a VA rating of up to 30% disabled as a result of the Khobar Towers Attack, with an upward departure to $6,000,000 to plaintiffs with VA rating of 40 to 60% disabled, and an upward departure to $7,000,000 to plaintiffs with a rating of 70% or higher. *See, e.g.*, *Breezee*, 2025 WL 2719250, at *29; *Schooley*, 2019 WL 2717888, at *75; *Johnson*, 2024 WL 3225954, at *14.

A disability rating is not necessary, however, for the Court to determine an appropriate amount of damages for a U.S. Servicemember Plaintiff; this Court should award damages for all U.S. Servicemember Plaintiffs based on the sworn testimony or other documentary evidence presented. *See, e.g.*, *Breezee*, 2025 WL 2719250, at *29; *Schooley*, 2019 WL 2717888, at *75; *Akins*, 332 F. Supp. 3d at 40-41.

The Family Member Plaintiffs are entitled to recover damages to compensate them for the emotional distress they suffered, including "personal injury to the feelings" and "mental anguish, bereavement and grief' caused by a family member's injury. Courts awarding such damages also "may look to prior decisions" in awarding damages, *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 15, 29 (D.D.C. 2008), and generally use the *Heiser* framework as a guide to award damages to family members, *see Roth*, 78 F. Supp. 3d at 403, *Heiser I*, 466 F. Supp. 2d at 269, with upward and downward departures "'to assess each plaintiff's injuries individually,'" *Breezee*, 2025 WL 2719250, at *31 (quoting *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065 (JDB), 2022 WL 2817730, at *43 (D.D.C. July 19, 2022)), and "ensur[e] that

'individuals with similar injuries receive similar awards,' by [making] adjustments so that awards reflect differences in the degree of injury," *Breezee*, 2025 WL 2719250, at *31 (quoting *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015)).

Under the *Heiser* framework, the baseline awards are: $4,000,000 each for the **spouses** of an injured U.S. Servicemember Plaintiff; $2,500,000 each for the **parents** of an injured U.S. Servicemember Plaintiff; $2,500,000[7] each for the **children** of an injured U.S. Servicemember Plaintiff; and $1,250,000 each for the **siblings** of an injured U.S. Servicemember Plaintiff. *See, e.g.*, *Johnson*, 2024 WL 3225954, at *15; *Maxwell*, 2024 WL 1342775, at *19; *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022); *Blank*, 2021 WL 3021450, at *9; *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 271 (D.D.C. 2020).

Upward departures are warranted for "'aggravating circumstances,'" which may be "'indicated by . . . testimony which describes a general feeling of permanent loss or change caused by decedent's absence or medical treatment for depression and related affective disorders.'" *Valore*, 700 F. Supp. 2d at 85-86.

Accordingly, based upon Plaintiffs' uncontroverted sworn testimony Proposed Findings of Facts and Conclusions of Law attached hereto, Plaintiffs respectfully request that this Court apply the *Heiser* framework to award damages to compensate each Plaintiff for his or her

[7] This Court has at times previously awarded children of injured victims $1,500,000 or $2,500,000 in damages, depending on the circumstances, while other courts in this district frequently have awarded $2,500,000. *Johnson*, 2024 WL 3225954, at *15 (awarding $2,500,000 to child plaintiffs and citing other cases awarding the same amount). Where the attack and its impact have resulted in lifelong impacts to the child plaintiff, this Court has awarded $2,500,000 to them. *Id.* ("Given the significant lifelong impacts that her mother's injury has had on [child plaintiff] and her family, an award similar to that given to the servicemember's parents of $2,500,000 is appropriate here."). All child plaintiffs in the present case have similarly suffered lifelong impacts as a result of the attack, and therefore the framework using a baseline award of $2,500,000 for children of an injured U.S. Servicemember Plaintiff is appropriate here.

injuries arising from the Khobar Towers Attack in the amounts provided in Plaintiffs' Proposed Findings of Facts and Conclusions of Law.

**3. Punitive damages should be awarded to punish and deter Iran.**

Punitive damages are meant "to 'punish outrageous behavior and deter such outrageous conduct in the future,'" *Fields*, 2021 WL 9244135, at *16 (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)), and are [] appropriate where 'defendant[] supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization and murder of American citizens and others,'" *Id.* at *16 (quoting *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 148 (D.D.C. 2018)).

Punitive damages are appropriate here and should be awarded to all Plaintiffs. In assessing punitive damages the Supreme Court has provided three "guideposts" (1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

Based on this precedent, in other cases involving the Khobar Towers Attack, this Court consistently has awarded punitive damages equal to the amount of compensatory damages awarded. *See, e.g.*, *Breezee*, 2025 WL 2719250, at 33 (citing *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *28 (D.D.C. July 2, 2020) (concluding that awarding punitive damages equal to compensatory damages was the most appropriate)). Accordingly, an award of punitive damages equal to the amount of compensatory damages to be awarded is therefore appropriate here, and such an award should be made in favor of each Plaintiff.

### 4. Plaintiffs are entitled to post-judgment interest

In addition to punitive damages, Plaintiffs also are entitled to an award of post-judgment interest. Where the FSIA provides jurisdiction, post-judgment interest may be awarded. *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Schooley*, 2019 WL 2717888, at *79. Federal law provides that allows "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court;" the amount of interest "shall be calculated from the date of the entry of judgment." 28 U.S.C. § 1961(a). When post-judgment interest is sought, application of section 1961(a) is mandatory. *See, e.g.*, *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 165; *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 78 (D.D.C. 2021).

Accordingly, this Court should award post-judgment interest at the statutory rate set out in 28 U.S.C. § 1961.

## **Conclusion**

For the reasons set forth herein, Plaintiffs respectfully request this Court to enter default judgment on liability against Iran for the deaths and injuries they caused and supported in the Khobar Towers Attack, award compensatory damages in the amount of $278,250,000.00 and award punitive damages in the amount of $278,250,000.00, for a total award of $ 556,500,000.00, allocated as provided in Plaintiffs' Proposed Findings of Fact and Conclusions of Law attached hereto, plus post-judgment interest in accordance with 28 U.S.C. §1961.

Dated: March 26, 2026

Respectfully submitted,

*/s/ Aryeh S. Portnoy*
Aryeh S. Portnoy
John L. Murino
Emily M. Alban
Leslie M. Castello

CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system on March 26, 2026. The Defendant in this action could not be sent a copy of the foregoing as it has not yet entered an appearance and/or has not acknowledged other efforts to contact it in this case or others similar to it.

*/s/ Aryeh S. Portnoy*
Aryeh S. Portnoy