**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAMMY LEE JACKSON, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>Defendant. | Civil Action No. 24-2304 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

This action, brought by seventy-six plaintiffs against defendant, the Islamic Republic of Iran ("Iran"), arises out of the June 25, 1996, bombing, executed by Saudi Hezbollah, of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel. *See* Compl. ¶¶ 1-2, 98, ECF No. 1. The bombing killed nineteen U.S. Air Force personnel and injured hundreds more, including the twenty-four injured servicemember plaintiffs in this case. *See id.* ¶¶ 1-2; *see also id.* ¶¶ 8-77. The plaintiffs in this case also include fifty-two immediate family members of seventeen of the twenty-four injured servicemember plaintiffs. *See id.* ¶¶ 8-83. Based on allegations that "Iran and its agents" provided material support and resources to "the Saudi Hezbollah," the "terrorist organization that carried out the bombing," thereby enabling the attack, Iran is named as the sole defendant. *See, e.g.*, *id.* ¶¶ 88-96; *see also id.* ¶¶ 92-94 (noting that Iran has repeatedly been found liable for the Khobar Towers attack based on the same factual allegations about its provision of material support and resources). Plaintiffs seek damages for their injuries suffered as a result of the attack pursuant to the terrorism exception to the Foreign Sovereign Immunities Act's ("FSIA") general conferral of immunity on foreign sovereigns, 28 U.S.C. § 1605A, and have complied with the FSIA's requirements for effectuating

service on the sovereign defendant, *see* 28 U.S.C. § 1608(a)(4). Iran has failed to enter an appearance or otherwise defend against this action. *See* Return of Service, ECF No. 22; Clerk's Entry of Default, ECF No. 24.

Plaintiffs now seek the entry of default judgment against Iran as to liability and damages. *See* Pls.' Mot. for Default J. ("Pls.' Mot."), ECF No. 29. For the reasons detailed below, plaintiffs' motion is granted in part and denied in part.

## I. BACKGROUND

Prior decisions of this Court have found Iran liable for the Khobar Towers bombing. *See, e.g.*, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.); *Est. of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran* ("*Rimkus II*"), 750 F. Supp. 2d 163 (D.D.C. 2010) (Lamberth, C.J.); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273 (D.D.C. July 2, 2020) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163 (BAH), 2023 WL 1778193 (D.D.C. Feb. 6, 2023) (Howell, C.J.); *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) (Howell, J.); *Thole v. Islamic Republic of Iran*, No. 23-cv-793 (BAH), 2024 WL 2208208 (D.D.C. May 16, 2024) (Howell, J.); *Est. of Johnson v. Islamic Republic of Iran*, No. 23-cv-1689 (BAH), 2024 WL 3225954 (D.D.C. June 28, 2024)

(Howell, J.); *Breezee v. Islamic Republic of Iran*, No. 23-cv-3392 (BAH), 2025 WL 2719250 (D.D.C. Sept. 24, 2025) (Howell, J.); *St. John v. Islamic Republic of Iran*, No. 23-cv-2333 (BAH), 2026 WL 1532818 (D.D.C. Apr. 6, 2026) (Howell, J.); *Dobbins v. Islamic Republic of Iran*, No. 24-cv-3271 (BAH), 2026 WL 1943314 (D.D.C. July 6, 2026) (Howell, J.).

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony about the connection between Iran and the attack on the Khobar Towers. *See Blais*, 459 F. Supp. 2d at 46 n.4, 48-49; *Heiser I*, 466 F. Supp. 2d at 249-50. In *Heiser I* alone, the plaintiffs' examination of witnesses, including seven expert witnesses, and presentation of other evidence took seventeen days. *See* 466 F. Supp. 2d at 250.[1] Other cases, including *Rimkus*, *Akins*, and *Schooley*, have concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus II*, 750 F. Supp. 2d at 173; *Akins*, 332 F. Supp. 3d at 10-11; *Schooley*, 2019 WL 2717888, at *2, and plaintiffs here request that this Court "take judicial notice of the evidence in *Blais* and *Heiser I* that . . . demonstrates that Iran provided 'material support and resources' for the act of extrajudicial killing that constituted the Khobar Towers Attack," Pls.' Mem. in Supp. of Mot. for Def. J. ("Pls.' Mem.") at 13, ECF No. 29.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R.

[1] The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former deputy counterterrorism chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260-65, 263 n.18; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on the grief process, *see id.* at 269-70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273-74.

EVID. 201(b).[2] In this District, Rule 201 has been applied frequently to take judicial notice of factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). Using judicial notice in this way avoids "the formality of having that evidence reproduced" in each new case. *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (quoting *Rimkus II*, 750 F. Supp. 2d at 172)); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding that courts are permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (internal quotation marks and citation omitted)); *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier cases").

Importantly, taking judicial notice of prior findings "does not conclusively establish the facts found" as to the instant case. *Foley*, 249 F. Supp. 3d at 191. Instead, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus II*, 750 F. Supp. 2d at 172 ("[C]ourts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them."). The D.C. Circuit has

[2] "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women v. Soc. Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (per curiam) (quoting FED. R. EVID. 201, Advisory Committee Note). The Rule does not govern judicial notice of "legislative fact[s]," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

endorsed the use of judicial notice to establish facts in FSIA terrorism cases. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049, 1051 (D.C. Cir. 2014) (holding that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice).

Persuaded that this approach is both "efficient and sufficiently protective of the absent defendant['s] interests," *Akins*, 332 F. Supp. 3d at 11, plaintiffs' request to take judicial notice of the evidence presented in *Blais* and *Heiser I* is granted, *see* Pls.' Mem. at 9-10 (citing this Court's prior decisions taking judicial notice in *Akins* and *Breezee* to support the instant request); *see also Akins*, 332 F. Supp. 3d at 11 ("[F]actual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case."). The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

**A. The Attack on Khobar Towers**

"The Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. Shortly before 10:00 p.m. on June 25, 1996, "a large gasoline tanker truck" drove up to the Khobar Towers complex and parked "alongside the perimeter wall." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 89. After parking, the driver of the truck "jumped out, ran into a waiting car that had pulled up near the truck, and sped off." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 89. Although security guards stationed near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle

location," the truck exploded "within about 15 minutes" and the blast "sheared off the face of Building 131." *Heiser I*, 466 F. Supp. 2d at 252. Investigations of the attack "determined that the force of the explosion was the equivalent of 20,000 pounds of TNT," which the U.S. Department of Defense described as "the largest non-nuclear explosion ever up to that time." *Id.*; *see also* Compl. ¶ 90.

**B. Defendants' Role in the Attack**

The U.S. Department of State has designated Iran as a state sponsor of terrorism since January 19, 1984. *Blais*, 459 F. Supp. 2d at 47; *see also, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism [https://perma.cc/VF4X-JQU4] (last visited Sept. 4, 2026).

Prior proceedings have found that Iran planned and supported the Khobar Towers bombing. Both Ayatollah Ali Khamenei, the supreme leader of Iran at the time of the attack, and the Iranian Minister of Intelligence and Security at the time, Ali Fallahian, "approved" the attack. *Heiser I*, 466 F. Supp. 2d at 252. The truck bomb used in the attack was "assembled" at a base in Lebanon's Bekaa Valley, which base was "jointly operated by the IRGC [(Islamic Revolutionary Guard Corps)] and by the terrorist organization known as Hezbollah." *Id.* The individuals who carried out the bombing drove the bomb from this base to Dhahran and called themselves "Saudi Hezbollah." *Id.*

These factual findings are based in part on testimony provided by four key expert witnesses in *Blais* and *Heiser I*, including Louis Freeh, who served as the director of the FBI at the time of the bombing, and Dale Watson, who served as the deputy counterterrorism chief of the FBI at the same time. The testimony of both Freeh and Watson in *Heiser I* was based on their oversight of

the FBI's "massive and thorough investigation of the attack," which investigation involved "over 250 agents." *Id.*; *see also id.* at 260-62 (describing the testimony of Freeh and Watson and the basis for each expert's knowledge of the incident).[3] Based on information gathered in their investigations, both Freeh and Watson testified to their conclusions that "Iran . . . w[as] responsible for the Khobar Towers bombing carried out by Saudi Hezbollah." *Id.* at 264; *see also Blais*, 459 F. Supp. 2d at 48.

Additional expert testimony was provided in *Heiser I* by Dr. Patrick Clawson, who based his opinions on "his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials," and "his academic research on the subject." 466 F. Supp. 2d at 262. According to Clawson, "the government of Iran . . . w[as] responsible for the Khobar Towers bombing, and . . . Saudi Hezbollah carried out the attack under their direction." *Id.* at 253. This opinion was also supported by Dr. Bruce Tefft, a former founding member of the CIA's counterterrorism bureau, who testified, based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA and from his security clearances since that time," that there was "no question" that Iran was "responsible for planning and supporting the attack on the Khobar Towers" and specifically that the attack "wouldn't have happened without Iranian support." *Id.* at 254.

### C. The Instant Plaintiffs

The seventy-six plaintiffs in this lawsuit include twenty-four servicemembers who allegedly suffered physical and emotional injuries as a result of the Khobar Towers bombing and

---

[3] During this investigation, the FBI interviewed six members of Saudi Hezbollah, each of whom admitted "their complicity in the attack on Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers." *Heiser I*, 466 F. Supp. 2d at 253. This investigation ultimately resulted in an indictment, returned by a grand jury in Alexandria, Virginia, "against 13 identified members of the pro-Iran Saudi Hezbollah organization." *Id.* at 252.

fifty-two of their immediate family members. *See* Compl. ¶ 2; Pls.' Mem. at 6. Information provided in sworn declarations submitted by each of the servicemember plaintiffs and associated family members, or their purported representatives, is summarized below.

**1. Servicemember Sammy Lee Jackson Jr. and Six Family Members**

On June 25, 1996, Sammy Lee Jackson Jr., was serving as a Staff Sergeant in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Sammy Lee Jackson Jr. ("Jackson Decl.") ¶ 4, ECF No. 29-3 at 1. At the time of the bombing, Jackson was inside the chapel, where he had been participating in a nighttime Bible study that was just ending when the explosion occurred. *Id.* ¶ 8. The blast's force "threw [him] across the room on the ground," and his "ears began to ring immediately." *Id.* The explosion also sent glass and debris flying into the chapel, causing "lacerations along [his] arms from glass and material being blown in from the explosion," as well as "severe bruising from being thrown across the room." *Id.* He "worked to help calm people down and get them out of the building," before "ma[king] [his] way toward [his] dorm," where he "tr[ied] to stop [his teammate] from bleeding out." *Id.* ¶ 9. "There was death and injury and agony all around" him. *Id.* ¶ 10.

The attack caused both "physical[]" and "emotional" injuries. *Id.* ¶¶ 13-14. In addition to the lacerations and bruising caused by the blast, the bombing left Jackson with "permanent hearing loss and tinnitus," as well as "breathing problems." *Id.* ¶ 13. Emotionally, the attack caused "feelings of isolation, difficulty with loud noises, survivor's guilt, depression, post-traumatic stress disorder (PTSD), and issues with sleeping," among other symptoms. *Id.* ¶ 14. He "went inward" and "stopped being the outgoing, fun-loving guy [he] used to be"; the version of himself that "just kind of disappeared" and whom he is "still trying to find." *Id.* ¶ 15. He could no longer attend concerts or "large churches." *Id.* He "had a really difficult time sleeping," felt "irrationally afraid

that [a] car pulling up would blow up the house," and has "problems with nightmares." *Id.* ¶¶ 16, 21. Jackson also experienced "emotional detachment," causing him to struggle to "express [him]self to" his children and to become "estranged" from his then-wife, Anita Cason Lewis, from whom he "eventually divorced." *Id.* ¶ 20.

Jackson received a disability rating of 80% from the U.S. Department of Veterans Affairs. *Id.* ¶ 23.

Six of Jackson's family members—his ex-wife, Anita Cason Lewis; mother, Minnie Lee Jackson; children, Samuel Aaron Jackson and Sierra Alexandria Jackson; and siblings, Rosalyn Shantell Jackson and Latricia Renell Small, who is deceased—are also plaintiffs in this case. *See* Compl. ¶¶ 8-14.

Jackson's ex-wife, Anita Cason Lewis, learned of the Khobar Towers attack while watching CNN. Decl. of Anita Cason Lewis ("Lewis Decl.") ¶ 10, ECF No. 29-3 at 8. When she saw the news, she began "screaming, crying, and running around the room." *Id.* ¶ 11. Lewis later learned that Jackson was alive but injured, and she felt "anxious and worried about how badly he was hurt" as she waited "over a week" for him to come home. *Id.* ¶¶ 12-13. She "couldn't sleep, could barely eat for the worry, and . . . hardly even interacted with [her] children." *Id.* ¶ 13. After Jackson returned, Lewis "could tell immediately that he was different." *Id.* ¶ 14. Before the attack, Jackson's "personality . . . was big in the best way possible"; he was "very funny and kindhearted," and Lewis and Jackson "laughed together constantly" and had a marriage that was "precious to [Lewis]." *Id.* ¶¶ 7-8. Lewis and Jackson had two children together, and Jackson "loved the children and they loved him." *Id.* ¶ 9. When Jackson returned, however, he "did not even want to touch" their daughter, Sierra, and when their son, Aaron, "ran up to hug him," Jackson "just kind of stood there and patted Aaron on the head." *Id.* ¶ 14. During Jackson's nightmares, Lewis was

"hit, kicked, and punched hard," at times leaving "bruises." *Id.* ¶ 15. He became "snappy and irritable," and he started to "push[] [Lewis] away." *Id.* ¶ 16. This behavior culminated in an incident when Jackson "began to brutally sodomize" Lewis, during which assault she "lost consciousness," and after which her parents eventually found her "alone, under a blanket and in a pool of [her] own blood" from internal injuries that required surgery. *Id.* ¶ 19. Lewis and Jackson divorced in 2001, which Lewis describes as "one of the biggest losses of [her] life." *Id.* ¶¶ 22-23.

Jackson's mother, Minnie Lee Jackson, learned of the attack when she received a telephone call from her daughter-in-law, Lewis, informing her that her son "had been in a terrorist bombing." Decl. of Minnie Lee Jackson ("M. Jackson Decl.") ¶ 9, ECF No. 29-3 at 14. She immediately turned on the television and recognized that the bombing had struck Jackson's dormitory but for two days did not know whether he was "injured, dead, or alive." *Id.* ¶¶ 9-10. During that period, she "could not eat or sleep," suffered "horrible migraine headaches," and worried that Sammy would return home traumatized. *Id.* ¶¶ 9-10. Before the attack, Minnie and Jackson "were like two peas in a pod" and spoke regularly. *Id.* ¶¶ 6-8. When Jackson finally returned, however, she "immediately" recognized that "[her] son came home a different person." *Id.* ¶ 12. Once "joyful," "confiden[t]," and "full of energy," he became "reserved," "hypervigilant," and reluctant to discuss the bombing, leaving Minnie feeling that she had "lost the joyful and open version of [Jackson] from before the attack." *Id.* ¶¶ 12-13. Minnie experienced chronic anxiety, paranoia, and stress, with physical effects including hypertension and Type 2 diabetes that developed after stress-related changes in her eating habits and health. *Id.* ¶¶ 11, 14-15. Witnessing Jackson's continuing struggles has remained "extremely depressing and stressful" for her, and although she will always love her son, she "will forever miss the person [he] used to be." *Id.* ¶ 16.

Jackson's son, Samuel Aaron Jackson, was nearly six years old and staying at his grandparents' house when he learned of the attack. Decl. of Samuel Aaron Jackson ("S.A. Jackson Decl.") ¶¶ 4, 7, ECF No. 29-3 at 17-18. He remembers "a commotion about something on the news," his mother "breaking down," and being "scared and confused" as his grandmother trying to distract him from the television and the adults' conversations. *Id.* ¶ 7. His grandfather and uncle later explained that his father had been injured but would survive, while many people from the base "were not going to come home." *Id.* ¶ 8. Before the attack, Samuel was "a happy kid in a happy home," and viewed his father as "a superhero," who taught him to play drums, took him to church, brought him onto the Air Force base, and helped him with schoolwork. *Id.* ¶¶ 5-6. After the attack, however, his father seemed "kind of lost," became "withdrawn," "hypervigilant," "distant," and "didn't want to go places with [Samuel] like he used to." *Id.* ¶¶ 9-11. Samuel often heard his parents "argue," "fight," "scream," and "cry," and "[s]eeing and hearing his parents fight so badly all the time . . . scared [him] and made [him] feel deeply insecure." *Id.* ¶¶ 2-13. "[T]hings only got worse" after they divorced because Samuel's mom "was so hurt and angry from everything after the attack" and "[s]he could be both physically and verbally abusive." *Id.* ¶ 14. Samuel developed "night terrors" and "emotional eating," became "domineering in [his] friendships," was "always distracted," and "started acting out," although he eventually sought therapy, which helped with these difficulties. *Id.* ¶¶ 13, 15, 17-18. He believes that, absent the bombing, his "parents would have [n]ever divorced," and he "would have been a lot happier and emotionally healthier." *Id.* ¶ 19.

Jackson's daughter, Sierra Alexandria Jackson, was only two months old at the time of the bombing and therefore has no memory of the bombing itself. Decl. of Sierra Alexandria Jackson ("Sierra Jackson Decl.") ¶¶ 2-4, ECF No. 29-3 at 22. She grew up hearing that, before the attack,

Jackson had been "a very loving and attentive father," who was "extremely family-oriented, fun-loving, outgoing, and caring," but the father she knew was "distant, reserved, angry, mean, and stern." *Id.* ¶¶ 5-6. She explained that she "[e]ffectively . . . grew up without a father" because she "was afraid of him," he was "verbally abusive" with her, and she "did not want a relationship with him." *Id.* ¶¶ 6-7. Sierra also witnessed her father "being physically abusive toward [her] mom" and later her older brother, which "made [her] even more afraid of [her] dad" and left her family "broken and dysfunctional." *Id.* ¶¶ 8-9. Her parents divorced when she was "four or five years old" as a result of the "changes in [her] father due to the attack." *Id.* ¶ 7. After the divorce, "it was like [Jackson] was a complete stranger," and she "hated" visiting him because he remained "mean and scary and unpredictable." *Id.* ¶ 10. Sierra developed anxiety, including "horrible social anxiety," that persists today, as she "struggle[s] to make friends" and "became a big people-pleaser." *Id.* ¶ 17. She believes the attack created a "domino effect" that traumatized her entire family, leaving her to grow up "without a dad present in [her] life" and with "an angry and broken mom." *Id.* ¶¶ 18-19. Ultimately, she attests that her life would have been "so much better, so much more whole," had the attack never occurred. *Id.*

Jackson's sister, Rosalyn Shantell Jackson, learned of the attack on her brother's housing complex when she was fourteen years old and Jackson's wife called their home to report the bombing. Decl. of Rosalyn Shantell Jackson ("R. Jackson Decl.") ¶¶ 4, 9, ECF No. 29-3 at 27-28. Rosalyn recalled her mother "holding [Rosalyn] in her arms and screaming and crying," repeatedly saying, "I need to talk to my child." *Id.* ¶ 9. Rosalyn feared her brother had "been mangled or lost his legs." *Id.* ¶ 10. When Jackson finally returned home, Rosalyn was relieved he was alive but immediately recognized that he had changed "physically and emotionally," becoming "reserved" and no longer the "happy-go-lucky version" of her brother. *Id.* ¶¶ 11-13. Before the attack,

Rosalyn viewed Jackson as "like Superman." *Id.* ¶ 5. He was "protective" of her, she "looked up to and admired him," and they stayed in contact regularly while he was deployed. *Id.* ¶¶ 5-6. After the attack, they "did not speak as frequently," and she "fe[lt] the need to be careful with [her] words so that [she] d[id] not say something that might trigger painful memories." *Id.* ¶ 13. Rosalyn "became extremely sensitive to anything related to war and anxious in response to news, conversations, or content related to war," as evidenced by her panic attack while watching a movie about combat. *Id.* ¶ 15. Even today, she thinks about the attack "at least once a month," checks on Jackson every Fourth of July during the fireworks, and remains "filled with sorrow" for what her brother endured and for the "loss of the father-figure [she] once had in him." *Id.* ¶¶ 15-17.

Jackson's sister, Latricia Renell Small, passed away in 2023 and her husband, Michael Small, seeks to represent her estate. Decl. of Michael Small as Representative of Latricia Renell Small ("Small Decl.") ¶¶ 2, 4-5, ECF No. 29-3 at 32. This representative's declaration attests that: When Latricia learned of the attack, she was "visibly disturbed" and "very distress[ed]" because she did not know whether her brother was alive or dead. *Id.* ¶ 10. Before the attack, Latricia and Jackson had a "very strong bond," since they were "only one year" apart in age. *Id.* ¶ 8. "[S]he looked up to him," they "kept in contact" "[e]ven when [Jackson] was far away from home," and he remained "an extremely important person in her life." *Id.* ¶ 8. After the bombing, Latricia was "overwhelmed with emotion" and "would sporadically . . . reflect on the past and her memories with [Jackson]." *Id.* ¶ 11. When Jackson returned home, Latricia "felt that [he] became distant from her and [her] children," and she believed she would "never [be] able to regain the closeness that she once had with [him]." *Id.* ¶ 12. Latricia developed "deep sadness and anxiety," "withdr[ew] into herself," and "even distanced herself from [her husband] because [he] reminded her of [Jackson]." *Id.* ¶ 13. Within a year of the bombing, Latricia "became pregnant with twins

but lost one of the twins during pregnancy," which her husband believed was "contributed to" by the stress she experienced following the attack. *Id.* ¶ 14. She "became very overprotective" of her children, which her husband believes "permanently damaged them as men." *Id.* ¶ 15. Latricia lived with "the profound and lasting effects of the Khobar Towers bombing" until her death. *Id.* ¶¶ 5, 16.

**2. Servicemember Russell Davin Barile and One Family Member**

On June 25, 1996, Russell Davin Barile was serving as a Captain Pilot and Chief of Current Operations for the U.S. Air Force in Dhahran, Saudi Arabia. Decl. of Russell Davin Barile ("Barile First Decl.") ¶¶ 2, 4, ECF No. 29-4 at 1. At the time of the bombing, he was at the gym, when "[t]he doors of the gym were blown off completely and the mirrors broke off the walls," and the explosion was "so strikingly loud" that he initially believed it was an airplane crash. *Id.* ¶ 9. His ears were ringing—"something that, unfortunately, never went away"—and after escaping the gym, he "saw many wounded service members coming from the dormitory buildings." *Id.* He spent the night evacuating injured personnel, "ignoring [his own] physical injuries, and not yet processing the emotional ones." *Id.* During the rescue effort, he discovered the "lifeless body" of his friend and "watched several pararescuemen attempt to resuscitate the motionless corpse of another crewman," who was also a "close friend[]." *Id.* ¶ 10. These experiences left him overwhelmed with "shock," "deep sadness," and "rage towards the terrorists." *Id.* The following morning, he returned to retrieve his belongings and found that the building "reeked of rot from human remains and spoiled food," a smell he describes as "sickening and traumatic." *Id.* ¶ 11.

Following the attack, Barile suffered "permanent partial hearing loss," chronic tinnitus, and asthma caused by inhaling blast debris, requiring daily inhaler use. *Id.* ¶ 14. He also developed survivor's guilt, repeatedly thinking that "if I had still been in my room, I would be dead," which

"continues to haunt [him]." *Id.* ¶ 15. He experiences "flashbacks," triggered by odors such as garbage, diesel fuel, and fertilizer, as well as nightmares, chronic insomnia, hypervigilance, paranoia, and memories of his friends' bodies. *Id.* ¶¶ 16, 19-20. He is no longer "able to enjoy [his] hobbies," like running, weightlifting, and surfing, "hardly engage[s] in any social events," "started drinking heavily," has a "difficult time focusing," and found himself "lost in dark thoughts and memories of the attack." *Id.* ¶¶ 17-18.

Barile received a 60% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 14.

Barile's mother, Margaret Barile, who passed away in 2012, is also a named plaintiff in this lawsuit, and Barile seeks to serve as the representative of her estate. Decl. of Russell Davin Barile as Representative of Margaret Barile ("Barile Second Decl.") ¶¶ 2, 5, ECF No. 29-4 at 6. This representative's declaration attests that: Margaret learned of the attack on television and "feared the worst" for her son until she spoke with him the following day, during which call she was "very emotional." *Id.* ¶ 10. Before the attack, Margaret and Barile "shared a close relationship" and "would frequently keep in touch," and Margaret was "very sociable and involved in her local community," serving as a church librarian and schoolteacher. *Id.* ¶¶ 8-9. After the attack, she became "incredibly worried and anxious about [Barile's] safety," and "[w]atching television became her priority, even over socializing and spending time with her friends or helping out at church," because she was "so . . . fixated on all the horrible things that could possibly happen to [him]." *Id.* ¶ 11. She also developed insomnia, depression, and a significantly decreased appetite. *Id.* ¶ 12. "Even at the end of her life," "she would become very emotional" during military-related news or discussions. *Id.* ¶ 13.

**3. Servicemember Laura Susanne Bergstrom and One Family Member**

Laura Susanne Bergstrom was a Public Affairs Officer in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers at the time of the attack. Decl. of Laura Susanne Bergstrom ("Bergstrom Decl.") ¶ 5, ECF No. 29-5 at 1. She was in bed reading when "a massive explosion shook the building, shattering the windows and plunging [her] into darkness." *Id.* ¶ 7. Initially believing she was in an earthquake because "the ground was shaking so violently," she "sustained some abrasions from the broken glass on the bottom of [her] feet" before she grabbed her shoes, dressed quickly, and carefully evacuated. *Id.* Outside, she encountered "injured and bloodied people everywhere," realized the base had been attacked, and "felt a deep sense of panic, fear, and confusion." *Id.* ¶ 8. In the immediate aftermath, she worked "relentlessly" in her Public Affairs role, "effectively re-living the attack over and over again" while coordinating the base's communications, "often without sleep or food." *Id.* ¶ 9. She felt "exhausted" and "unjust[ly]" "blamed by [her] superiors," and her "confidence was shaken," leading her to leave the Air Force earlier than planned and abandon her goal of a lifelong military career. *Id.*

Following the attack, Bergstrom developed insomnia, "difficulties with hearing loud noises," "loss of appetite," "recurring nightmares" of the bomb crater, anxiety, "survivor's guilt," and "painful" recurring eye styes brought on by stress and exhaustion. *Id.* ¶ 11. She withdrew from social activities, experienced a "loss of confidence," and "did not talk to anyone about what [she] was feeling." *Id.* ¶ 10. Her "anxiety and insecurities increased after the attack," contributing to the breakdown of her first marriage, and she continues to struggle with social gatherings, "controlling [her] anger," and "emotional volatility," which "created distance" in her relationship with her second husband and her children. *Id.* ¶¶ 12-13. Approximately ten years after the attack,

she sought treatment and was diagnosed with depression and Post-Traumatic Stress Disorder (PTSD). *Id.* ¶ 14. She has taken antidepressants for approximately fifteen years but continues to experience severe PTSD symptoms, including "tears, a racing heartbeat, . . . sweating," and "intense emotions" whenever reminded of the bombing. *Id.* ¶¶ 14-15. Bergstrom believes that, absent the attack, she "would have continued [her] military career," "enjoyed healthier relationships," and had a "significantly better" life. *Id.* ¶ 16.

Bergstrom received a 60% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 14.

Bergstrom's mother, Virginia Lee Simmons, is also a plaintiff in this lawsuit. Virginia learned of the attack when a neighbor told her that the housing complex where her daughter was stationed had been bombed. Decl. of Virginia Lee Simmons ("Simmons Decl.") ¶ 8, ECF No. 29-5 at 6. She immediately went into shock, "could not stop crying," was "hyperventilating," and remembered "just walking in circles around the house, scared and so stressed." *Id.* ¶ 8. After a "couple days," she learned Bergstrom had survived by seeing her interviewed on CNN and later spoke with her by phone, where Bergstrom explained that "she was 'okay'" but "her dorm room had been destroyed." *Id.* ¶¶ 10-11. Simmons "sobb[ed] through the whole call" and remains deeply emotional when recalling that conversation. *Id.* ¶ 11. Before the attack, Virginia and Bergstrom were "very close"; Virginia saw Bergstrom as her "best friend," and they "spoke over the phone at least once a week" after Bergstrom joined the Air Force. *Id.* ¶¶ 6-7. Following the bombing, Virginia noticed that Bergstrom became "volatile" and "very blunt," and Virginia "wanted to protect her, but [she] couldn't." *Id.* ¶¶ 12-13. For "several months," Virginia would sometimes "start crying uncontrollably," "could not sleep," and "completely lost [her] appetite." *Id.* ¶¶ 14-16. She is still "reminded of the day of the attack whenever [she] encounter[s] any

military-related discussions, news or media posts," and believes that "[t]he attack has left lasting negative impacts on [her] family." *Id.* ¶ 18.

**4. Servicemember Jessica Francine Bradshaw and One Family Member**

On June 25, 1996, Jessica Francine Bradshaw was a Security Forces Specialist in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Jessica Francine Bradshaw ("Bradshaw Decl.") ¶ 5, ECF No. 29-6 at 1. Bradshaw was outside her dorm room when "the bomb detonated." *Id.* ¶ 7. She recalled "a blinding flash, a deafening explosion, and debris filling the hallway as the building was plunged into darkness." *Id.* She inhaled dust and debris, suffered "lacerations on [her] face and left toe from shattered glass," and evacuated in the dark while "bumping into furniture along the way." *Id.* Despite her injuries, she "assist[ed] other injured airmen with first aid and transportation for medical care" before being assigned to secure the base perimeter because officials believed they remained under attack. *Id.* Bradshaw felt "numb with shock at the scale of destruction and devastation all around [her]." *Id.* In the days that followed, she saw "bloody footprints," "blood on the handrails and sidewalk," and "coffins containing the bodies of those who were killed" in the bombing—images she "will never be able to forget." *Id.* ¶ 9. She subsequently worked 15-to-18-hour shifts "under highly stressful and demoralizing conditions," was "made to feel as though [she] had failed in [her] duty by not preventing the attack," and ultimately left the Air Force in 1997 after the attack "permanently damaged [her] sense of belonging in the Air Force." *Id.* ¶ 10.

Following the attack, Bradshaw developed asthma from "inhaling the dust and debris during and in the aftermath of the attack," requiring daily inhalers, steroids, and antibiotics because her "right lung no longer inflate[s] air properly," as well as "severe" stress-induced eczema with recurrent flare-ups. *Id.* ¶ 8. She was diagnosed with PTSD and continues to suffer from

"flashbacks, anxiety, depression, sleep disorders and nightmares, anger," "fear of loud noises," "detachment from loved ones," and an "inability to communicate with others." *Id.* ¶ 11. Darkness triggers vivid memories of the attack, and she has "never been able to sleep in the dark since." *Id.* ¶ 12. She developed "binge eating," high blood pressure, declining self-esteem, and "impulsive behaviors," including "impulsively cut[ting] [her] hair," and she began "smoking cigars to cope with [her] anxiety." *Id.* ¶¶ 14-15. Her first marriage ended in divorce within a year of the attack, her "unresolved trauma and anxieties contributed to the worsening of [her] second marriage," which also eventually ended, and she continues to struggle in her current marriage. *Id.* ¶¶ 16-17. Bradshaw believes that, but for the Khobar Towers attack, she would have "continued [her] military career" and "had healthier and more fulfilling relationships." *Id.* ¶ 18.

Bradshaw provided no disability rating from the U.S. Department of Veterans Affairs.

Bradshaw's father, Frederick Joe Kowalczyk, is also a plaintiff in this lawsuit. Kowalczyk learned of the Khobar Towers bombing when he saw on the evening news that his daughter's base had been attacked by a "massive explosion." Decl. of Frederick Joe Kowalczyk ("Kowalczyk Decl.") ¶ 10, ECF No. 29-6 at 7. He "felt sick to [his] stomach" and "[t]he uncertainty" about whether Bradshaw was alive "ate at [him]." *Id.* He waited "days" before receiving any information about Bradshaw's condition, and in the first week after the attack, he "was a mess," "lost approximately 10 pounds," was unable to eat or sleep, and developed a "gastrointestinal bleed," requiring treatment and a blood transfusion of six pints of blood. *Id.* ¶ 11. Kowalczyk is a Vietnam veteran himself and "started having flashbacks again," despite his diagnosed PTSD having "long been manageable with medication." *Id.* ¶ 12. After learning Bradshaw had survived from her then-husband, he "continued to worry about her," and soon "developed high blood pressure for the first time in [his] life," requiring medication that he takes to this day. *Id.* ¶¶ 13, 15.

When he "finally" saw Bradshaw in person a few months later, he "immediately noticed some changes in her demeanor," observing that she was "anxious," "distant," and had "put[] up a wall between [them]," which behaviors continue now and "cause[] [him] ongoing pain and sadness." *Id.* ¶ 16. The bombing "profoundly worsened [his] pre-existing PTSD," and caused him to develop depression, insomnia, nightmares, and "hypersensitiv[ity] to bright lights and loud noises," requiring increased antidepressant medication and leaving him unable to "sleep in the same bed as [his] wife" because of persistent nightmares. *Id.* ¶¶ 17-19. Kowalczyk believes that the attack "has left lasting impacts on both" him and his daughter and "wish[es] that [he] could have protected [his] daughter from what happened." *Id.* ¶ 20.

**5. Servicemember Lawrence Henry Branch and Six Family Members**

On June 25, 1996, Lawrence Henry Branch was an HC-130P pilot in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, on his first overseas assignment and quartered at the Khobar Towers. Decl. of Lawrence Henry Branch ("Branch First Decl.") ¶¶ 4, 8, ECF No. 29-7 at 1-2. On the evening of the bombing, Branch was in his dormitory and about to leave for the gym, when others approached him "telling [him] to evacuate the building immediately." *Id.* ¶ 9. As he was doing so, the bomb detonated. *Id.* The explosion "pushed [him] roughly into the wall," leaving him with "bruising," "legs . . . cut up from debris," and ringing in his ears. *Id.* ¶ 10. He exited the building and then reentered "to help find and evacuate others" during which time he "saw people . . . suffering from gruesome injuries to their bodies," "someone who had a deep cut on their face," and a "wall . . . badly smeared with blood." *Id.* ¶¶ 10-11. While digging through the rubble, Branch discovered "the back of [his] roommate's head, which was split open and bloody," and quickly realized "[h]e was dead." *Id.* ¶ 12. Branch had an "immense feeling of guilt," believing that if he had communicated the evacuation order to his roommate, "he would still be

alive." *Id.* Branch received the Airman's Medal for his actions in the aftermath of the attack. *Id.* ¶ 14.

Branch sustained permanent hearing damage, with recurring ringing in his ears, and since the attack has experienced "anxiety, flashbacks, insomnia, nightmares, difficulties with loud noises, a short temper, an inability to focus, and depression." *Id.* ¶¶ 13, 18. He continues to relive the experiences of discovering his roommate's body and the other injuries he witnessed. *Id.* ¶ 19. His "relationships were also severely impacted by the attack," as he "grew distant" from friends and family, his wife developed "severe alcoholism" as a result of drinking "to cope with her constant anxiety," and his "erectile dysfunction as a result of the attack" further damaged their "intima[cy]." *Id.* ¶¶ 20-21. His wife eventually passed away at 48 years old from "cirrhosis of the liver . . . a direct result of her drinking." *Id.* ¶ 23. He remarried after her death, but "[t]he psychological impacts from the attack now also impact [his] current marriage." *Id.* ¶ 24. Professionally, Branch abandoned his "original intention" of remaining on active duty until retirement, left active service early because he "did not want any possibility of being sent back to Saudi Arabia," forfeited military benefits causing "financial stress," and gave up his dream of becoming an airline pilot because his anxiety and inability to focus made that career impossible. *Id.* ¶ 25. Branch states that the attack "radically changed the course of [his] life" and "has taken so much from [him]." *Id.* ¶ 26.

Branch provided no disability rating from the U.S. Department of Veterans Affairs.

Six of Branch's family members—his late wife, Melisa Jolene Padgett-Branch; his mother, Mary Ida Branch, who is deceased; his father, Joseph Ralph Branch; his sister, Loretta Josephine Vigil, who is deceased; and his brothers, Teodoro Anthony Gandert and James Gandert—are also plaintiffs in this lawsuit.

Branch's late wife, Melisa Jolene Padgett-Branch, passed away in 2015 and Branch seeks to serve as the representative of her estate. Decl. of Lawrence Henry Branch as Representative of Melisa Jolene Padgett-Branch ("Branch Second Decl.") ¶¶ 2, 5, ECF No. 29-7 at 7. This representative's declaration attests that: When she learned of the Khobar Towers bombing, Melisa received "very little information about what happened to" Branch, and "did not know whether [he] was alive or dead" or the "nature . . . of any injuries" he had sustained, which was "terrible and traumatic." *Id.* ¶ 10. Before the attack, Melisa and Branch were "happily and newly married" and "dreamed of having a beautiful family with a lot of children." *Id.* ¶ 8. After Branch returned home "about a week or two" after the attack, however, he "became withdrawn," "had no desire to . . . go on dates with [her]," and "develop[ed] erectile dysfunction," all of which strained their marriage. *Id.* ¶¶ 11-12. Melisa "became very anxious . . . and started to show signs of depression," "isolate[d] herself from her friends and family," became "quick to anger," and began "drinking heavily . . . to cope with her stress and anxiety," which "evolved into severe alcoholism." *Id.* ¶ 13. Her alcoholism and depression caused the "rapid deterioration of [their] marriage," damaged her relationship with their daughter, caused her to "struggle[] with everyday tasks," and ended her career as a portrait photographer. *Id.* ¶¶ 14-17. Melisa "refused to seek treatment for her alcoholism" and died from cirrhosis of the liver in 2015 at the age of 48, which Branch attributes directly to the excessive drinking that began after the attack. *Id.* ¶¶ 5, 18.

Branch's mother, Mary Ida Branch, passed away in 2000 and Branch seeks to serve as the representative of her estate. Decl. of Lawrence Henry Branch as Representative of Mary Ida Branch ("Branch Third Decl.") ¶¶ 2, 5, ECF No. 29-7 at 10. This representative's declaration attests that: Mary learned of the attack when Branch's wife, Melisa, called to tell her that her son was alive, although Melisa did not yet know the extent of his injuries. *Id.* ¶ 11. The days that

followed were "especially difficult," and when Mary spoke with Branch about a week later, she was "crying nonstop on the phone," with fear and panic evident in her voice because "[t]he thought of losing [Branch], her youngest son, was unbearable." *Id.* ¶ 11. Before the attack, Mary and Branch "shared a very close relationship" that continued throughout his military career through frequent telephone calls, visits, and care packages. *Id.* ¶¶ 8-10. Following the bombing, Mary became consumed with fear for Branch's safety, and each of his subsequent deployments left her in "constant terror that something would happen to [him] again." *Id.* ¶ 12. She developed "depression," "no longer wanted to go out to eat or do other things outside of the house," "stopped doing household chores or other personal tasks," and became "dependent on" anti-depressant medications. *Id.* ¶ 13. She also "started smoking more and more to cope with her anxiety," and "her ongoing depression, anxiety, and other health issues, ma[de] it even more difficult to fight her [pre-existing lung] cancer." *Id.* ¶ 14. The attack caused Mary and Branch's relationship to "suffer[]," "accelerated [Mary's] decline," and "robbed [Mary] of precious years with [her] family"—ultimately leaving "lasting impacts on [her] family that will never heal." *Id.* ¶¶ 15-17.

Branch's father, Joseph Ralph Branch, learned of the attack when Melisa called to tell him that "[Branch's] station in Saudi Arabia had been bombed" but "[Branch] was alive." Decl. of Joseph Ralph Branch ("J. Branch Decl.") ¶ 8, ECF No. 29-7 at 13-14. Although relieved that his "only biological child" had survived, Joseph remained "very worried about [Branch's] safety" and "wellbeing." *Id.* ¶¶ 8-9. Before the attack, Joseph and Branch shared "a very close bond" and they "always maintained close contact" throughout Branch's military career by "speaking often on the phone and visiting one another." *Id.* ¶¶ 5-6. After the bombing, however, Branch "became more distant" and Joseph started to "worry[] constantly about [him]." *Id.* ¶¶ 9, 11. At the same time, Joseph served as the "primary caretaker" for his wife, Mary, whose "health—both physical

and mental—continued to decline" as she "struggled to cope" with their son's experience "in a terrorist attack." *Id.* ¶ 10. "[O]verwhelmed" by "the toll that the attack was taking on [his] family," Joseph developed "severe alcoholism," "depression," and "trouble sleeping" that continues "to this day." *Id.* ¶ 12. He believed the attack "robbed [him] of the last bit of meaningful time [he] could have had with [Mary] during her last years." *Id.* ¶ 13. Joseph "continue[s] to live with the impact of the attack to this day." *Id.* ¶ 16.

Branch's sister, Loretta Josephine Vigil, passed away in 2015 and her daughter, Marisa Angelica Vigil-Valdez, seeks to serve as the representative of her estate. Decl. of Marisa Angelica Vigil-Valdez ("Vigil-Valdez Decl.") ¶¶ 2, 6, ECF No. 29-7 at 17. This representative's declaration attests that: Loretta's mother informed her of the attack when she called and shared that Branch was alive. *Id.* ¶ 11. Loretta responded by "crying desperately" because she was "so stressed about her brother's safety" and her mother's health. *Id.* Before the attack, Loretta "thought of herself as [Branch's] second mother" and the siblings shared "a close bond," "speaking . . . by phone most days" and "[seeing] each other regularly" even after Branch joined the Air Force. *Id.* ¶ 10. After the bombing, Loretta bore "a great burden" to care for her increasingly depressed mother "without [Branch's] help," and "deal[t] with the pain of watching [Branch] pull away from her." *Id.* ¶¶ 12-13. She also "became less involved with [her children]," and began "getting angry and snapping at [them], which was unlike the type of mother she had been before the attack." *Id.* ¶ 15. Loretta "abandoned her dream of starting a seamstress business," "suffered from depression," "developed severe anxieties," began "smok[ing] regularly" and "stress eating," and "struggled with alcohol abuse for the rest of her life." *Id.* ¶¶ 14, 16-19. She died "as a result of lung cancer" at age 55, and Vigil-Valdez believes Loretta's "life would have been very different" and "lasted much longer" if not for the attack. *Id.* ¶ 20.

Branch's brother, Teodoro Anthony Gandert, "was watching television" when he learned about the attack from a "breaking news report." Decl. of Teodoro Anthony Gandert ("Gandert Decl.") ¶ 8, ECF No. 29-7 at 21. Knowing Branch, his younger brother, was stationed in Saudi Arabia, Teodoro "was immediately concerned about him." *Id.* He later "learned from [his] stepfather . . . that [Branch] was alive." *Id.* Before the attack, Teodoro and Branch "shared a close relationship" and "kept in regular contact after [Branch] joined the military" by "speak[ing] on the phone often." *Id.* ¶¶ 6-7. In the aftermath, however, their relationship was "virtually destroyed," as "[Branch] stopped all communication with [Teodoro]" for "four years," then started to see him "once every few years" with "no contact in between." *Id.* ¶¶ 10-12. That distance worsened Teodoro's anxiety, caused him to have "trouble sleeping," and "ma[de] it hard to focus on [his] day-to-day life." *Id.* ¶ 10. Teodoro "deeply miss[es] the connection [they] once shared" and feels "sad" that Branch "has been largely absent from the lives of [Teodoro's] children." *Id.* ¶ 12.

Branch's brother, James Gandert, "found it hard to sleep and [his] thoughts were filled with anxiety and fears" when he learned of the attack from his brother, Teodoro. Decl. of James Gandert ("J. Gandert Decl.") ¶ 8, ECF No. 29-7 at 25. Before the attack, James considered Branch "a steadfast and reliable person in [his] life" and "stayed in touch by writing letters" and "spen[ding] time together" at family events "even throughout [Branch's] tenure" in the Air Force. *Id.* ¶¶ 6-7. After the bombing, however, Branch "completely stopped all communication with [James]," leading James to feel "as if [his] brother actually had died in the attack" and "a deep sense of rejection," which "contributed to" a period of "severe substance abuse." *Id.* ¶¶ 9-10. James and Branch "eventually reconnected" nearly twenty years later, but their "relationship was irreversibly affected by the attack" and Branch "is far from the joyful, social, and expressive person that he once was." *Id.* ¶¶ 11-12. "The pain and anxiety of being separated from [his] brother for nearly

two decades . . . profoundly affected [James] and will always be something [he has] to live with." *Id.* ¶ 14.

**6. Servicemember Robert Edward Bryant**

On June 25, 1996, Robert Edward Bryant was a Senior Airman (E-4) serving in the U.S. Air Force Security Forces and stationed in Dhahran, Saudi Arabia. Decl. of Robert Edward Bryant ("Bryant Decl.") ¶ 4, ECF No. 29-8 at 1. Bryant "was posted as a mobile patrol along the flight line" when he "heard on the radio" a request to investigate "a semitruck [that] had pulled up near the dorms" and, "just a few seconds" later, "the explosion hit." *Id.* ¶ 7. The "fireball was enormous" and "then everything was chaos," as Bryant "began to work to remove everyone off of the flight line." *Id.* ¶¶ 7-8. He experienced "a deep sense of failure" for not "keep[ing] everyone safe" and "guilt for just being alive." *Id.* ¶ 8. Bryant remained on duty for "approximately sixteen hours" before relief arrived, during which time he encountered "destruction and blood everywhere." *Id.* ¶ 9. He "stayed for the rest of [his] deployment, which was approximately six months," growing "more jaded, serious, . . . neurotic," and "constantly on edge." *Id.* ¶ 12.

Following the attack, Bryant "struggled with severe depression for decades, as well as hypervigilance, anxiety, difficulty with loud noises, flashbacks, and nightmares," causing "issues with sleeping at night" because it "does not feel safe." *Id.* ¶¶ 13-14, 21. He developed "irritability and anger" issues that "impacted [his] ability to work" and "negatively affected [his] professional growth." *Id.* ¶ 18. He still suffers from "a persistent static-like sound in [his] ear," and "cannot watch any television or movies about war or depicting violent scenes or explosions" because he "burst[s] out into tears," and his depression has caused him to "have no hobbies anymore." *Id.* ¶¶ 19-21. Even his relationships with his children "feel[] a little empty" despite his "sincere[] love for them." *Id.* ¶ 21.

Bryant received a 90% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 19.

**7. Servicemember Benjamin Scott Coleman**

On June 25, 1996, Benjamin Scott Coleman was an Aeromedical Specialist, Airman First Class (E-4) with the U.S. Air Force in Dhahran, Saudi Arabia. Decl. of Benjamin Scott Coleman ("Coleman Decl.") ¶ 4, ECF No. 29-9 at 1. Coleman was off duty in his dormitory when "the bomb detonated," "[a]ll the doors in [his] apartment slammed open," and he "saw a shockwave move past [him] across the carpet." *Id.* ¶ 8. "After confirming that [his] roommates were not in need of immediate medical care, [he] rushed to the Khobar Clinic," and "began to attend to" "one casualty at a time" in the "wave of casualties [that] kept coming toward [him]." *Id.* ¶¶ 9-10. Coleman later "went to help at the bomb site" and saw people "pulling bodies out of the rubble," then "went back to the clinic" and helped to "treat[] about 360 people with varying degrees of injuries" throughout the night. *Id.* ¶¶ 10-11. He "felt stunned in the hours and days after the attack" but "was so consumed with [his] duties that it did not occur to [him] to call [his] family to let them know [he] was alive until three days after the attack." *Id.* ¶ 13.

Coleman returned from Saudi Arabia "a little over two weeks" after the attack and initially tried to "suppress [his] emotions and pain" to focus on his future. *Id.* ¶ 14. He soon experienced flashbacks to Khobar Towers, however, and was "deemed not physically qualified" to complete "pilot training in the U.S. Marine Corps." *Id.* He also developed "PTSD" and "trouble sleeping," and he is "now an anxious person" who "cannot be in crowded places without feeling extremely uneasy." *Id.* ¶¶ 15-16. Coleman began to feel a "sense of distrust" that "often mak[es] it hard for [him] to build new relationships or feel truly safe," and he has "suffered from experiencing unpredictable angry outbursts." *Id.* ¶¶ 17-18. The "emotional impacts of the attack" also "affected

[his] relationships," including with his ex-wife and in "a string of failed relationships," and impaired his "professional career." *Id.* ¶¶ 19-20. Although Coleman was awarded the Air Force Commendation Medal (with Valor Device) and the Armed Forces Expeditionary Medal for his actions after the bombing, the medals are "a painful reminder of what [he] went through that night," which "continues to play on a constant loop in [his] head." *Id.* ¶ 21.

Coleman received a disability rating of 50% from the U.S. Department of Veterans Affairs. *Id.* ¶15.

**8. Servicemember Michael J. Dolinar**

On June 25, 1996, Michael J. Dolinar was an F-15 Crew Chief serving with the U.S. Air Force in Dhahran, Saudi Arabia, in the middle of his first overseas deployment. Decl. of Michael J. Dolinar ("Dolinar Decl.") ¶ 5, ECF No. 29-10 at 1. At the time of the bombing, Dolinar was in Building 131, "the building that was directly hit by the explosion," cleaning his dormitory kitchen when there was "a bright flash of light," followed by "an electrical buzzing sound" and "chaos." *Id.* ¶ 7. As he tried to evacuate, he "nearly walked off the new edge of the building created by the detonation," believing it was the stairwell, before finding the actual stairs amid "people screaming," with "[d]ebris and blood . . . everywhere." *Id.* ¶ 8. Only after someone attempted to wipe the blood from his back did he realize that "broken glass and shrapnel [were] embedded all over [his] back," and "all the pain hit [him] like a ton of bricks." *Id.* He was transported by ambulance to the hospital, where he "lost consciousness" and "believed [he] was dying." *Id.* Dolinar woke up in a German hospital "[a] day or two later" after receiving "emergency surgery to remove the glass." *Id.* ¶ 9. He "stayed in shock for weeks following the attack" and "would find additional shards of glass in [his] back" for the remainder of the year, requiring multiple additional hospital trips. *Id.* ¶¶ 10-11.

Following the attack, Dolinar suffered "chronic back pain, which [he] still suffer[s] from to this day," as well as "permanent hearing loss," "a permanent and unending ringing in both of [his] ears," and "restrictive lung disease." *Id.* ¶¶ 11-12. For these injuries, he received the Purple Heart. *Id.* ¶ 12. Emotionally, Dolinar "became withdrawn," developed PTSD, "began suffering from flashbacks and disturbing visions," and is no longer the "happy and sociable" person he used to be. *Id.* ¶¶ 13-14. He "think[s] of the attack every day" causing anxiety for which he "ha[s] been prescribed anti-anxiety medication to help [him] cope." *Id.* ¶ 15. His symptoms "prevented [him] from achieving [his] dream" of becoming a Chief Master Sergeant and permanently altered both his career and enjoyment of life. *Id.* ¶¶ 16-17.

Dolinar received a 100% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 12.

**9. Servicemember Lonnie Duane Innmon and Three Family Members**

On June 25, 1996, Lonnie Duane Innmon was serving as a Munitions Systems Journeyman, Senior Airman with the U.S. Air Force in Dhahran, Saudi Arabia. Decl. of Lonnie Duane Innmon ("Innmon Decl.") ¶ 4, ECF No. 29-11 at 1. On the night of the attack, Innmon was "studying for [his] first staff sergeant test" when the "blast blew [the] door open, knocked the blinds out of the windows, and damaged [his] hearing," after which he saw "a huge plume of black smoke" rising over the barracks. *Id.* ¶ 7. Believing the base was under attack, he "sprinted towards munitions control" to "prepare for battle," but "slipped on the gravel, twisted [his] ankle," "tore up [his] palms, . . . and shredded [his] kneecap and the upper part of [his] shin." *Id.* ¶ 8. Despite his injuries, he continued his mission, "camp[ing] out at munitions control for over 24 hours" and treating his own wounds with "a first aid kit." *Id.* During the following six days, Innmon "worked 12- to 14-hour shifts going through rubble and searching for any identifiable body parts, bone

fragments, and teeth of [his] colleagues and friends," while enduring the "smell of burnt and rotting flesh"—memories he "will never forget." *Id.* ¶ 10.

Following the attack, Innmon remained in Saudi Arabia "for another four months," receiving multiple "credible bomb threats" each day and living in "a state of intense fear and uncertainty" that required medication "to help [him] sleep." *Id.* ¶ 11. He suffered "severe recurring nightmares" that he "still ha[s] to this day," and turned to "stress eating." *Id.* ¶¶ 12-13. Despite his "goal . . . to serve in the Air Force for 24 years," Innmon "ended up getting discharged" just "two years" after the attack "due to the severe impacts of the attack on [his] mental and physical health." *Id.* ¶ 13. He has had years of "isolat[ing] from [his] family" and other "self-destructive behavior," *id.* ¶ 14, with his trauma continuing to affect every aspect of his life, including "difficult[y] . . . enjoy[ing] activities [he] used to love before the attack," "no longer trust[ing] anyone," "hav[ing] to take anxiety medication before [he] leave[s] [his] house," "becom[ing] detached from [his] wife and children," and "drift[ing] apart from both of [his] parents," *id.* ¶¶ 17-19. The attack "robbed [Innmon] of so much in [his] life" and still has "continued" impacts on his life. *Id.* ¶ 21.

Innmon was diagnosed with PTSD and received a 50% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 14.

Three of Innmon's family members—his mother, Patricia Dianne McSparran; his father, Lonnie Laprelle Innmon Jr., who is deceased; and his stepmother, Martha Gray Innmon—are also plaintiffs in this lawsuit.

Innmon's mother, Patricia Dianne McSparran, learned of the attack through an "unusual" telephone call from her son while she was at work. Decl. of Patricia Diane McSparran ("McSparran Decl.") ¶ 7, ECF No. 29-11 at 9. His "voice was shaking," and he sounded "like he

was reading from a piece of paper," leaving her "scared to death" after he refused to explain what had happened before abruptly ending the call. *Id.* For the next several hours, she imagined "[t]he worst-case scenarios," wondering whether her son had been captured or forced to make the call, and described those hours as "some of the longest hours of [her] life." *Id.* ¶ 8. She "worried about his safety" every day of the remaining months that Innmon was deployed in Saudi Arabia, unable to "sleep well" and "deal[ing] with severe anxiety." *Id.* ¶ 9. Even after Innmon was discharged from the Air Force, she has remained "more anxious and worried than [she] had ever been before." *Id.* ¶ 10. When Innmon returned home, Patricia "quickly noticed changes in him," including that he was "very quick-tempered," "withdrawn and reluctant" to discuss his feelings, which caused them to "los[e] the closeness [they] had before the attack." *Id.* ¶ 11. Decades later, learning the full extent of his experiences was "devastating" and "broke [her] heart." *Id.* ¶ 12.

Innmon's father, Lonnie Laprelle Innmon Jr., passed away in 2010 and his wife, Martha Gray Innmon, seeks to serve as the representative of his estate. Decl. of Martha Gray Innmon as Representative of Lonnie Laprelle Innmon Jr. ("M. Innmon First Decl.") ¶¶ 2, 6, ECF No. 29-11 at 12. This representative's declaration attests that: Lonnie was "shocked" and "became extremely worried and anxious" when he learned about the attack. *Id.* ¶ 10. Innmon "was Lonnie's only child and meant the world to him," and before the attack, the two "spent a lot of time together" and "ke[pt] in regular contact even when [Innmon] was deployed to Saudi Arabia." *Id.* at ¶¶ 8-9. After Innmon returned home, however, he "was different," as he "began to create physical and emotional boundaries around himself" and became "reserved," "withdrawn," "quick-tempered," and "impatient." *Id.* ¶ 11. These changes left Lonnie "heartbroken and depressed" because he "no longer understood his only son and did not know how to help him." *Id.* When Lonnie "became very ill in 2005," Innmon "rarely came to visit him" and the "decline in [their] relationship . . . was

agonizing to Lonnie." *Id.* ¶¶ 12-13. Lonnie passed away "deeply pained over the changes in his son and their relationship" and feeling "like he had lost his only child." *Id.* ¶ 15.

Innmon's stepmother, Martha Gray Innmon, was similarly "shocked" when she learned that her stepson "had been in such a horrible attack" and remained "anxious and worried about him until he came home." Decl. of Martha Gray Innmon ("M. Innmon Second Decl.") ¶ 8, ECF No. 29-11 at 17. Before the bombing, Martha and Innmon "had a great relationship" and they "kept in touch" with calls "about once a month" when he was deployed to Saudi Arabia. *Id.* ¶¶ 6-7. When Innmon returned home, however, "[i]t was like he had become a different person—he was anxious, unhappy, and very short-tempered," and "[their] relationship was never the same." *Id.* ¶ 9. Martha also found it "devastating" to see her husband "struggle with all the changes in [Innmon] and in their relationship." *Id.* ¶ 10. The attack "negatively changed [her] life" because the changes it caused in Innmon and "the effects on [their] relationship [were] gut-wrenching." *Id.* ¶ 14.

**10. Servicemember Harald Robert Jautakis and One Family Member**

On June 25, 1996, Harald Robert Jautakis was serving as a Technical Sergeant in the U.S. Air Force in Dhahran, Saudia Arabia. Decl. of Harald Robert Jautakis ("Jautakis Decl.") ¶¶ 2, 4, ECF No. 29-12 at 1. He was sitting in a recliner in Building 131, the building "closest to the truck bomb," watching the news and writing a letter to his wife when, from his window, he "saw the fireball from the explosion rise in the parking lot and surge toward [him]." *Id.* ¶ 5. The explosion's force made "the windows explode[]" and threw Jautakis "into the air and then hard onto the ground." *Id.* His "leg was bleeding badly," and he "was covered in glass, paint, and varnish that had literally been blown off the wall." *Id.* He used a curtain cord as a "makeshift tourniquet" for his "severe[ly] bleeding" leg, then "crawled to the stairwell," where he "kept finding bodies," few

of which "were breathing." *Id.* Jautakis was ultimately transported to a local hospital, where "[t]he doctors recommended amputating [his] leg, but [he] refused," and later underwent "extensive surgery" to save it. *Id.* ¶ 6. The leg injury caused "long-term, constant pain" and inability "to run, climb, or squat for over a year." *Id.*

In addition to the leg injury, Jautakis "sustained temporary vision loss in [his] right eye," "a joint fracture to [his] jawbone," "chronic hearing loss," "tremors," "high blood pressure," and "additional injuries to [his] left forearm (which also required surgery), chest, and throat." *Id.* ¶ 7. He has also "dealt with extreme survivor's guilt, flashbacks, nightmares, and difficulty with loud noises," as well as "intense feelings of anger at both [him]self and others for not doing more to safeguard against an attack like this one." *Id.* ¶ 9.

Jautakis received a 60% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 8.

Jautakis's wife, Pamela Barbara Jautakis, is also a plaintiff in this lawsuit. Pamela "was at home watching CNN when news of the attack broke" and she "used a map that [Jautakis] had given to [her]" to figure out "that it was his living quarters" that had been bombed. Decl. of Pamela Barbara Jautakis ("P. Jautakis Decl.") ¶ 7, ECF No. 29-12 at 3. Pamela and Jautakis "were always together" unless he was on a deployment and had been married for exactly nineteen years on the day of the attack. *Id.* ¶¶ 6-7. Their nineteenth wedding anniversary "was the worst and most horrible day of [Pamela's] life," as she "pray[ed] over and over that he was not dead." *Id.* When she finally reunited with Jautakis the following month, he "was dressed in the same bloody uniform that he was wearing during the bombing" and acted "incredibly animated and angry . . . about what had been done to him and the other airmen at Khobar Towers," a "state" that was "difficult for [Pamela] to see." *Id.* ¶ 8. As a registered nurse, Pamela took on the stressful work of "advocating

for [Jautakis]" to "get[] appropriate medical care," including a surgery without which Jautakis "might have lost his leg." *Id.* ¶ 9. She also "[took] care of him" by "making sure he was recovering, going to medical appointments, and doing anything else he needed." *Id.* ¶ 10. Pamela "experienced significant difficulty sleeping" and her life changed after the attack because she and Jautakis "weren't able to do [their] usual activities that had brought [them] joy together." *Id.* ¶ 11.

**11. Servicemember Mark Edwin Ladtkow and One Family Member**

June 25, 1996, was supposed to be the last night of Mark Edwin Ladtkow's deployment to Dahran, Saudi Arabia as a member of the U.S. Air Force, before returning home to his wife and two children. Decl. of Mark Edwin Ladtkow ("Ladtkow Decl.") ¶¶ 2, 5, 8, ECF No. 29-13 at 1-2. Instead, while "lying on a couch and . . . watch[ing] a movie" in the building "immediately adjacent to Building 131," he suddenly "heard and felt a low, thunderous boom" before the force of the explosion threw his colleague "across the room" and threw Ladtkow backwards. *Id.* ¶ 8. Ladtkow was "in shock" after the blast, but "remember[s] a loud ringing in [his] ears," "feeling dizzy," and "a pool of blood quickly forming below [him]" as "shattered glass" covered his body. *Id.* ¶ 9. After another airman "rinse[d] shards of glass off [Ladtkow's] legs and feet," he "was escorted" out of the building "then joined hundreds of others" in a dining facility for medical attention amid a "mass sense of confusion, panic and fear, with people running and screaming all around [him]." *Id.* There, despite "bleeding from [his] head, arms, legs and feet" and "exhibiting signs of shock," Ladtkow spent hours assisting with triage by "handing out water, checking wounds," and accounting for members of his squadron, before finally receiving stitches and bandages himself. *Id.* ¶ 10. When he "saw the news about the attack on CNN" and "[l]earn[ed] it was a terrorist bombing," Ladtkow felt "numb, overwhelmed by anger, sadness, and despair." *Id.*

Ladtkow sustained "lacerations and bruises from the blast, mostly due to embedded glass and blunt force trauma," as well as "deep cuts on the front and top of [his] head," face, "upper left arm," and "feet." *Id.* ¶ 11. Several of these injuries left him with "scar[s]," "permanent numbness," "diminished sensation," and "ongoing nerve issues." *Id.* In the following years, "tiny pieces of glass gradually worked their way out through [his] skin, causing [him] recurring pain and discomfort. *Id.* Ladtkow also suffered "a loss of hearing" and "still struggle[s] with tinnitus." *Id.* ¶ 12. In the wake of the attack, he experienced "great difficulty sleeping," "nightmares," and "flashbacks," and he "developed trust issues." *Id.* ¶¶ 16-17. His "family relationships were also negatively affected," as he grew "irritab[le]," "withdrawn," and "exhausted." *Id.* ¶ 18. The attack "slowed down [his] career advancement" with "a significant financial impact," as he turned down "steps toward senior leadership" in the military and decided "not to pursue" a career as a commercial airline pilot after retirement "for the sake of [his] own peace of mind." *Id.* ¶ 20. He "will never forget how deeply [the attack] affected [his] life—physically, emotionally, and financially." *Id.* ¶ 21. Ladtkow received the Purple Heart, Air Medal, Aerial Achievement Medal, and Meritorious Service Medal in recognition of his injuries and actions following the bombing. *Id.*

Ladtkow received an 80% disability rating from the U.S. Department of Veterans Affairs. *Id.*

Ladtkow's wife, Andrea Dora Ladtkow, is also a plaintiff in this case. On the day of the bombing, Andrea received a call from her mother "in a panic," reporting "news of an attack in Saudi Arabia." Decl. of Andrea Dora Ladtkow ("A. Ladtkow Decl.") ¶ 10, ECF No. 29-13 at 9. She "fe[lt] completely shocked and paralyzed," "cried nonstop," experienced "intrusive, terrifying thoughts," and "went through the worst hours of [her] life" as she waited to hear if her husband

had survived. *Id.* ¶¶ 10-11. After a "few days," Andrea reunited with Ladtkow, "[b]ut right away, [she] could tell he was not himself—physically or emotionally." *Id.* ¶¶ 12-13. He "was noticeably withdrawn and quiet," "seemed emotionally distant," and "refused to share any details about the attack," leaving Andrea feeling "utterly helpless." *Id.* ¶ 14. She "felt like [she] was walking on eggshells" to avoid upsetting Ladtkow, which "increased [her] own anxiety." *Id.* ¶ 16. Ladtkow was "emotionally absent" from "[their] family life," so Andrea "had to take on extra responsibilities at home to support both him and [their] children" and "could not return to [her] career as a preschool teacher." *Id.* ¶¶ 16-17. She also developed "separation anxiety" from her husband as she "worried about his safety nonstop," and she "suffered from recurring nightmares," "anxiety," and "fear." *Id.* ¶¶ 20-21. Andrea's "persistent worry that something terrible could happen to [her] family has never really gone away" and "[their] lives have never returned to what they were before." *Id.* ¶¶ 22-23.

**12. Servicemember Christine Ann Locke**

On June 25, 1996, Christine Ann Locke was serving in the U.S. Air Force as a combat search and rescue HC-130 copilot in Dhahran, Saudi Arabia. Decl. of Christine Ann Locke ("Locke Decl.") ¶¶ 2, 5, ECF No. 29-14 at 1. She was "working out" with her colleagues when she "felt the shockwave go through [her] body," saw "every third mirror in the gym shatter[]," and immediately "knew that it was a bombing." *Id.* ¶ 8. Locke "helped to evacuate several victims to the medical station," and then walked toward Building 131, observing that the bomb had "blown several holes straight through" the building, and "flames were visible on the other side." *Id.* ¶¶ 8-9. After "addressing the immediate injuries and identifying bodies," she returned to work and "didn't sleep for several days in the next week after the attack." *Id.* ¶ 10.

Following the attack, Locke became "an anxious, hypervigilant, and paranoid person," "constantly worried about [her] physical safety," and felt like she lost "the basic peace of mind [she] once had just going through daily life." *Id.* ¶ 11. She suffers from "PTSD," "survivor's guilt," "flashbacks," and "nightmares." *Id.* ¶ 12. The attack also caused "caused friction in [her] marriage" and damaged her "relationship with [her] children" because she "simply did not have the emotional capacity to be there" for them and found it "especially difficult" to cope with outbursts from her son who was "diagnosed with Aspergers." *Id.* ¶ 14. The "emotional distance" from her children, is "one of the greatest losses the attack caused [her]," *id.* ¶ 14, and the attack "continues to impact [her] daily life and [her] very being," *id.* ¶ 15.

Locke provided no disability rating from the U.S. Department of Veterans Affairs.

**13. Servicemember Tonya Catrice McCurdy and One Family Member**

On June 25, 1996, Tonya Catrice McCurdy was serving as an F-15 Avionics C-Shop Technician, Senior Airman in the U.S. Air Force in Dhahran, Saudi Arabia. Decl. of Tonya Catrice McCurdy ("McCurdy First Decl.") ¶¶ 3, 5 ECF No. 29-15 at 1. As she was getting ready to shower on the night of the bombing, she experienced an inexplicable intuition that told her to "duck" and, "[i]mmediately after [she] did, there was a large boom, and the glass of the shower blew out over [her] head and scattered across the room." *Id.* ¶ 9. Hearing her dorm chief yell "bomb," she fled the building "in shock," seeing "bloody scenes" as she escaped. *Id.* "The rest of that night felt like a bad dream," and McCurdy was "sent home" the following day. *Id.* ¶¶ 10-11.

Following the attack, McCurdy suffered from "panic attacks," felt "incredibly anxious" when "taking a shower," "became more cautious and avoidant of other people," and was diagnosed with "PTSD." *Id.* ¶¶ 17-19. The attack damaged her relationships, as she "felt isolated, misunderstood, and dismissed" when she "tried to speak with [her] family" about her experiences,

"rushed into" an unsuccessful marriage, "put[] up walls" to create emotional distance, and "los[t] the close relationship [she] had always shared with [her] mother." *Id.* ¶¶ 14-15, 20, 22. Professionally, she turned down opportunities "to keep working on airplanes and move forward in [her] career" to avoid "constant reminders of [her] time in the military." *Id.* ¶ 21. For McCurdy, "[l]ife was never the same after the attack, and nothing can fix that." *Id.* ¶ 24.

McCurdy provided no disability rating from the U.S. Department of Veterans Affairs.

McCurdy's mother, Vickie Lynn McCurdy is also a named plaintiff in this suit and, since she passed away in 1998, her daughter, McCurdy, seeks to serve as the representative of Vickie's estate. Decl. of Tonya Catrice McCurdy as Representative of Vickie Lynn McCurdy ("McCurdy Second Decl.") ¶¶ 2, 6, ECF No. 29-15 at 7. This representative's declaration attests that: Vickie was overcome with "shock and panic" when she learned of the attack, and she immediately called her husband to help her cope with the news. *Id.* ¶ 11. Even after McCurdy returned home, Vickie found it "hard . . . to speak about what happened." *Id.* ¶ 12. Before the attack, Vickie and McCurdy were "very close" and Vickie was often "like a big sister or best friend" to her daughter. *Id.* ¶¶ 9-10. After the bombing, when Vickie was "avoiding dealing with her own emotions" and unable to talk about the attack, their "relationship felt less close" and they "both stopped calling each other every day." *Id.* ¶ 13. Vickie "didn't attend" McCurdy's "courthouse wedding," and found it "painful" to see her daughter "making some of the same mistakes [Vickie] made when she was young." *Id.* ¶ 14. When Vickie was later diagnosed with breast cancer, the emotional "distance between [them]" prevented the support and communication they once would have shared. *Id.* ¶¶ 15-16. The "fatigue of all the emotions and difficulties . . . left [Vickie] unable to handle her battle with cancer," and she "passed away not long after the attack." *Id.* ¶ 18. If Vickie and McCurdy "had been as close as [they] had [been] before the attack, everything would have

been different, and [Vickie's] life would have been so much better during that terrible time." *Id.* ¶ 16.

**14. Servicemember Wayne Mello Sr. and Three Family Members**

On June 25, 1996, Wayne Mello Sr. was serving as the 4404th Wing Fire Chief for the U.S. Air Force in Dhahran, Saudi Arabia. Decl. of Wayne Mello Sr. ("Mello Sr. Decl.") ¶¶ 2, 4, ECF No. 32-1 at 2. He "had just gone to sleep in the fire station when the bomb went off," and "[t]he force of the blast threw [him] out of bed and into the wall, leaving [him] with scrapes on [his] hands and back" and ringing in his ears. *Id.* ¶ 9. He "made [his] way to ground zero" and spent the night "bringing fatalities to the young lieutenant who had been placed in charge of mortuary affairs." *Id.* ¶ 10. In the following days, he "did everything [he] could to help rescue efforts" and "continued working nonstop until [he] returned home the next month." *Id.* ¶ 12. Mello Sr. was awarded the Air Force Commendation Medal (with Valor Device) "for [his] contributions in the aftermath of the attack." *Id.*

As a result of the attack, Mello Sr. "suffer[s] from severe tinnitus," "developed sinusitis and breathing problems," and "still take[s] a huge list of medications" to address his injuries. *Id.* ¶ 11. He became "deeply depressed," felt "anxious and hyper alert," "started avoiding crowds or noisy places," and developed "panic attacks" and "nightmares" that endure to this day. *Id.* ¶¶ 13-14. He also "began to drink a lot more" to "cope with [his] depression and self-medicate," and was "told by a doctor that [he] likely had severe . . . PTSD," all of which "exacerbate[ed] [his] diabetes and high blood pressure conditions." *Id.* ¶¶ 15-16, 19. Mello Sr.'s "relationships were inevitably impacted," as the attack "created a lot of strain on [his] marriage" and made it "hard to be fully present with [his] family." *Id.* ¶ 17.

Mello Sr. received a 70% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 20.

Three of Mello Sr.'s family members—his son, Wayne Mello Jr.; his wife, Rose Marie Mello; and his son, Anthony Mello—are also plaintiffs in this case.

Mello Sr.'s son, Wayne Mello Jr., learned of the attack by "[s]eeing the destruction on television." Decl. of Wayne Mello Jr. ("Mello Jr. Decl.") ¶ 8, ECF No. 29-16 at 1. He was "terrified" and he spent "nerve-racking" hours feeling "helpless" until he "got word" that his father had survived. *Id.* ¶¶ 8-10. His mother was "completely overwhelmed" and his younger brother was "stressed," so as the oldest son, Mello Jr. felt he had to "step up and take control of everything." *Id.* ¶ 9. When Mello Sr. returned, Mello Jr. realized "[t]he man who came home was not the same dad who left." *Id.* ¶ 12. Before the attack, his father "was a big part of [his] life and very involved with everything [he] did," including by serving as his "sports coach," "cub scout dad," and "junior firefighter instructor." *Id.* ¶ 6. After the bombing, however, his father became "uncomfortable and jumpy," "bottle[d] up" his feelings, and was so "anxious about any possible dangers" that he was unable to travel. *Id.* ¶¶ 12-13. Mello Jr. "felt like [he] couldn't approach him about problems" and that he "los[t] the relationship [he] had previously with [his] dad." *Id.* The attack also forced Mello Sr. to leave the military, giving up "a very successful career" and prompting the family's move to Las Vegas "so he could get a civilian job." *Id.* ¶ 14. As a result, Mello Jr. abandoned his plans to attend college away from home so he could remain nearby and "help [his] family adjust." *Id.* Mello Jr. has "deal[t] with anxiety ever since the attack," experienced "many sleepless nights," struggles with "loud noises and crowds," and continues to be emotionally affected by anniversaries and reminders of the attack nearly thirty years later. *Id.* ¶¶ 15-17.

Mello Sr.'s wife, Rose Marie Mello, learned of the Khobar Towers bombing when her father called and told her to turn on the television because "something had happened." Decl. of Rose Marie Mello ("R. Mello Decl.") ¶ 8, ECF No. 29-16 at 6. Seeing the news, she was "shocked" and "desperately worried" because she knew her husband "would be right in the middle of things." *Id.* She spent the day "incredibly worried and anxious" until she learned her husband had survived. *Id.* ¶¶ 9-10. Before the attack, Rose and Mello Sr. "had been happily married" and Mello Sr. "was very caring and was always involved with [their] family." *Id.* ¶¶ 6-7. After the bombing, however, he returned home "very sullen and quiet," "constantly anxious," "depressed," "more reserved," and "no longer himself around [their] family." *Id.* ¶¶ 13-14. Mello Sr.'s struggles with "PTSD" required the family's lives to "change[] to accommodate everything he was going through." *Id.* ¶ 14. The attack also took "an emotional toll on [Rose]," who "fell into a depression," required therapy and "antidepressants and anxiety medication" that she continues to take, and struggled with the strain the attack placed on her marriage because Mello Sr. was "often moody," could not "ask for help," and "would sometimes get very angry." *Id.* ¶¶ 16-17. She continues to encounter daily reminders of the bombing, which leave her angry over how it changed "not just [her] husband's life, but [hers] and [her] children's." *Id.* ¶ 18.

Mello Sr.'s son, Anthony Mello, learned of the attack when he was told he "needed to go home immediately" from a friend's house then "saw images on the television of the Khobar Towers complex engulfed in smoke." Decl. of Anthony Mello ("A. Mello Decl.") ¶ 7, ECF No. 29-16 at 9. He felt "[f]ear and anguish" as his family "had no way of knowing if [his] dad was inside that building or if he had been hurt." *Id.* ¶¶ 7-8. Although he later learned his father was alive, Anthony's "anxiety and overwhelming emotions wouldn't go away" until he saw him safely home. *Id.* ¶ 10. Before the attack, his father "was always an active part of [his] life," "was very involved,"

and "was the one person [Anthony] could count on to have [his] back." *Id.* ¶ 6. After the bombing, however, Anthony was told to avoid "loud noises" and "sneaking up on dad," and "to always make sure to announce [himself] before walking into the room" to accommodate Mello Sr.'s PTSD, which left Anthony feeling that he "couldn't just be [himself]" around his father. *Id.* ¶ 11. Anthony found his father "frustrated and angry," and watched them gradually "grow[] apart" until he felt "the attack took away the affectionate and caring dad [he] used to have." *Id.* ¶¶ 11-14. Anthony developed "a lot of anxiety," anger, "sleepless nights," "nightmares," and a habit of "bottl[ing] up" his emotions. *Id.* ¶¶ 14-16. He continues to experience anger and frustration over the lasting impact the attack had on his family and the loss of "the relationship that [he] once had with [his] father." *Id.* ¶¶ 17-18.

**15. Servicemember Michael David Morelock**

On June 25, 1996, Michael David Morelock was serving as a Captain in the U.S. Air Force and deployed to Dhahran, Saudi Arabia. Decl. of Michael David Morelock ("Morelock Decl.") ¶¶ 2, 4, ECF No. 29-17 at 1. At the time of the attack, he was "relaxing" "inside Building 131" when "security forces" ordered an immediate evacuation after discovering a suspicious truck outside. *Id.* ¶ 7. He alerted his roommates and neighbors, "began to make [his] way out of the building," then "felt the blast" while in the stairwell. *Id.* "The explosion felt like a concrete balloon bursting" with "intense" pressure, then Morelock lost consciousness and awoke in "complete darkness," "choking on dust" beneath the rubble. *Id.* ¶ 8. Despite suffering "a head injury that was bleeding heavily," he searched for and assisted injured comrades "on [his] hands and knees." *Id.* Morelock later "received medical attention," was released from the hospital the following day, and "was then assigned to fly the deceased" to Dover Air Force Base for repatriation. *Id.* ¶¶ 8, 10.

The attack left Morelock with physical and psychological injuries for which he received the Purple Heart. *Id.* ¶ 11. He sustained "numerous lacerations from glass" causing "permanent scarring on [his] head, face, neck, and along the left side of the body," as well as "bruising, nerve damage," and "chronic" injuries affecting his "head, neck, ears, throat, teeth, sinuses, shoulders, knees, [and] back." *Id.* ¶ 11. Shrapnel "continued to work its way out of [his] skin for over a decade," and he continues to suffer "persistent headaches, ear pain, tinnitus, toothaches, . . . throat pain," "nerve damage," "restless leg syndrome," trouble sleeping, and multiple injuries requiring surgery. *Id.* ¶¶ 11-13. Morelock developed "PTSD" marked by "anxiety, flashbacks, and anger," as well as "depression," "night terrors," "thoughts of self-harm," and "alcohol abuse." *Id.* ¶¶ 14, 16-17. He withdrew from his family and declined an opportunity "to attend the Air Command and Staff College"—a decision that derailed his career. *Id.* ¶ 15. The "drastic shift in [his] personality after the attack" caused his wife to "file[] for divorce," and "[t]he constant strain of [their] failing marriage . . . negatively impacted each of [their] children" and their relationships with Morelock. *Id.* ¶ 18. The attack resulted in "immense cost[s]" for him, "including the loss of [his] family, [his] marriage, [his] dream to be a pilot, and [his] health," *id.* ¶ 20, and his continuing symptoms leave him feeling "exhausted, hopeless, worthless, and guilty," *id.* ¶ 19.

Morelock received a 70% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 17.

**16. Servicemember Frederick Antonio Robinson and Ten Family Members**

On June 25, 1996, Frederick Antonio Robinson was serving as a Munitions Specialist in the U.S. Air Force, deployed to Dhahran, Saudi Arabia. Decl. of Tomickca Denise Robinson as Representative of Frederick Antonio Robinson ("T. Robinson Decl.") ¶¶ 4, 7, ECF No. 29-18 at 1. Robinson passed away in 2022 and his wife, Tomickca Denise Robinson, seeks to serve as the

representative of his estate. *Id.* ¶¶ 2, 4-5. This representative's declaration attests that: Robinson "was lying in bed when the bomb exploded," "sen[ding] shockwaves through the building," shattering the windows, and throwing him "across his room and into the wall." *Id.* ¶ 10. He quickly regained his bearings, "started to evacuate while keeping an eye out for those who might need help in the rubble," witnessed servicemembers "running, some bleeding and others in a state of shock," "provid[ed] what assistance he could," and then "receiv[ed] medical attention" for his own injuries. *Id.* As a result of the attack, Robinson "sustained bruises and lacerations to his back, shoulder, knees, and feet," as well as "a head injury" that caused "chronic migraines," requiring ongoing medical monitoring. *Id.* ¶ 11. That head injury "disqualified" him from accepting a military assignment that would have allowed his family "to move back home to Mississippi." *Id.*

Following the bombing, Robinson became "more tense and vigilant," lost his previously "easygoing" demeanor, and developed "depression," "PTSD," "survivor's guilt," "relentless flashbacks," and "nightmares." *Id.* ¶¶ 12-13. His symptoms "became more pronounced" over time, leading his wife to worry "that he might harm himself" and prompting a "significant[]" increase in his drinking that resulted in a "drinking and driving" citation and loss of rank. *Id.* ¶¶ 14-15. Robinson's "marriage also struggled after the attack" as he was "prone to emotional spirals or sudden anger" and "had a lot of trouble communicating." *Id.* ¶ 16. Even after "more than 20 years reliving the trauma," the attack "affected every part of his life." *Id.* ¶ 18.

Robinson received a 70% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 14.

Ten of Robinson's family members—his parents, Ula G. Evans and Nathaniel Robinson, who are both deceased; his son, Marquell Demetrae Robinson; and his siblings, Tonya Rena Boone, Pamela Denise Bradley, who is deceased, Kawam Mwangi Evans, Cedric Camino

Robinson, Osa Lee Robinson, Sidney Garcia Robinson, who is deceased, and Chandra Lynn Wheaton, who is deceased—are also plaintiffs in this lawsuit.

Robinson's mother, Ula G. Evans, passed away in 2013, and her daughter, Tonya Rena Boone, seeks to serve as the representative of her estate. Decl. of Tonya Rena Boone as Representative of Ula G. Evans ("Boone First Decl.") ¶¶ 2, 6, ECF No. 29-18 at 5. This representative's declaration attests that: Ula learned of the attack from Robinson's wife, Tomickca, who informed her that he was injured but alive. *Id.* ¶ 10. Before the attack, Ula and Robinson's relationship "was the best that it had ever been," speaking "frequently" and often going "out to eat" or "shopping" together. *Id.* ¶ 9. As the mother of three children serving in the military, the bombing "shook her deeply," causing "severe anxiety," overwhelming worry, and a need for "constant reassurance about [her children's] safety." *Id.* ¶ 11. When Robinson "became very withdrawn" and "did not let [Ula] in," "the closeness they once shared was replaced by a sense of loss and discomfort." *Id.* ¶¶ 12-13. The "stress from the attack took a major toll on [Ula's] health," contributing to "high blood pressure," "diabetes," and "high cholesterol," making it "harder for her to function at work" and "dampen[ing] the joy she should have experienced in life." *Id.* ¶ 14. Even at the time of her death in 2013, Ula "was still struggling with feelings of confusion and heartbreak over her relationship with [Robinson]." *Id.* ¶ 15.

Robinson's father, Nathaniel Robinson, passed away in 2017 and his wife, Linda Ruth Robinson, seeks to serve as the representative of his estate. Decl. of Linda Ruth Robinson as Representative of Nathaniel Robinson ("L. Robinson Decl.") ¶¶ 2, 4-5, ECF No. 29-18 at 8. This representative's declaration attests that: Nathaniel learned of the attack when he watched the news with his family and was "visibly devastated," "pacing the halls of the house in tears" and "anxiously awaiting any news" about whether Robinson had survived. *Id.* ¶ 10. When Nathaniel

and Robinson reunited in person "several weeks" later, Nathaniel "could immediately see the physical and emotional toll [the attack] had taken," observing that his son was "shaken" and "very withdrawn." *Id.* ¶ 11. Before the bombing, Nathaniel and Robinson shared the relationship "of a loving father and son," "spen[ding] a lot of time together," and "speak[ing] regularly, even while [Robinson] was away on deployment." *Id.* ¶¶ 8-9. After the attack, however, Robinson "spent less time around the family, so Nathaniel saw less of his son" and consequently "struggled with anxiety and a general sense of increased fear," as well as "frequent nightmares." *Id.* ¶¶ 12-13, 15. The attack "directly affected [Nathaniel's] ability to fulfill his mission" as a pastor, as he was less able to help his congregants through "the hurt and sadness he was feeling himself." *Id.* ¶ 14. His "health deteriorated quickly" in the years after the attack, with issues including "a heart attack," "colon cancer," "prostate cancer," "diabetes," and "immune system issues." *Id.* ¶ 16. Until his death in 2017, Nathaniel continued to think about the attack "every day." *Id.* ¶ 17.

Robinson's son, Marquell Demetrae Robinson, was "approximately one and a half years old when [his] father was injured in the Khobar Towers attack," but its "repercussions have stayed with [him] throughout [his] life and have permanently altered [his] relationships." Decl. of Marquell Demetrae Robinson ("M. Robinson Decl.") ¶¶ 4, 6, ECF No. 29-18 at 11. As a child, he "could sense how much [his] dad was struggling" and "that hurt [him] too." *Id.* ¶ 7. He frequently awoke to Robinson "shouting during his nightmares," an experience that was "always scary," particularly because "[n]o one ever addressed it or explained why it was happening." *Id.* ¶ 8. Robinson remained "emotionally unavailable" and was "often away" because he volunteered for deployments, during which Marquell "had nightmares" and "was always scared something really bad would happen to [his] father again." *Id.* ¶ 9. Unlike the relationships he observed between his friends and their fathers, Marquell's relationship with Robinson was "more transactional and

reserved," and they "could never really speak about anything too deep or too personal." *Id.* ¶¶ 10-11. Robinson's PTSD "negatively impacted" Marquell's "emotional development," making it "hard" to be "vulnerable or express[] emotion" and "more difficult . . . to form and maintain close relationships." *Id.* ¶ 12. Amid these struggles, Marquell had to "step up and try to provide some emotional support for other family members" due to his father's emotional unavailability. *Id.* ¶ 13. After enlisting in the military at his father's urging, he was "formally diagnosed with depression" but " did not feel like [he] could go to [his] father for support," and he attributes his difficulties "succeed[ing] in the military" and navigating "life's challenges" to the "lack of a strong emotional foundation with [his] father." *Id.* ¶ 14. The attack "negatively shaped [Marquell's] life and [his] relationships—with [his] father, and with others close to [him]." *Id.* ¶ 16.

Robinson's sister, Tonya Rena Boone, was a member of the U.S. Air Force and was stationed at Langley Air Force Base when she learned from her family that Robinson "had been in a terrorist attack." Decl. of Tonya Rena Boone ("Boone Second Decl.") ¶¶ 8-9, ECF No. 29-18 at 15-16. She was immediately overwhelmed with "shock, disbelief, and confusion." *Id.* ¶ 9. Tonya and Robinson "spent a lot of time together as children," both joined the Air Force after high school, and developed an "even stronger" bond while "stationed together in Korea." *Id.* ¶¶ 6-8. After the attack, however, Robinson was "stoic," "reserved," and "withdrawn in a way that [Tonya] hadn't seen before." *Id.* ¶ 11. He "became less social and more distant," even keeping his cancer diagnosis from Tonya, who "blame[s] the attack for destroying the close bond [they] once shared." *Id.* ¶ 12. The attack also caused Tonya to become "extremely anxious, paranoid, and hypervigilant," "gain an unhealthy amount of weight and a high blood pressure diagnosis," and "gr[ow] more suspicious" and "quick to anger." *Id.* ¶ 13. Tonya's career in the Air Force "changed after the attack" because she "never volunteered for deployments again" to avoid "the possibility

of violence and loss." *Id.* ¶ 14. She continues to be "reminded of the attack and its lasting effects" on her family. *Id.* ¶ 15.

Robinson's sister, Pamela Denise Bradley, passed away in 2006 and her daughter, Breana Ne'Cole Cunningham, seeks to serve as the representative of her estate. Decl. of Breana Ne'Cole Cunningham as Representative of Pamela Denise Bradley ("Cunningham Decl.") ¶¶ 2, 5, ECF No. 29-18 at 19. This representative's declaration attests that: Pamela "was in complete shock" when "the attack was reported on the news" and "she realized that [Robinson] was deployed there." *Id.* ¶ 10. She remained "incredibly anxious and physically stressed" until she learned that her brother had survived. *Id.* Before the attack, Pamela and Robinson "had a strong relationship" and "special connection," speaking on the phone "at least twice a week," with Robinson providing both emotional encouragement and financial assistance while Pamela was pregnant and completing her teaching degree. *Id.* ¶¶ 8-9. However, "[Robinson] changed dramatically after the attack," becoming "very closed off," unresponsive to Pamela's attempts "to reach out to him," and no longer willing to provide "financial support." *Id.* ¶ 11. Pamela "remained anxious for the rest of her life as a result of the attack," "suffered from severe depression," "went through a dark period of alcohol abuse," and dealt with persistent "[n]ightmares." *Id.* ¶ 12. She developed "physical manifestations from chronic stress and anxiety, including high blood pressure and continued heart problems." *Id.* ¶ 13. Pamela died at the age of thirty-three after "the attack took from her one of her most cherished relationships." *Id.* ¶ 14.

Robinson's brother, Kawam Mwangi Evans learned of the attack when he was at home with his parents watching the news, and he "remember[s] holding [his] breath" as he prayed that his brother would survive and return home "healthy and the same person he was before." Decl. of Kawam Mwangi Evans ("Evans Decl.") ¶ 7, ECF No. 29-18 at 22-23. Before the attack, Robinson

was Kawam's "idol" and "always made time to talk to [Kawam]" even after he "left to join the Air Force." *Id.* ¶¶ 5-6. When Kawam finally saw Robinson after the attack, he "noticed immediately" that Robinson was not the "outgoing, fun, generous, artistic, and creative older brother" he once had been but was instead "reserved," "constantly worried," "stoic," and, at times, "dark and paranoid." *Id.* ¶¶ 9-10. Over the years, Robinson remained burdened by "depression" and "generally avoided speaking about [the attack]," leaving Kawam to "suffer from anxiety each time [Robinson] went on another mission overseas" because he felt unable to support him. *Id.* ¶¶ 10-11. Witnessing Robinson's transformation caused Kawam to experience lasting "anger," "confusion," "paranoias," and "insecurity" leaving him "feeling detached from [his] family." *Id.* ¶12. Kawam "felt like [his] brother had been taken from [him]" and believes that, if not for the bombing, they would have "maintained the close bond that [they] cultivated as children." *Id.* ¶¶ 12-13.

Robinson's brother, Cedric Camino Robinson "was at work when [he] saw the news report" about the attack and immediately called his father in "shock[]," recognizing from the sound of his father's voice that they were equally "scared." Decl. of Cedric Camino Robinson ("C. Robinson Decl.") ¶ 8, ECF No. 29-18 at 25. While waiting several days for news, Cedric felt "physically sick" as his "mind raced with worry" that Robinson had been injured or killed. *Id.* Before the attack, Cedric and Robinson "were not only brothers, but best friends," keeping "in close contact" even when Robinson joined the military. *Id.* ¶¶ 6-7. When Cedric finally spoke with Robinson on the phone, he noticed "[r]ight away" that he was "very guarded and reserved," and when they reunited in person "nearly a year" later, "it was clear to [him] that something was seriously wrong." *Id.* ¶ 9. Robinson "became very withdrawn," came home "less frequently," and stopped "hunting, something he had always enjoyed and that [they] had loved doing together." *Id.* ¶ 10. As a result, Cedric saw Robinson only during "rare visits" and the brothers' conversations that made clear

"[they] were no longer as close as [they] once had been." *Id.* ¶ 10. The attack also "affected [Cedric] emotionally," causing him to become "angry" and "restless," "struggle[] with insomnia" that impacted "[his] ability to do [his] job," "drink[] more heavily," and experience "ongoing anxiety" and sensitivity to loud noises. *Id.* ¶ 12. Cedric continues to experience a "sense of loss and loneliness" as a result of the attack, and his family "ha[s] never really healed from the pain and stress that day brought into [their] lives." *Id.* ¶ 13.

Robinson's brother, Osa Lee Robinson, had a "very close" relationship with Robinson prior to the attack, "usually talking [to him] every other day" during adulthood and "spen[ding] as much time . . . as possible" with him during in-person visits. Decl. of Osa Lee Robinson ("O. Robinson Decl.") ¶ 5, ECF No. 29-18 at 28. When Robinson returned home after the attack, Osa "felt a shift in [Robinson] . . . as he became distant" and their "almost constant communications were drastically diminished." *Id.* ¶ 6. Even when Robinson was diagnosed with cancer, he "never overcame his need to suffer his struggles alone without the support of those closest to him." *Id.* ¶ 7. Osa "had to fill th[e] role" of father to Robinson's children because Robinson "struggled to be open and honest with them emotionally." *Id.* ¶ 8. Robinson's "emotional distance" also caused "the relationships among all of [his] siblings" to "gr[ow] less close and less open and connected." *Id.* After Robinson's death, Osa continues to "think of the attack every single day," feeling "mad at [himself] for not doing more to be there for [Robinson]" and "partly responsible for what he went through." *Id.* ¶¶ 9-10.

Robinson's brother, Sidney Garcia Robinson, passed away by suicide in 2007 and his mother, Linda Ruth Robinson, seeks to serve as the representative of his estate. Decl. of Linda Ruth Robinson as Representative of Sidney Garcia Robinson ("L. Robinson Second Decl.") ¶¶ 2, 5, ECF No. 29-18 at 31. This representative's declaration attests that: Sidney was at school when

his family "heard about the bombing on the news," and his father picked him up so they "could be together as a family while [they] waited for updates about [Robinson]." *Id.* ¶ 10. Sidney was "nervous and distraught" and remained "on pins and needles" until the family learned several days later that Robinson had survived. *Id.* ¶¶ 10-11. Sidney and Robinson "had a loving, brotherly relationship before the attack," and Sidney looked up to Robinson as his "role model and inspiration" with the "dream" to "join the military one day like [his brother]." *Id.* ¶¶ 8-9. After the attack, "Sidney did not want to leave [Robinson's] side," but Robinson "began to pull away" and was "withdrawn and distant from [Sidney]." *Id.* ¶ 12. The brothers stopped doing "activities" together, leaving Sidney unable to understand why "the relationship between them had changed." *Id.* ¶ 12. As a result, Sidney developed mental health struggles that ultimately "led to Sidney eventually taking his own life." *Id.* ¶ 13. Sidney "suffered from severe depression following the attack," becoming "withdrawn" and "socially isolated," and he "developed an intense temper," angered by "what he perceived to be the loss of his brother and confidant." *Id.* ¶¶ 14-15. He also struggled with "abandonment issues" and "panic attacks," and he was "deeply worried that a similar attack could happen again." *Id.* ¶¶ 16-19. Sidney "gave up his lifelong dream of joining the military service" and "took his own life at the age of 25." *Id.* ¶¶ 20-21. His mother "believe[s] that Sidney would still be here if not for the Khobar Towers attack." *Id.* ¶ 21.

Robinson's sister, Chandra Lynn Wheaton passed away in 2026 and her son, Zaccheus Roshad Barlow, seeks to serve as the representative of her estate. Decl. of Zaccheus Roshad Barlow as Representative of Chandra Lynn Wheaton ("Barlow Decl.") ¶¶ 2, 5, ECF No. 29-18 at 35. This representative's declaration attests that: Chandra "was working as an assistant teacher at a school when she saw the news flashes on the television reporting a bombing at a U.S. Air Force housing complex in Saudi Arabia." *Id.* ¶ 10. She felt "shock[ed]" and "numb" when she

later learned from Robinson's wife that her brother lived in the targeted building and could not be reached. *Id.* Before the attack, "Chandra's relationship with [Robinson] was very special to her" and "they were always very close," staying in touch when he joined the military "by writing letters and speaking on the phone." *Id.* ¶¶ 8-9. After the attack, Chandra found it hard to see Robinson "appear[ing] weighed down and depressed" and noticed that he became "withdrawn and isolated from [their] family." *Id.* ¶¶ 11-12. Over a decade later, Robinson "finally opened up to Chandra" about his PTSD symptoms and that "doctors [had] found a tumor in his head," leaving Chandra feeling unsure of "how to help him." *Id.* ¶ 12. The attack left Chandra with chronic stress, "trouble sleeping," "frequent nightmares," "anxiety," and "depression." *Id.* ¶¶ 13-14. Her emotional troubles caused her grades to drop, forced her to withdraw from her teaching program, and contributed to her "us[ing] food to alleviate the stress" and "gain[ing] over 200 pounds." *Id.* ¶¶ 14-15. Although she and Robinson attempted to rebuild their relationship before their deaths, "Chandra felt things were never truly the same" after the Khobar Towers attack. *Id.* ¶ 16.

**17. Servicemember Christopher Howard Romero and Two Family Members**

On June 25, 1996, Christopher Howard Romero was serving as a Crew Chief/AERO Repair Technician in the U.S. Armed Forces, deployed to Dhahran, Saudi Arabia. Decl. of Christopher Howard Romero ("Romero First Decl.") ¶¶ 2, 4, ECF No. 29-19 at 1. While "sitting in the day room with some coworkers" waiting to begin his shift, he "saw a bright flash" before "the glass door exploded inward with tremendous force and knocked [him] backward." *Id.* ¶ 6. The blast left him "stunned and disoriented," and he fell while struggling to make his way across a floor "completely covered in glass." *Id.* After losing consciousness, he "eventually made [his] way into the hallway" and realized his ears were "ringing violently" and that he had sustained "a lot of cuts on [his] knees, face, and head," with glass shards embedded "in [his] skin around [his] body,

including "the largest piece of glass . . . lodged in the top of [his] head." *Id.* ¶¶ 6-7. Romero checked his sleeping quarters "to see if anyone was there" and "saw the door had been completely blown off its hinges" and there was "shattered glass all over [his] bed." *Id.* ¶ 7. When he reported for medical care, the line "was so long that [he] had to bandage his own cuts and apply pressure to stop the bleeding." *Id.* ¶ 8. He then volunteered in the triage area, where he witnessed "horrifying" scenes of "victims being carried in" covered in blood and "body bags that were brought out to be shipped back home." *Id.* Upon learning that close coworkers had been killed, Romero experienced "an overwhelming amount of guilt" because "[he] felt like [he] had failed them." *Id.*

Following the attack, Romero dealt with "profound and lasting emotional impacts," including "depression," "isolat[ion]," "crippling anxiety," "PTSD," and "nightmares." *Id.* ¶¶ 9-10. He was prescribed "anxiety medication," and "began drinking heavily" to deal with his "anxiety from normal daily situations." *Id.* ¶ 9. Many of his injuries continue to this day, as he still experiences nightmares, "occasionally find[s] small pieces" of glass embedded in his skin, and "continue[s] to hear the ringing in [his] ears." *Id.* ¶¶ 7, 10. The attack "severely affected" Romero's personal relationships, as he became "quick to anger" and "emotionally distant," ultimately contributing to the "deteriorat[ion]" of his marriage and his "relationship with [his] children." *Id.* ¶ 11. He also "withdrew from friendships" that he "previously cherished" and took "a step down" in his career because he "could not handle the pressure and anxiety that came with [his] old role" due to "the unresolved trauma [he] was dealing with after Khobar Towers." *Id.* ¶¶ 12-13. Romero continues to require counseling and believes "the attack permanently changed [his] life for the worse," explaining that "[he] lost the person [he] was before, and the person [he] had hoped to become." *Id.* ¶ 14.

Romero received a 100% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 9

Two of Romero's family members—his mother, Judith Ann Moya, who is deceased, and his stepfather, Thomas Leopold Moya—are also plaintiffs in this lawsuit.

Romero's mother, Judith Ann Moya, passed away in 2021 and Romero seeks to serve as the representative of her estate. Decl. of Christopher Howard Romero as Representative of Judith Ann Moya ("Romero Second Decl.") ¶¶ 3-4, ECF No. 29-19 at 5. This representative's declaration attests that: Judith was at home in California "watching the 11:00 p.m. news" with her husband when reports of the attack aired and she "immediately collapsed into [her husband's] arms and nearly passed out from shock." *Id.* ¶ 8. A "close" and devoted mother, she had spoken with her son "daily, either by phone or through letters" while he was deployed, and his inability to contact her for several days after the bombing left her "overwhelmed" and "panic[ked]." *Id.* ¶¶ 7, 9. She became "deeply distressed" after learning the extent of Romero's "serious injuries," including that glass shards remained embedded in his body, and she "wanted [him] to come home immediately and was frustrated that she could not protect [him]." *Id.* ¶ 10. In the years following the bombing, Judith suffered from "anxiety," "depression," and "constant fear that something could happen to [her son] again." *Id.* ¶ 11. She "experienced vivid nightmares," became "visibly depressed," and during his later deployments, often "could not speak to [him] on the phone because she would immediately start to cry." *Id.* Her emotional distress became so severe that "she regularly missed work or left early" and she "frequently asked [Romero] to . . . leave the Air Force" for "a safer career." *Id.* ¶¶ 11-12. The attack "permanently changed her emotional well-being and its negative effects remained with her for the rest of her life." *Id.* ¶ 13.

Romero's stepfather, Thomas Leopold Moya, learned of the attack while watching television with his wife, Judith, and seeing news reports announcing that the Khobar Towers housing complex had been attacked. Decl. of Thomas Leopold Moya ("Moya Decl.") ¶ 7, ECF No. 29-19 at 8. Knowing his stepson, Romero, was stationed there, "[Thomas's] heart immediately sank" and he "was terrified that [Romero] may not have survived." *Id.* Thomas spent the following days "watch[ing] the news closely" and enduring "constant stress" and "extreme anxiety" because there was "no way to advise or help [his] son." *Id.* ¶ 8. When Romero finally called to "let [them] know that he was alive," Thomas felt "overwhelming relief and gratitude," while wishing Romero could "come home immediately." *Id.* In subsequent months and years, Thomas lived in "constant fear that something could happen to [Romero]," feeling that "it was not a matter of if, but a matter of when." *Id.* ¶ 9. That fear manifested in recurring "nightmares" severe enough that Judith "would often wake [him] from [his] sleep," leaving him "angry and irritable due to the lack of sleep." *Id.* ¶ 10. Thomas became "depressed," "stopped enjoying activities" he once engaged in with Romero, "became less social," and "withdrew from . . . loved ones and friends." *Id.* ¶ 11. He also experienced lasting guilt because "[he] could not do more to help or protect [his] son" or "better support [Judith]," explaining that the "guilt stayed with [him] forever." *Id.* ¶ 12. Watching his wife's emotional suffering "added to [his] own emotional distress," and he found that the "same son [he] knew from before the attack" and with whom he "had such a close and communicative relationship . . . was just not there any more." *Id.* ¶¶ 14-15. Thomas's "anxiety never really ended" and the attack "deeply affected" his relationship with Judith "until she died." *Id.* ¶ 16.

**18. Servicemember Donald Wayne Rouse and One Family Member**

On June 25, 1996, Donald Wayne Rouse was serving as an Aircraft Loadmaster in the U.S. Air Force, deployed to Dhahran, Saudi Arabia. Decl. of Donald Wayne Rouse ("Rouse Decl.")

¶¶ 2, 4, ECF No. 29-20 at 1. On the night of the attack, Rouse had just left his napping roommate behind in Building 131, and was beginning a workout in the gym when he "heard a loud, unnatural sucking sound," witnessed "every bit of dust and debris lift[] into the air," and felt the blast "knock[] [him] backward and caus[e] [him] to hit [his] head." *Id.* ¶ 9. He was "completely disoriented, shocked, and confused," initially believing "a bomb had been placed inside the gym," before exiting to find "a mushroom cloud rising over [the] housing complex." *Id.* Outside, he encountered servicemembers with "large shards of glass embedded in their bodies," helped establish "triage stations," and "provided aid to people for the remainder of the night," including by "performing CPR" and tending to a "flight engineer[] [who] lost his ear in the blast." *Id.* ¶ 10. Later, after learning that "five members of [his] squadron were missing" and "[a]ll of [his] personal belongings had been destroyed or lost," Rouse was ordered to the morgue to identify the bodies of deceased fellow servicemembers, including the roommate he left behind. *Id.* ¶¶ 11-12.

Following the attack, Rouse suffered "a severe concussion from the blast," "frequent headaches, tinnitus, and back problems," requiring multiple surgeries. *Id.* ¶ 13. He continues to experience "constant ringing in [his] ears" that interferes with sleep, as well as regular headaches. *Id.* Rouse returned home "as a different person," consumed by "deep[] pain" and "guilt" over not waking his roommate before leaving for the gym. *Id.* ¶ 14. He continues to "experience[] nightmares almost every single night," remains in "a constant state of hypervigilance," and is easily startled by fireworks and other sudden loud noises. *Id.* ¶ 15. In the wake of the bombing, he became "blunt," "withdrawn," "anxious," and "quickly angered," and he "began drinking heavily" to "suppress intrusive memories, emotional pain, and guilt." *Id.* ¶¶ 16-17. His relationships with his family deteriorated as he "began to withdraw" and his "fellow service members began to distance themselves" while he struggled with "persistent suicidal thoughts." *Id.*

¶¶ 18-19. Rouse's "excessive drinking was a major contributing factor in the eventual breakdown of [his] marriage," and the "increasingly unbearable" nature of future deployments "overshadowed" the joys of parenting two young sons. *Id.* ¶¶ 19-22. As a result, his relationship with his children became "strained," causing him to feel like "the terrorists literally took [him] away from [his] family and [his] family away from [him]." *Id.* ¶ 23. Rouse abandoned hobbies he "once loved," attempted suicide twice, and has been diagnosed with severe PTSD. *Id.* ¶¶ 24-25. He continues to "require an emotional support animal to function" in daily life and mourns "the life [he] once had and the person [he] once was." *Id.* ¶¶ 25-26.

Rouse received a 100% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 25.

One of Rouse's family members—his ex-wife, Eileen Patricia Casey—is also a plaintiff in this lawsuit. Eileen learned of the attack when she returned from walking her dog to a voicemail on the answering machine from the wife of Rouse's coworker sharing that Rouse "was alive." Decl. of Eileen Patricia Casey ("Casey Decl.") ¶ 7, ECF No. 29-20 at 8. She "immediately turned on the news," and shortly afterwards, "members of the squadron" and a physician came to her home to "check on [her] after all the shock and stress." *Id.* ¶¶ 7-8. Eileen spent the next five hours "in agony," before Rouse called. *Id.* ¶ 9. In the days that followed, she "was not sleeping" and "remained in a constant state of fear, shock, and emotional strain, just wanting [her] husband back." *Id.* ¶ 10. Before the attack, Eileen and Rouse's "life together [had] felt like a fairytale" and they endeavored to "spend as much time together as possible," often "hosting friends and members of the squadron at [their] home." *Id.* ¶ 6. After Rouse's return, however, Eileen's "sense of control disappeared" and she lived in fear that he would not come home from future assignments, keeping "a black funeral dress prepared" in case there was more bad news. *Id.* ¶ 12. Rouse's trauma "led

to [his] escalating alcohol abuse, anger, and emotional instability" that "ultimately destroyed [their] marriage." *Id.* ¶ 15. Meanwhile, Eileen withdrew from family and friends because Rouse "had little tolerance for being around others and often became angry" and she did not "want [them] to see [her] husband in that condition." *Id.* ¶ 16. After Rouse, while intoxicated, allowed their son to "hold one of his rifles," which then discharged inside their home, and later "threatened to kill himself," Eileen fled with their children, feeling "trapped and helpless," and concluded "that incident marked the end of [their] marriage." *Id.* ¶¶ 17-18. Without her marriage, Eileen felt "emotionally gutted," lost "joy, [her] sense of purpose, and [her] ability to feel connected to life," and "struggle[d] with sleep issues, anxiety, and depression." *Id.* ¶ 19. Even today, she struggles to "re-engage with loved ones" and believes that "marriage became associated with fear, instability, and emotional exhaustion." *Id.* ¶ 20.

**19. Servicemember Roy Edgar Smith**

On June 25, 1996, Roy Edgar Smith was serving as a Flight Surgeon with the U.S. Air Force, deployed to Dhahran, Saudi Arabia. Decl. of Roy Edgar Smith ("Smith Decl.") ¶¶ 2, 4, ECF No. 29-21 at 1. On the night of the attack, Smith "had gone to bed early" and was "in a deep sleep" when the explosion "suddenly shook" the building. *Id.* ¶ 8. He awoke "in shock," ran with his roommates down to the clinic, and "snapped into action" treating the overwhelming number of casualties "pouring in from all over the city." *Id.* ¶¶ 8-9. Smith "worked for about 24 hours straight" in a makeshift clinic in the dining area, "triag[ing] the life-threatening injuries" and caring for "about 500 patients" until "the last person needing medical attention was treated." *Id.* ¶¶ 9-10. He then "spent the next several hours sorting through body parts and grouping them together into body bags for forensics," and with "only a few hours" of sleep, spent the following days "attempting to locate all the injured people [they] had sent out in the ambulances." *Id.* ¶¶ 10-11.

Once the immediate crisis subsided, "[d]epression set in quickly" and he felt "deeply traumatized by what [he] had seen"—a feeling that "has never left [him]." *Id.* ¶ 11.

Following the attack, Smith struggled with "[d]epression," "survivor's guilt," "PTSD," and intensifying "anxiety," which "manifest[ed] as restlessness, difficulty connecting with others," inability to remain present, and "paranoi[a]." *Id.* ¶¶ 11-12. Feeling unable to "seek medical care or diagnosis while on active duty because [he] did not want to jeopardize [his] career," Smith "used alcohol to cope and suppress [his] trauma," eventually developing "uncontrolled alcoholism." *Id.* ¶ 13. The attack also caused him to "distance [him]self from the people closest to [him]," including his children, wife, and mother, which led to his "eventual divorce" and "strain[s] on [his] relationships [that] continue[] to this day." *Id.* ¶ 14. The "emotional and psychological toll [of] the attack" prompted Smith him to leave active duty earlier than expected, which required "forfeit[ing] . . . substantial retirement benefits," and his "ongoing struggles" required periods of residential inpatient treatment, resulting in "significant financial losses" and "roughly $250,000 in debt." *Id.* ¶ 15. He states that "the psychological, emotional, and financial consequences" of the attack "shaped the course of [his] life ever since." *Id.* ¶ 17.

Smith received a 70% disability rating from the U.S. Department of Veterans Affairs. *Id.*

**20. Servicemember Jeffery Dean Spivey and One Family Member**

On June 25, 1996, Jeffery Dean Spivey was serving as an Air Force Airman Staff Sergeant, deployed to Dhahran, Saudi Arabia. Decl. of Jeffery Dean Spivey ("Spivey Decl.") ¶¶ 2, 4, ECF No. 29-22 at 1. On the night of the attack, Spivey was preparing to leave his dormitory to "head to the recreation center" when he "suddenly felt a deep rumble—like an earthquake—followed by the entire building violently rocking." *Id.* ¶ 7. The force of the explosion threw him onto his bed "as if someone had physically lifted and tossed [him]," and, after "scrambl[ing] to [his] feet," he

twisted both ankles while fleeing the building. *Id.* Outside, he saw a "thick cloud of smoke," was "overcome with panic," and froze, believing "[he] was going to die." *Id.* He eventually "ran to the middle of the compound," where "everywhere [he] turned there was chaos, debris, screaming, confusion, and fear." *Id.* ¶ 8.

Following the attack, Spivey suffered from "tinnitus, chronic pain from a serious ankle injury, and asthma from the dust and debris during the bombing." *Id.* ¶ 10. He also developed "nightmares, depression, survivors' guilt, and trouble sleeping," as well as PTSD symptoms. *Id.* ¶¶ 11, 14. Spivey's "relationships also suffered," as he "started visiting [his] family much less often," "was never able to develop a strong relationship with [his] daughter," and lost the outgoing personality that had once made him the "life of the party." *Id.* ¶ 15. He became "more negative, irritable, and quicker to anger," "often f[ell] into periods of depression," and lost the ability to "be in crowds without feeling anxious." *Id.* ¶¶ 15-17. The "emotional and psychological effects of the attack have been long-lasting and continue to impact every area of [his] life." *Id.* ¶ 17.

Spivey has been given a 100% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 14.

One of Spivey's family members—his daughter, Jalissa Denise Spivey—is also a plaintiff in this lawsuit. Jalissa was only two years old and living in Guam with her mother when the attack occurred, and that day "marked the beginning of a prolonged absence of [her] father from [her] life." Decl. of Jalissa Denise Spivey ("J. Spivey Decl.") ¶ 4, ECF No. 29-22 at 5. She was told that before the attack, her father had been "very happy" and "deeply involved" in her life, and her parents had successfully co-parented. *Id.* ¶ 5. After the bombing, however, her father "was no longer a consistent presence," and she was raised primarily by her mother, grandmother, and aunt. *Id.* ¶ 6. As a child, Jalissa "struggled with deep feelings of abandonment" and "resented" her

mother because she blamed her for Spivey's absence. *Id.* ¶¶ 6-7. Jalissa questioned whether her father "really loved or cared about [her]," believing she was "not enough" because he chose not to be involved in her life. *Id.* ¶ 7. Jalissa's contact with her father was limited to "birthdays and holidays," and her father repeatedly failed to keep promises to visit or send gifts. *Id.* ¶ 8. He "missed many important milestones in [Jalissa's] life," which, "even now," makes it "extremely hard" for her to trust people, including her siblings. *Id.* ¶¶ 9-10. The attack caused Jalissa to "struggle[] to find any sense of stability," and she "could never get a career going" due, in part, to "financial constraints" that she wished her father was willing to help ease. *Id.* ¶ 12. She became "convinced [she] could not rely on anyone" and "often sought father figures in romantic partners" to "fill the emotional void [her] father left behind." *Id.* ¶ 13. She also "struggled with sleep issues for much of [her] life" and developed "alcoholism," which "significantly strained [her] relationship with [her] mother" and "impacted [her] job performance." *Id.* ¶ 14. Jalissa believes that, if not for the attack, she "would have been more stable and successful," rather than spending much of her life in "survival mode due to a lack of guidance and unresolved trauma." *Id.* ¶ 16.

**21. Servicemember Timothy Paul Stehley and Four Family Members**

On June 25, 1996, Timothy Paul Stehley was a Senior Airman (E-4) in the U.S. Air Force serving in Dhahran, Saudi Arabia. Decl. of Timothy Paul Stehley ("Stehley Decl.") ¶¶ 2, 4, ECF No. 29-23 at 1. He was watching a movie at his friends' apartment when "the ground start[ed] to shake," the glass doors "exploded into the room and shattered all over [him]," and he blacked out before awakening "wedged between the wall and the chair" and "bleeding from lacerations on [his] arms." *Id.* ¶ 9. He carried outside a woman in the neighboring apartment, who was "conscious but could not walk," "bandaged her arm," and "made sure she was okay." *Id.* ¶ 10. He then reported for duty and used his recently-earned EMT license to treat "hundreds of injured

people," including "one person with a severed femoral artery" who "did not survive" despite Stehley's efforts at CPR. *Id.* ¶¶ 10, 12. He then searched the damaged building for survivors and later spent hours "put[ting] the killed victims into body bags," including a young man with whom he had deployed. *Id.* ¶¶ 13-14. The gruesome scenes of "people missing limbs and heads" were "overwhelming and traumatizing," and he continues to experience "nightmares and visions" of the bodies he handled. *Id.* ¶ 14.

Following the attack, Stehley suffered "lacerations," "permanent loss of hearing in [his] left ear," and "permanent tinnitus" that "disrupts [his] daily life." *Id.* ¶¶ 15-16. He "did not sleep well" after the attack, experiencing "frequent nightmares" and soon receiving a PTSD diagnosis. *Id.* ¶¶ 17-18. He "started drinking heavily as a way to deal with the effects of his [PTSD]," eventually "becoming an alcoholic." *Id.* ¶ 19. He was "deemed non-deployable" and was "honorably discharged" with "a commendation medal with valor" in 1999, but Spivey left the military "feel[ing] useless." *Id.* ¶ 20. He experienced "nightmares" and "drank heavily" for many years after the attack. *Id.* ¶ 21. Stehley's alcoholism ultimately "led to [his] divorce from [his] first wife," damaged his relationships with his mother and sisters, "contributed to [his] coronary heart disease diagnosis," and forced his retirement as a civilian firefighter years earlier than planned. *Id.* ¶¶ 21-26.

The Department of Veterans Affairs gave Stehley a 100% disability rating. *Id.* ¶ 21.

Four of Stehley's family members—his mother, Patricia Karen Hermalik, and his sisters, Tabatha Ann Barr, Tanya Karen Harshberger, and Tammy Lee Stehley—are also plaintiffs in this lawsuit.

Stehley's mother, Patricia Karen Hermalik, learned of the attack when she was at work and Stehley's friend called to report that Stehley had survived an explosion at the residential buildings

on his base. Decl. of Patricia Karen Hermalik ("Hermalik Decl.") ¶ 8, ECF No. 29-23 at 7. Although relieved her son had survived, she was "extremely frightened and confused" and spent the following days "break[ing] down crying every day at work and at home," unable to focus because her mind was "constantly racing with fears about [her] son's wellbeing." *Id.* ¶¶ 8-9. When Stehley returned home, Patricia noticed "abrupt change[s]" in her son—he became "very stern," "began drinking a lot," which "quickly became a serious problem," and "started getting [physically] rough" and angry with Patricia and his sisters. *Id.* ¶¶ 10-14. She felt their relationship had "permanently changed" and she "often felt scared for [her] own safety" around her son before they "drifted apart." *Id.* ¶ 15. Years later, after learning that Stehley had suffered for decades with "PTSD," "recurring nightmares," and "panic attacks," she felt "heartbroken and helpless," wishing she could have done more to help him. *Id.* ¶ 16. The attack caused Patricia to "bec[ome] depressed," "dr[ink] every night," and grow more "absent" from her other children. *Id.* ¶¶ 17-18.

Stehley's sister, Tabatha Ann Barr, learned of the Khobar Towers attack when her mother "received a call that there was an attack at Khobar Towers" and that Stehley had survived. Decl. of Tabatha Ann Barr ("Barr Decl.") ¶ 9, ECF No. 29-23 at 12. In the weeks that followed, she felt "helpless and disoriented" because "he did not call, and [she] felt unsure about what to do." *Id.* ¶ 10. Before the attack, Tabatha's relationship with Stehley "was especially important to [her]"—he was her "role model" and they "spoke on the phone every few weeks"—and she did not "remember him drinking at all." *Id.* ¶¶ 7-8, 11. "The attack completely changed [Stehley]," however, as he "drank every day" and "would get overly physical, aggressive, and cruel towards [Tabatha], [their] mom, and [their] sisters." *Id.* ¶¶ 11-12. His "unpredictable and dangerous behavior continued for years after the attack," causing Tabatha to "resent[] him" for not helping to care for their mother after she "suffered a stroke" and instead "caus[ing] more harm than good"

when the family needed him most. *Id.* ¶ 14. The attack "ruined [Tabatha's] relationship with [her] brother," leaving her afraid to be around him, "nervous to approach him," and "depressed to think about the loss of [their] close relationship." *Id.* ¶ 15. Even when Tabatha developed PTSD herself, her brother "was not there for [her] . . . like he would have been before." *Id.* ¶ 16. The attack and Stehley remain "inextricably intertwined" in her mind, and she blames the attack for the feeling that "he is missing in [their] lives." *Id.* ¶ 18.

Stehley's sister, Tanya Karen Harshberger, learned of the Khobar Towers attack when she was at home with her husband and two children, and her mother called to tell her that there had been a bombing and Stehley had survived. Decl. of Tanya Karen Harshberger ("Harshberger Decl.") ¶ 9, ECF No. 29-23 at 16. Tanya "blocked out the moments afterwards" because she was "too shocked to process what was happening," and she remained in "a constant state of fear" until she reunited with Stehley several months later. *Id.* ¶¶ 9-10. The relief of seeing him alive quickly "dissipated," however, because she "could tell that the attack had changed him" from the "outgoing" and "lighthearted[]," brother she remembered to someone more "withdrawn" and "on edge." *Id.* ¶¶ 7, 10. Although their "relationship was wonderful" before the attack and they "would keep in touch" by "talk[ing] often on the phone," *id.* ¶¶ 6-8, that relationship "was never the same after the attack" and they "barely spoke," *id.* ¶ 11. The attack also caused Tanya to suffer years of "recurring nightmares," "insomnia," "depression," "guilt," and "bouts of intense anxiety," particularly when she was "around [her] brother." *Id.* ¶¶ 12-15. She further "lost [her] sense of positivity" and was not "the same silly and fun mom" to her children. *Id.* ¶ 14. Tanya continues to grieve the loss of her brother as he was before the attack and believes there has been "a missing place in [their] family" ever since. *Id.* ¶ 15.

Stehley's sister, Tammy Lee Stehley, learned of the attack in a phone call from her mother, who shared that there had been an explosion at Khobar Towers and that Stehley had survived. Decl. of Tammy Lee Stehley ("T. Stehley Decl.") ¶ 8, ECF No. 29-23 at 19. She was "very upset and shaken by the news," especially without "any more details" about "what happened to [her brother], how he was doing, or what he would be like when [she] finally saw him again." *Id.* When Stehley returned home a few months later, she found that "everything was different." *Id.* ¶ 9. Once an "outgoing and independent" brother who "[she] always knew [she] could talk to" and "stayed close" with while he was deployed, Stehley returned as someone who was "not pleasant to be around," was "very angry all the time," and would frequently "drink to the point of working himself into a rage." *Id.* ¶¶ 6-7, 9. With no one around to match his strength, he would often "put [Tammy] in a headlock, or pick [her] up and body slam [her] to the ground" or "get rough with [her] mom," leaving Tammy terrified to be around him. *Id.* ¶ 9. As a result, she "avoided being alone with him" and later "avoided bringing her [own] children around" because she feared he might become violent with them, too. *Id.* ¶ 10. The attack and Stehley's dramatic personality changes caused Tammy to "sink[] into a depression" and mourn the loss of "the brother [she] had before the attack" whom she "could talk to candidly" and "depend on." *Id.* ¶ 11. She also felt "guilty that she blamed [her brother] for the failures in [their] relationship" when she knew he was struggling with the "weight of his trauma from the attack." *Id.* Tammy continues to think about her brother "almost every day" and grieves "all that [they] lost" because of the attack. *Id.* ¶ 13.

**22. Servicemember Robert Morris Treadway Jr. and Four Family Members**

On June 25, 1996, Robert Morris Treadway Jr. was a deployed as a Flight Surgeon in the U.S. Air Force to Dhahran, Saudi Arabia. Decl. of Robert Morris Treadway Jr. ("Treadway Decl.")

¶ 4, ECF No. 29-24 at 1. He was sitting in his room "when, without warning," he heard a "loud, prolonged explosion." *Id.* ¶ 8. The blast caused the room to "dark[en] instantly," blew the windows inward, and sent "sharp shards of glass" into his chest and abdomen. *Id.* He was thrown to the floor and "immediately noticed problems with [his] hearing" and "intense[]" ringing in his ears," symptoms that he later learned were permanent. *Id.* ¶¶ 8, 13. Despite his injuries, Treadway "began searching for members of [his] squadron," "carried people down stairwells," and "cleared the building floor by floor" under continuing fears of additional attacks. *Id.* ¶ 9. He then transported the wounded to the medical facility, where he "realized that a lot of people were severely injured or already deceased." *Id.* ¶¶ 9-10. He and other flight surgeons "converted the commander's office into a temporary morgue and established a trauma area where [they] performed emergency procedures." *Id.* ¶ 10. Treadway worked "nonstop for more than twenty-four hours," assessing casualties, providing care, and directing those who did not survive "to the morgue," including "twelve members of [his] own squadron." *Id.* ¶¶ 11-12.

Following the attack, Treadway developed "persistent headaches," "anxiety around loud noises and crowded environments," "recurrent nightmares," "flashbacks," and difficulty sleeping. *Id.* ¶¶ 13, 16-17. He became "more volatile and prone to anger," struggled with "emotional regulation," and experienced strain in his marriage and family relationships because of his trauma. *Id.* ¶ 18. The attack also "dramatically altered [his] career trajectory," causing him, "at a professional cost," to abandon plans for "a long-term military career" despite strong promotion prospects. *Id.* ¶ 19. He continues to be "reminded of the attack every day," triggered by "certain sounds, smells, and songs" that transport him back to Khobar Towers, and he believes that, absent the attack, he "would carry less fear and anxiety, keep deeper friendships, and feel more comfortable in public spaces." *Id.* ¶¶ 20-21.

Treadway provided no disability rating from the U.S. Department of Veterans Affairs.

Four of Treadway's family members—his wife, Mary Thaggard Treadway; his mother, Janice Powers Treadway; his father, Robert Morris Treadway Sr., who is deceased; and his sister, Roberta Treadway Coats—are also plaintiffs in this lawsuit.

Treadway's wife, Mary Thaggard Treadway, was at work in a hospital and learned of the bombing when her father called to tell her that a military base in Saudi Arabia had been attacked. Decl. of Mary Thaggard Treadway ("M. Treadway Decl.") ¶ 8, ECF No. 29-24 at 7. The news left her "in shock" and feeling "frightened and helpless" with "no way to get additional information" about her then-fiancé's safety. *Id.* She spent "the longest and hardest hours of [her] life" without any information before receiving a call from one of Treadway's squadron members confirming only that he had survived. *Id.* ¶ 9. When Mary spoke with Treadway later that day, the conversation was brief but "emotionally overwhelming," and she "could not eat or sleep for weeks" until he came home. *Id.* ¶¶ 9-10. Once Treadway returned, Mary found him physically and emotionally changed—"thinner, exhausted, and drained"—and their relationship was permanently altered by his "irritab[ility]," "anger[]," "nightmares," "flashbacks," lower "patience threshold," and increased drinking. *Id.* ¶¶ 11-13. His unexpected redeployment the following year "brought back the same rush of emotions [Mary] experienced when [she] first learned of the Khobar Towers attack," and created additional strain in their early marriage. *Id.* ¶ 14. The attack also permanently changed their family life by limiting travel, prompting a "more rigid and cautious" approach to parenting, and making their communications "complicated and emotionally charged." *Id.* ¶¶ 15-16. Mary independently suffered from "pessimis[m]," increased "anxiety," and withdrawal from the people and activities she had once enjoyed. *Id.* ¶ 17.

Treadway's mother, Janice Powers Treadway, may be deceased, though the record is unclear as to this fact or the date of her death, but her son, Treadway, seeks to serve as her "representative . . . in this matter." Decl. of Robert Morris Treadway Jr. as Representative of Janice Powers Treadway ("Treadway Second Decl.") ¶ 2, ECF No. 29-24 at 11. This representative's declaration attests that: Janice was at home with her husband when she learned of the attack and immediately became "overwhelmed with fear and panic," because she did not know whether her son was alive or dead. *Id.* ¶ 9. She then spent several "unbearable" days "in a constant state of fear" until she heard from Treadway. *Id.* After the attack, Janice "became anxious and fearful in ways she never had before," experienced "persistent negative thoughts and flashbacks," and developed "ongoing difficulty sleeping." *Id.* ¶ 11. When Treadway "received a no-notice deployment" less than two years later, Janice experienced "even more stress and anxiety" and began to "argu[e] more frequently" with her husband as they "struggled to cope" with their uncertainty and emotions. *Id.* ¶ 12. As "[c]ommunication within [her] family became more strained," Janice "gradually withdrew from experiences she enjoyed," "socialized less," and lost her "sense of safety, peace, and stability." *Id.* ¶¶ 13-17.

Treadway's father, Robert Morris Treadway Sr., passed away in 2019 and his son, Treadway, seeks to represent his estate. Decl. of Robert Morris Treadway Jr. as Representative of Robert Morris Treadway Sr. ("Treadway Third Decl.") ¶¶ 2, 4, ECF No. 29-24 at 14. This representative's declaration attests that: Robert learned of the attack while at home with Janice, and his voice conveyed "fear and emotional strain" when he was able to speak to his son "several days later." *Id.* ¶ 8. The bombing "marked a clear shift" in Robert's relationship with his son and in Robert's "emotional state." *Id.* ¶ 10. He "developed persistent depression and anxiety," "struggl[ed] to get quality sleep," "experienc[ed] fear and panic related to the attack," became "less

active," "withdrew from many of the social activities he once enjoyed," and was no longer able to engage in "deeper conversations" with his son because they "often led to heightened anxiety by inevitably touching on the bombing or its aftermath." *Id.* ¶¶ 10-12. His "stress intensified" when Treadway was deployed again and unable to "tell [his] family where [he] was going or what [he] would be doing," leading to "tension" in Robert and Janice's marriage. *Id.* ¶ 11. Robert "noticeably gain[ed] weight" as "a result of being overwhelmed and depressed," and no longer "diligent[ly]" managed his diabetes. *Id.* ¶ 13. He "lived with the lasting effects of the attack for the remainder of his life," including harm to his relationship with his son. *Id.* ¶ 14.

Treadway's sister, Roberta Treadway Coats, was at the gym when she saw news of the Khobar Towers attack on television. Decl. of Roberta Treadway Coats ("Coats Decl.") ¶ 8, ECF No. 29-24 at 17-18. Her "heart dropped" when she realized the report appeared to involve "the area where [her] brother was stationed," and she rushed to contact her family. *Id.* As she waited to hear "whether [Treadway] was alive or dead," she "felt physically sick," "could not eat," "barely slept," and "had vivid nightmares." *Id.* ¶¶ 9-10. Even after she learned he was alive, Roberta "could not relax" and was "terrified that another attack could happen at any moment." *Id.* ¶ 11. When she finally spoke with Treadway several days later, his "deeply saddened and demoralized" voice and his description of losing friends and patients "broke [her] heart," leaving her unable to work for approximately two weeks because "fatigue and emotional strain made it difficult to function." *Id.* ¶ 12. Watching as "[f]amilies met the caskets" of deceased servicemembers, while waiting for the "plane carrying survivors" to arrive, was "devastating" to Roberta and "made it painfully clear how close [she] came to losing [her] brother." *Id.* ¶ 13. Although Roberta and Treadway were "exceptionally close" as children and "spoke or at least emailed each other" often while he was in the military, the attack and its impacts on Treadway

"created a distance between [them] and affected [their] closeness." *Id.* ¶¶ 6-7, 14. She "sensed [herself] spiraling back into a dark place" when Treadway was ordered deployed again the following year, fearing that he may not "come home safely." *Id.* ¶ 15. Following the attack, she "began to have a recurring nightmare" that endures "even today," "struggled with intense anxiety and daily feelings of panic," "developed a deep fear of crowds," "became hyper-vigilant," and stopped "traveling" and "watching the news." *Id.* ¶¶ 16-17. Her "mental health struggles" may have "also contributed to [her] fertility problems," including "more than ten" miscarriages and multiple rounds of IVF before she successfully gave birth. *Id.* ¶ 20. The attack "changed how [she] view[s] the world" and permanently altered her sense of safety, relationships, career, ability to travel, and parenting—leaving her with a constant need to check that loved ones are safe. *Id.* ¶¶ 21–22.

**23. Servicemember Christopher Thomas Wagar**

Christopher Thomas Wagar was serving as a security policeman in the U.S. Air Force and deployed to Dhahran, Saudi Arabia when the June 25, 1996, bombing occurred. Decl. of Christopher Thomas Wagar ("Wagar Decl.") ¶¶ 2, 6, ECF No. 29-25 at 1. That night, he was "on duty on the rooftop of Building 131," the primary target of the attack, when he observed "something that seemed extremely unusual" and "sounded the alarm" to "evacuate the building." *Id.* ¶ 7. Specifically, he saw a "fuel truck pull[] up" and "turn[] off its headlights," then "two men jumped out of the truck, got into another vehicle, and sped off." *Id.* Wagar had "just finished evacuating the top floor" of the building and was in the stairwell "when the bomb exploded," threw him "against the stairs," and "knocked [him] unconscious." *Id.* When he regained consciousness, "[his] ears were ringing" and he observed "severely wounded" victims amidst "flickering lights" and "a thick cloud of dust." *Id.* ¶ 8. He "started to give CPR to victims" and "helped to evacuate

the injured," not yet aware of his own "physical pain." *Id.* "Saudi government officials" transported Wagar to a "remote location off-base" for interrogation about the incident because he was "one of only three witnesses to see the terrorist bombers." *Id.* ¶ 9. He was "terrified" that the officials "would kill [him]" during that period of interrogation, and he "did not receive any medical attention until two days after" he was released. *Id.*

After the attack, Wagar "experienced severe pain in [his] left arm," "a severe concussion," and "a persistent, debilitating headache" that an MRI revealed was caused by "brain bleeding." *Id.* ¶ 10. He also had "bone chips in [his] elbows," "underwent shoulder reconstruction surgery," and "lost the cartilage in both wrists," which will require "surgery in the future." *Id.* He continues to suffer from "chronic migraines," "irritable bowel syndrome, tinnitus, and pain in [his] back, shoulders, wrists, and right knee." *Id.* ¶¶ 10, 15. Beyond physical injuries, Wagar developed "insomnia," "nightmares," "extreme anxiety," and "PTSD." *Id.* ¶¶ 11-14. The attack ultimately "forced him to make the painful decision to leave the military" and "forfeit" a "lifelong pension." *Id.* ¶ 14. He also "had to abandon" his later career "dream[]" of "becoming a TV reporter" because he was "unable to retain information" due to "the lingering effects of the attack." *Id.* ¶ 19. Over time, Wagar "became withdrawn," "hypervigilant," "hypercritical," and "ang[ry]," which affected his "close friendships" and "deeply hurt [his] wife and children at times." *Id.* ¶¶ 16-17. Wagar was "awarded the Airman's Medal" and "earned a Purple Heart" in recognition of his bravery and injuries sustained during the attack. *Id.* ¶ 18. He thinks constantly about "how [his] life would have been very different—and far better—had it not been for the attack." *Id.* ¶ 20.

Wagar received a 100% disability rating from the U.S. Department of Veterans Affairs. *Id.* ¶ 14.

**24. Servicemember Matthew A. Wells and Six Family Members**

On June 25, 1996, Matthew A. Wells was a Pararescue Specialist in the U.S. Air Force and deployed to Dhahran, Saudi Arabia. Decl. of Matthew A. Wells ("Wells Decl.") ¶¶ 3, 5, ECF No. 29-26 at 1. He was "in the gym with two teammates" at "the moment of the explosion," but "[h]ad [he] been in [his] room" in Building 131, "there is a very strong likelihood [he] would have been killed." *Id.* ¶¶ 14-15. The blast felt like "a pressure wave" and "shattered" the gym mirrors "one after another," with "shards cutting across [his] back as glass flew through the air." *Id.* ¶¶ 15-16. Without "tak[ing] the time to address [his] own injuries," Wells ran "towards the epicenter of the blast," "helped set up a casualty collection and triage point," and when they began to "run[] out of medical supplies," hurried toward his building to get more. *Id.* ¶¶ 17-18. His "heart sank" when he saw the state of Building 131 and he "ignored" an airman's warning not to enter. *Id.* ¶ 19. Wells ran into his "team leader" near the entrance and learned that "a friend and teammate" was missing, so he "immediately joined in the search." *Id.* ¶¶ 19-20. While "clear[ing] each floor," "[i]njured and dead people were everywhere," so Wells "marked where the dead were, triaged the living, and tried to help evacuate as many people as possible, as quickly as possible, to the medical clinic." *Id.* ¶ 20. Despite not finding his friend inside, his team "cleared two more buildings," ultimately "work[ing] for about 20 hours straight" and "treating over 400 people." *Id.* ¶¶ 20-21. Over the following four days, he "did not sleep more than four hours at a time," "had to break the devastating news to a lot of people that their friends were dead," and, after "loading the bodies of the people who were killed onto the Air Force cargo plane," sat next to the caskets "on the long flight back to the United States." *Id.* ¶¶ 22-23.

Wells sustained "sharp cuts across [his] back" from shattered glass, "ringing in [his] ears," and a foot injury during the attack. *Id.* ¶ 25. In its aftermath, he felt "like [he] was suddenly a

different person," experiencing "anger," "frustration," "an overwhelming sense of guilt," "deep anxiety and depression," and "nightmares." *Id.* ¶¶ 27-29. He became "more stoic and guarded," lost his "sense of safety" and "confidence," and "began drinking more." *Id.* ¶¶ 30-31, 34. The attack "ruined [his] marriage," as he "refused to acknowledge [his] trauma" and later "started an affair." *Id.* ¶¶ 33-34. After being "assigned to a post in England," Wells's "drinking picked up" and his "other family relationships suffered," including his relationship with his daughter. *Id.* ¶¶ 35-38. Years later, he was "diagnosed with post-traumatic stress disorder and anxiety stemming from the attack," and he continues to "rely on medication and therapy to get through every day." *Id.* ¶ 40.

Wells provided no disability rating from the U.S. Department of Veterans Affairs.

Six of Wells's family members—his ex-wife, Angela Sue Holloway; his daughter, Sara Ashley Wells; his mother, Margaret Kaye Wells; his father, Willard Lee Wells, who is deceased; and his brothers, Nicholas Wells and Stephen Hutchinson Wells—are also plaintiffs in this lawsuit.

Wells's ex-wife, Angela Sue Holloway, was home caring for their four-month-old daughter, Sara, when she learned of the Khobar Towers attack from its "coverage . . . on television." Decl. of Angela Sue Holloway ("Holloway Decl.") ¶¶ 8-10, ECF No. 29-26 at 10. Family and friends "started calling nonstop" to ask about her husband, but she "did not know if he was even alive" and "felt like [she] was holding [her] breath for hours." *Id.* ¶ 10. Several hours later, Wells's commander "knocked on [her] door and told [her] that they had not been able to locate him," so "they assumed [Wells] was dead." *Id.* ¶ 11. Angela "panicked" and "sat in limbo" for several more "excruciating" hours until Wells called and "told [her] that he was safe." *Id.* ¶¶ 11-13. The subsequent time spent waiting for Wells to return was "an incredibly hard and lonely period" because she "was alone with [their] baby" and felt "constantly worried and overwhelmed." *Id.*

¶ 14. Before the attack, Angela and Wells "were so happy together" in a loving marriage "filled with smiles, adventure and so much potential," and they "were both excited" to raise Sara together, *id.* ¶¶ 6-8, but "[t]he [husband] who came back was not the [husband] who had left," *id.* ¶ 15. Wells's "jokes and smiles were gone," he "withdrew from [Angela] and Sara," and "[their] marriage collapsed quickly." *Id.* ¶¶ 15-18. Wells "threw himself into work," spending most of the year on deployments and calling Angela "on the phone once or twice a week at best." *Id.* ¶ 18. As their marriage grew "emotionally distant," Angela suffered from "depression," "anxiety," and "suicidal thoughts," which intensified after she learned of Wells's affair. *Id.* ¶¶ 19-22. After they officially divorced, Angela "essentially bec[ame] a single parent" for Sara and struggled to make enough money "to cover the bills." *Id.* ¶¶ 23-24. The attack "also put a strain on [Angela's] relationship with Sara," which "made [Angela] feel like a failure." *Id.* ¶ 25. The attack "changed [Angela's] life at its core—taking [her] husband from [her] and upending everything in an instant." *Id.* ¶ 26.

Wells's daughter, Sara Ashley Wells, was four months old when her father was injured in the attack, so she has no personal memory of the attack itself. Decl. of Sara Ashley Wells ("S.A. Wells Decl.") ¶¶ 4, 5, ECF No. 29-26 at 15. She learned from her mother that, before the attack, Wells was an "engaged, loving, and present parent," and her parents had "planned their lives around" raising her together. *Id.* ¶ 5. "The attack had a significant impact on [her] father," however, so Sara "ha[s] only ever known him as a very unexpressive, serious person who is constantly on alert" and who "took every possible deployment," leaving Sara to be raised largely by her mother. *Id.* ¶¶ 8-10. Her parents "divorced when [she] was just three years old, as a direct result of the attack and how it changed [her] father," and Sara "never felt like [she] had enough time with [Wells]," "constantly worried that [she] might never see him again," and "fe[lt] that the

attack robbed [her] of a normal, loving relationship with [her] dad." *Id.* ¶¶ 11-15. She later developed "anxiety and concern" for Wells and felt "helpless and worried" watching him suffer from poor sleep and "compulsive exercise and drinking." *Id.* ¶¶ 16-17. The attack also "led to a strained relationship with [her] mother," which "only contributed to [Sara's] feelings of abandonment" and her "diagnoses of anxiety and depression." *Id.* ¶¶ 18-21. Sara still "struggle[s] to maintain friendships and build romantic relationships," as she is "constantly worr[ied] about something else bad happening." *Id.* ¶ 21. She has "carr[ied] the impact of the attack" throughout her life and continues to "feel a deep sense of loss when [she] imagine[s] how different [her] life might look today." *Id.* ¶¶ 23-24.

Wells' mother, Margaret Kaye Wells, "was at home with [her] husband" when her daughter-in-law, Angela, called to say that the building where her son was living had been bombed but "[s]he did not know if [Wells] had survived." Decl. of Margaret Kaye Wells ("M. Wells Decl.") ¶ 12, ECF No. 29-26 at 20. In those first hours, Margaret felt "deep fear and dread," while she and her husband waited desperately for news. *Id.* ¶¶ 12-13. When Wells eventually called, Margaret was initially "just grateful that [he] had survived, but [she] then began to be overwhelmed by enormous grief" for "those who had lost their lives" and for her son who had "experienc[ed] the carnage." *Id.* ¶ 15. She experienced "frequent nightmares" and "anxiety" after the attack, with some symptoms continuing "[t]o this day." *Id.* ¶¶ 16-18. As it became "clear to [Margaret] that [Wells] was withdrawing" from his wife, daughter, and parents, she remained "deeply anxious about [her] son" and "worried about how [Sara] would be affected by what her dad had experienced." *Id.* ¶¶ 19-21. Since the attack, Margaret has "sought medical treatment for the physical problems caused by internalized anxiety," as well as "psychological counseling." *Id.* ¶ 23.

Wells's father, Willard Lee Wells, passed away in 2024 and his wife, Margaret Kaye Wells, seeks to serve as the representative of his estate. Decl. of Margaret Kaye Wells as Representative of Willard Lee Wells ("M. Wells Second Decl.") ¶¶ 2, 5, ECF No. 29-26 at 24. This representative attests that: Willard was at home with Margaret when their daughter-in-law, Angela "called to tell [them] there had been a bombing at [Wells's] base and that she did not know if [Wells] had survived because the Air Force could not account for him." *Id.* ¶ 11. Willard was "extremely anxious and terrified for his son," but "tried to remain strong for the family." *Id.* When they "finally got a call from [Wells]" in the following days, Willard "was relieved to hear his son's voice" but he was "shaken" by how close they had come to losing him. *Id.* ¶ 13. Willard "felt responsible for what had happened" because had encouraged Wells to enlist in the Air Force, and "ma[de] every effort to reach out and support his son during such a difficult time," including by taking on a "fatherly role" with Sara "in [Wells's] absence." *Id.* ¶¶ 14-15. Despite these efforts, Wells remained "emotionally distant," leaving Willard "ach[ing] for a deeper connection with his son." *Id.* ¶ 16.

Wells's brother, Nicholas Wells, learned of the attack while "in Italy as a member of a traveling goodwill music tour" of "high school age" performers. Decl. of Nicholas Wells ("N. Wells Decl.") ¶¶ 2, 7, ECF No. 29-26 at 28. He was about to perform at a church in Naples when the "music director received a fax from [his] father with the news of the Khobar Towers attack, [Wells's] survival, and [Wells's] subsequent involvement as a first responder." *Id.* ¶ 7. Nicholas was "shock[ed] and emotional," and felt "isolated" while so far away from family. *Id.* Although Nicholas "got along well" with his brother and "looked up to him" as a child, *id.* ¶ 5, Wells "returned to the United States a changed man," who was "reluctant to connect" and "[m]ore distant," *id.* ¶ 8. When Nicholas visited Wells "about 12 months later," he was "concerned about his drinking of alcohol" and saw "on his face and in his body language" the "burden of his

experience." *Id.* ¶ 10. As a result of the attack, Nicholas "tangentially suffered the trauma" of "working with Sara" through her "chaotic childhood" and navigating Wells's "short temper." *Id.* ¶¶ 12-13. The "greatest impact" on Nicholas was Wills's "greatly limited ability" to help with "the unrelenting caregiving responsibilities for [their] father" during his "long battle with dementia" and with their "mother's recovery from caregiving." *Id.* ¶ 17. Nicholas "miss[es] the brother [he] once knew" and still "feel[s] his loss," but "only feel[s] stress and sadness each time he visits or calls." *Id.* ¶¶ 20, 22.

Wells's brother, Stephen Hutchinson Wells, learned of the attack while at home in Pittsburgh with his wife and their three-week-old baby, and he immediately "rushed over to [his] mother's house" to "anxiously wait[] to hear if [Wells] had been injured or killed." Decl. of Stephen Hutchinson Wells ("S.H. Wells Decl.") ¶¶ 2, 7, ECF No. 29-26 at 33-34. He was "shocked and terrified" and could not stop thinking that, regardless of the outcome, "the events of that day would irreversibly alter the course of [Wells's] life, and [his family's] lives." *Id.* ¶¶ 7-8. The attack "triggered flashbacks" of "a horrific air show crash," resulting in seventy deaths and hundreds of injuries, that Stephen experienced during his own Air Force deployment in Germany. *Id.* ¶ 9. Despite being "very close growing up" and Wells serving as "best man at [Stephen's] wedding," *id.* ¶ 5, the brothers' relationship faded "drastically" after the attack, with "increasingly infrequent" contact, *id.* ¶ 10. As a result, Stephen "miss[es] the closeness [they] had begun to enjoy in the years before the attack." *Id.* Stephen also watched the bombing contribute "in large part" to Wells's divorce from Angela, after which Stephen and his wife helped raise their niece, Sara, "essentially serv[ing] as [her] primary caregivers during the week" and providing financial support and emotional stability "within the chaos of her life." *Id.* ¶ 11. Moreover, when their father,

Willard, died, Stephen "really needed [his] brother to connect with, but the attack and its impact left [them] unable to connect in any deeply meaningful way." *Id.* ¶ 12.

### D. Procedural History

Plaintiffs filed this lawsuit on August 6, 2024. Compl., ECF No. 1, as a related case to *Breezee v. Islamic Republic of Iran*, No. 23-cv-3392 (BAH) (D.D.C.), *see* Not. of Related Case, ECF No. 2. Thereafter, as discussed *infra* in Part III.B, plaintiffs properly served Iran with the complaint pursuant to the FSIA. When Iran failed to answer or otherwise appear, plaintiffs moved for and the Clerk's Office entered default on December 9, 2025. *See* Mot. for Entry of Default, ECF No. 23; Clerk's Entry of Default, ECF No. 24. Plaintiffs subsequently moved to substitute as parties the legal representatives of the estates of two deceased plaintiffs, Willard Lee Wells and Chandra Lynn Wheaton, on March 26, 2026, *see* Pls.' Suggestion of Death, ECF No. 26; Pls.' Mot. to Substitute Party, ECF No. 27, and that motion remains pending and is addressed *infra* in Part III.C. That same day, plaintiffs moved for default judgment as to liability and damages, accompanied by declarations and exhibits to support their damages allegations. *See* Mot. for Default Judgment, ECF No. 29. In response to an order to show cause noting plaintiffs' failure to include a declaration from plaintiff Wayne Mello Sr., plaintiffs supplemented the record with that final declaration. *See* Minute Order (July 17, 2026); Response to Order to Show Cause, ECF No. 32. The motion for default judgment is now ripe for resolution.

## II. LEGAL STANDARD

"Rule 55(a) [of the Federal Rules of Civil Procedure] requires the Clerk to enter a default when a defendant 'has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise,'" and, "[o]nce the Clerk does so, the plaintiff may 'apply to the court for a default judgment' under Rule 55(b)." *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1023 (D.C.

Cir. 2020) (quoting FED. R. CIV. P. 55(a), (b)(2)). Rule 55(b)(2) thus permits a court to consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). Since "strong policies favor resolution of disputes on their merits[,] '[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)). At the same time, the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether the court has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Consequently, "entry of a default judgment is not automatic." *Id.* at 6 (footnote omitted).

While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, the FSIA's state-sponsored terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim*, 774 F.3d at 1047-48; *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019). To this end, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (alterations accepted and omission in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)); *see also Klapprott v. United States*, 335 U.S. 601, 611 (1949) (observing that "statutes and rules have

largely left for judicial determination the type of cases in which hearings and proof should precede default judgments").

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Han Kim*, 774 F.3d at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Uncontroverted factual allegations that are supported by admissible evidence are taken as true. *See* FED. R. CIV. P. 56(e)(2) (authorizing courts to "consider the fact undisputed for purposes of the motion" when the adverse party "fails to properly address another party's assertion of fact"); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus II*, 750 F. Supp. 2d at 171)).

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient,'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if 'there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted.'" *Owens*, 864 F.3d at 785 (omission in original) (quoting *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)).

## III. DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have

provided sufficient evidence to demonstrate their standing to bring their claims against the defendant; (4) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant, and (5) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. These requirements are addressed *seriatim*.

### A. Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). In this case, plaintiffs seek *in personam* relief, so the question is whether defendant Iran is entitled to immunity.[4]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13-14; *see also Doe v. Taliban*, 101 F.4th 1, 5 (D.C. Cir. 2024). In the instant case, plaintiffs assert jurisdiction based on the FSIA's terrorism exception, 28 U.S.C. § 1605A, *see* Compl. ¶ 5, which provision was enacted "[i]n 1996, [when] Congress withdrew foreign sovereign immunity for lawsuits that seek money damages for personal injury or death from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,'" *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1057 (D.C. Cir. 2024) (quoting the Antiterrorism and Effective

[4] This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant has "forfeited its affirmative defense . . . by failing to raise it" here, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1114-15 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241); *see also Mark v. Republic of Sudan*, 77 F.4th 892, 895 (D.C. Cir. 2023). As the quoted text indicates, this exception also requires that "the foreign country was designated a 'state sponsor of terrorism at the time [of] the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and also at that time of the act, "the 'claimant or the victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[5]

Plaintiffs have satisfactorily proven the applicable elements here. As already stated, Iran has been designated a state sponsor of terrorism since 1984, over a decade before the 1996 Khobar Towers bombing. Moreover, all but one of the plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack.[6] The one plaintiff who does not attest to

---

[5] Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(iii). Since the Khobar Towers attack took place in Saudi Arabia and not Iran, this requirement does not apply in this case.

[6] *See* Jackson Decl. ¶ 3 (attesting to the declarant's United States citizenship); Lewis Decl. ¶ 4 (same); M. Jackson Decl. ¶ 4 (same); S.A. Jackson Decl. ¶ 3 (same); Sierra Jackson Decl. ¶ 3 (same); R. Jackson Decl. ¶ 3 (same); Small Decl. ¶ 5 (same); Barile First Decl. ¶ 3 (same); Barile Second Decl. ¶ 5 (same); Bergstrom Decl. ¶ 4 (same); Simmons Decl. ¶ 4 (same); Bradshaw Decl. ¶ 4 (same); Kowalczyk Decl. ¶ 3 (same); Branch First Decl. ¶ 3 (same); Branch Second Decl. ¶ 5 (same); Branch Third Decl. ¶ 5 (same); J. Branch Decl. ¶ 3 (same); Vigil-Valdez Decl. ¶ 6 (same); Gandert Decl. ¶ 4 (same); J. Gandert Decl. ¶ 4 (same); Bryant Decl. ¶ 3 (same); Coleman Decl. ¶ 3 (same); Dolinar Decl. ¶ 3 (same); Innmon Decl. ¶ 3 (same); McSparran Decl. ¶ 3 (same); M. Innmon First Decl. ¶ 6 (same); M. Innmon Second Decl. ¶ 4 (same); Jautakis Decl. ¶ 3 (same); P. Jautakis Decl. ¶ 4 (same); Ladtkow Decl. ¶ 3 (same); A. Ladtkow Decl. ¶ 4 (same); Locke Decl. ¶ 3 (same); McCurdy First Decl. ¶ 4 (same); McCurdy Second Decl. ¶ 6 (same); Mello Sr. Decl. ¶ 3 (same); Mello Jr. Decl. ¶ 4 (same); R. Mello Decl. ¶ 4 (same); A. Mello Decl. ¶ 3 (same); Morelock Decl. ¶ 3 (same); T. Robinson Decl. ¶ 5 (same); Boone First Decl. ¶ 6 (same); L. Robinson Decl. ¶ 5 (same); M. Robinson Decl. ¶ 3 (same); Boone Second Decl. ¶ 4 (same); Cunningham Decl. ¶ 5 (same); Evans Decl. ¶ 3 (same); C. Robinson Decl. ¶ 4 (same); O. Robinson Decl. ¶ 3 (same); L. Robinson Second Decl. ¶ 5 (same); Barlow Decl. ¶ 5 (same); Romero First Decl. ¶ 3 (same); Moya Decl. ¶ 3 (same); Rouse Decl. ¶ 3 (same); Casey Decl. ¶ 4 (same); Smith Decl. ¶ 3 (same); Spivey Decl. ¶ 3 (same); J. Spivey Decl. ¶ 3 (same); Stehley Decl. ¶ 3 (same); Hermalik Decl. ¶ 4 (same); Barr Decl. ¶ 4 (same); Harshberger Decl. ¶ 4 (same); T. Stehley Decl. ¶ 4 (same); Treadway Decl. ¶ 3 (same); M. Treadway Decl. ¶ 4 (same); Treadway Second Decl. ¶ 5 (same); Treadway Third Decl. ¶ 4 (same); Coats Decl. ¶ 4 (same); Wagar Decl. ¶ 3 (same); Wells Decl. ¶ 4 (same); Holloway Decl. ¶ 4 (same); S.A. Wells Decl. ¶ 3 (same); M. Wells Decl. ¶ 4 (same); M. Wells Second Decl. ¶ 5 (same); N. Wells Decl. ¶ 3 (same); S.H. Wells Decl. ¶ 3 (same).

United States citizenship at the time of the attack, Judith Ann Moya, ostensibly represented by her estate, bases her estate's claim on her son—servicemember plaintiff Christopher Howard Romero—who was both a U.S. citizen and a member of the U.S. armed forces at the time of the Khobar Towers bombing. *See* Romero First Decl. ¶¶ 3-4; Romero Second Decl. ¶¶ 3, 5; Pls.' Mem. at 11-12; *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 34-35 (D.D.C. 2016) (finding subject-matter jurisdiction to adjudicate claims of non-U.S.-citizen family members of U.S.-citizen victims under the FSIA's terrorism exception). Finally, plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which defendant provided "material support or resources." 28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors.").

More specifically, the truck bombing that plaintiffs allege caused their injuries was manifestly an "extrajudicial killing" that resulted in the deaths of nineteen American military personnel. *See, e.g.*, *Rimkus II*, 750 F. Supp. 2d at 182 ("The actions of defendants constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins*, 332 F. Supp. 3d at 33-34 (concluding the same); *Aceto*, 2020 WL 619925, at *13 (same). For the purposes of the FSIA terrorism exception, the term "extrajudicial killing" has the "meaning given" in "the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which statute defines the term as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are

recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)).

The Court additionally takes judicial notice of the evidence presented in *Blais* and *Heiser I* demonstrating that Iran provided "material support or resources" for the extrajudicial killing carried out in the Khobar Towers bombing. As is clear from the evidence in those cases, described *supra* in Parts I.A-B, Iran planned, supported, and "approved" the attack. *Heiser I*, 466 F. Supp. 2d at 252. The evidence also shows that Iran played a key role in helping to recruit, train, fund, supply, and direct Saudi Hezbollah, including in specific preparation for the attack on the Khobar Towers, *id.* at 262, establishing that Iran's actions were "a 'substantial factor' in the sequence of events that led to . . . plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran]'s conduct," *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception is proximate cause).

Therefore, under 28 U.S.C. § 1605A, Iran, though a foreign sovereign, is not immune from this suit, meaning that subject-matter jurisdiction may be properly exercised. *See* 28 U.S.C. § 1330(a).

**B. Personal Jurisdiction Under the FSIA**

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]." 28 U.S.C. § 1330(b). This section prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)-(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), because

"defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

For this reason, plaintiffs attempted to effectuate service of the Complaint under § 1608(a)(3) by sending one copy of the summons, complaint, and notice of suit, along with a translation of each document in Iran's official language, to Iran's Ministry of Foreign Affairs. *See* Pls.' Aff. Requesting Foreign Mailing, ECF No. 5; Request of Clerk, ECF No. 6; Certificate of Clerk, ECF No. 7. When that method of service twice proved unsuccessful, plaintiffs, following the requirements of § 1608(a)(4), transmitted two copies of the summons, complaint, and notice of suit, along with translations of each document, to the U.S. Department of State, *see* Pls. Aff. Requesting Foreign Mailing, ECF No. 19; Request of Clerk, ECF No. 20; Certificate of Clerk, ECF No. 21, for service "through diplomatic channels," 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service cannot be made within 30 days under paragraph (3)").[7] On November 17, 2025, the U.S. Department of State certified that service had been effected pursuant to § 1608(a)(4). *See* Return of Service/Aff., ECF No. 22.

Plaintiffs' executed service under 28 U.S.C. § 1608(a)(4) authorizes the exercise of personal jurisdiction over Iran. *See* 28 U.S.C. § 1330(b); *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 605 U.S. 223, 232 (2025) ("[T]he most natural reading of § 1330(b) is that personal

[7] After one failed attempt at service under § 1603(a)(3) in August 2024, *see* Pls.' Aff. Requesting Foreign Mailing, ECF No. 5; Request of Clerk, ECF No. 6; Certificate of Clerk, ECF No. 7, plaintiffs turned to the method of service provided by § 1603(a)(4), *see* Pls. Aff. Requesting Foreign Mailing, ECF No. 9; Request of Clerk, ECF No. 10; Certificate of Clerk, ECF No. 11. Thereafter, "upon learning that Iran had appointed a new foreign minister, and out of an abundance of caution," Pls.' Mem. at 15, plaintiffs re-attempted service under § 1608(a)(3) in January 2025, *see* Pls.' Aff. Requesting Foreign Mailing, ECF No. 13; Request of Clerk, ECF No. 16; Certificate of Clerk, ECF No. 17, but, as with the first attempt, that proved unsuccessful. Consequently, plaintiffs re-initiated their request for service "through diplomatic channels," pursuant to § 1608(a)(4).

jurisdiction over a foreign sovereign is 'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished.'" (citation omitted)).

**C. Standing of Estates**

One servicemember plaintiff—Frederick Antonio Robinson—and fifteen immediate family member plaintiffs—Latricia Renell Small, Margaret Barile, Melisa Jolene Padgett-Branch, Mary Ida Branch, Loretta Josephine Vigil, Lonnie Laprelle Innmon Jr., Vickie Lynn McCurdy, Ula G. Evans, Nathaniel Robinson, Pamela Denise Bradley, Sidney Garcia Robinson, Chandra Lynn Wheaton, Judith Ann Moya, Robert Morris Treadway Sr., and Willard Lee Wells—are deceased and seek to appear through the purported representatives of their respective estates. One other immediate family member plaintiff—Janice Powers Treadway—seeks to be represented by her son, but the record is unclear as to whether she is deceased or is seeking or to be represented by her son for another reason. *See* Treadway Second Decl. ¶¶ 2, 4-5.

After two of those named plaintiffs passed away during the pendency of this litigation, plaintiffs moved to substitute "Margaret Kaye Wells . . . as legal representative of the estate of her late husband Willard Lee Wells, for deceased Plaintiff Willard Lee Wells" and to substitute "Zaccheus Roshad Barlow, as legal representative of the estate of Chandra Lynn Wheaton . . . for deceased Plaintiff Chandra Lynn Wheaton," under Federal Rule of Civil Procedure 25(a). Pls.' Mot. to Substitute Party at 1. "A deceased individual cannot serve as the real party in interest in a civil action," but the Court "may order substitution of the proper party" if the deceased party's "claim is not extinguished." *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 54 n.2 (D.D.C. 2013) (citing FED. R. CIV. P. 25(a)(1)). Plaintiffs filed both their suggestion of death and motion to substitute on the same day and thus complied with Rule 25's ninety-day window to file a motion for substitution. *See* Pls.' Suggestion of Death; Pls.' Mot. to Substitute Party; *cf. Maxwell*

*v. Islamic Republic of Iran*, No. 22-cv-173 (RC), 2024 WL 1342775, at *8 (D.D.C. Mar. 29, 2024) (granting a motion to substitute where the suggestion of death and motion to substitute were filed on the same day). Plaintiffs failed to establish, however, that Margaret Kaye Wells or Zaccheus Roshad Barlow are each a "proper party" to substitute with "standing to invoke Rule 25(a)." *Dist. Title v. Warren*, No. 14-cv-1808 (ABJ), 2017 WL 6816482, at *3 (D.D.C. Sept. 20, 2017). No evidence has been submitted by plaintiffs to show that those individuals are "representatives of [Wells's or Wheaton's] estate[s]," *id.*, and thus there is no evidence that the proposed representatives are "the proper part[ies]" within the meaning of Rule 25(a)(1), *see generally* Pls.' Mot. to Substitute Party (providing no evidence, such as sworn declarations or certificates of appointment as personal representatives, to verify the proposed representatives' legal status with respect to the deceased plaintiffs' estates). Plaintiffs' Motion to Substitute is thus denied.

Similar issues plague the other plaintiffs who seek to be represented by representatives of their respective estates. True, damages to properly represented estates of deceased victims and relatives of victims in terrorism actions brought under the FSIA have been regularly awarded by this Court. *See, e.g.*, *Estate of Johnson v. Islamic Republic of Iran*, No. 23-cv-1689, 2024 WL 3225954, at *14 (D.D.C. June 28, 2024); *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 36-38 (D.D.C. 2020). "When, such as here, an estate-plaintiff brings an action under [the] FSIA's private cause of action," however, the plaintiff "must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'" *Barry*, 437 F. Supp. 3d at 36 (alterations in original) (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017)); *see also Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011) ("[R]ecovery for pain and suffering . . . is not universally available to estate-plaintiffs."). Standing of an estate is

governed by the law of the state which governed the creation of the estate. *Id.* (citing *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014)).

Here, plaintiffs make the general and conclusory assertion in their briefing that each estate has standing under the "state law governing [each] estate." Pls.' Mem. at 31. Specifically, they contend that the estate of Latricia Renell Small has standing under Tennessee law; the estates of Margaret Barile and Robert Morris Treadway, Sr., have standing under North Carolina law; the estate of Melisa Jolene Padgett-Branch has standing under Georgia law; the estates of Mary Ida Branch and Loretta Josephine Vigil have standing under New Mexico law; the estates of Lonnie Laprelle Innmon Jr. and Vickie Lynn McCurdy have standing under Texas law; the estate of Frederick Antonio Robinson has standing under Virginia law; the estate of Ula G. Evans has standing under Indiana law; the estates of Nathaniel Robinson, Pamela Denise Bradley, Sidney Garcia Robinson, and Chandra Lynn Wheaton have standing under Mississippi law; the estate of Judith Ann Moya has standing under Nevada law; and the estate of Willard Lee Wells has standing under Pennsylvania law. *See* Pls.' Mem. at 32-38. Plaintiffs repeat these general assertions as to the state law governing each estate in their proposed findings of fact and conclusions of law, without any citation in that document to any specific provision of the State law or other evidentiary support. *See* Pls.' Proposed Findings of Fact and Conclusions of Law, ECF No. 29-2. This is wholly insufficient.

Plaintiffs have presented no evidence in their sworn declarations or exhibits supporting these conclusory statements to establish that the cited State's law governs the standing of the estate, for example, because the deceased resided in the State at the time of death or for some other reason. Moreover, no specific provision in the cited State's law is provided in the sworn declarations or exhibits confirming that the claims asserted by the estate in this lawsuit are authorized to be

brought on behalf of the estate, or even that the person seeking to serve as the estate's representative has been legally designated to so serve.[8] *Cf., e.g.*, *Est. of Johnson*, 2024 WL 3225954, at *4-6 (considering estate plaintiffs' claims where the representatives provided letters of administration or certificates of appointment as personal representative from the relevant State); *Aceto*, 2020 WL 619925, at *8, *10 (same). None of this sort of evidence necessary to establish the standing of an estate is provided. *See, e.g.*, *Worley*, 75 F. Supp. 3d at 333 (referring estate plaintiffs' claims to a special master, rather than analyzing defendant's liability, where those plaintiffs "presented no evidence regarding which state laws govern this question as to each estate plaintiff"); *Strauss v. Islamic Republic of Iran*, No. 22-cv-52 (RCL), 2024 WL 2499922, *2 (D.D.C. Mar. 28, 2024) (noting that when plaintiffs have not "presented any evidence as to what the applicable [state] law says about the availability of damages for pain and suffering," the court "need not divine this information nor scour through foreign treatises"); *Dobbins*, 2026 WL 1943314, at *19 (declining to consider an estate plaintiff's claims where the representative provided the deceased plaintiff's will, which named the purported representative as the executor of the estate, but no evidence that the purported representative "ha[d] been recognized or appointed by a court or registrar as the executor of [the] estate"). Indeed, the declaration of one family-member plaintiff, Janice Powers Treadway, does not even attest that the plaintiff, who is purportedly represented by another individual "for the purposes of this lawsuit," is deceased or unable to represent herself for some other reason. Compl. ¶ 73; *see* Treadway Second Decl. ¶¶ 4-5.

---

[8] *See* Small Decl. ¶¶ 2, 4-5 (attesting to representing the deceased plaintiff and to the deceased plaintiff's state of birth, without any statements or exhibits establishing where the estate was created or the declarant's legal designation as representative of the estate); Barile Second Decl. ¶¶ 2, 4-5 (same); Branch Second Decl. ¶¶ 2, 4-5 (same); Branch Third Decl. ¶¶ 2, 4-5 (same); Vigil-Valdez Decl. ¶¶ 2, 5-6 (same); M. Innmon First Decl. ¶¶ 2, 4, 6 (same); McCurdy Second Decl. ¶¶ 2, 5-6 (same); T. Robinson Decl. ¶¶ 2, 4-5 (same); Boone First Decl. ¶¶ 2, 5-6 (same); L. Robinson Decl. ¶¶ 2, 4-5 (same); Cunningham Decl. ¶¶ 2, 4-5 (same); L. Robinson Second Decl. ¶¶ 2, 4-5 (same); Barlow Decl. ¶¶ 2, 4-5 (same); Romero Second Decl. ¶¶ 3-4 (same); Treadway Second Decl. ¶¶ 2, 4-5 (same); Treadway Third Decl. ¶¶ 2-5 (same); M. Wells Second Decl. ¶¶ 2, 4-5 (same).

While this Court may exercise "broad discretion to determine what degree and kind of evidence is satisfactory" to establish entitlement to relief under § 1608, *Maalouf*, 923 F.3d at 1114, courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence," *Han Kim*, 774 F.3d at 1049 (quoting *Daliberti*, 146 F. Supp. 2d at 21 n.1). "[U]ncontroverted factual allegations that are supported by affidavits" satisfy that standard, *Roth*, 78 F. Supp. 3d at 386, but "briefs 'are not evidence'" sufficient for a plaintiff to "support its standing," *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)); *see also Grimes v. District of Columbia*, 794 F.3d 83, 91 n.4 (D.C. Cir. 2015) ("[A]ssertions in briefing . . . are not evidence upon which a court may rely."); *In re Pub. Def. Serv.*, 607 F. Supp. 3d 11, 21 (D.D.C. 2022) ("Statements made by counsel in briefs are not evidence . . . ."). Here, plaintiffs' mere statements in counseled briefing about which State's law governs each estate—without record evidence proving that each purported representative is formally appointed under the law of the State in which their respective estate is supposedly established, and without "any evidence as to what the applicable [State] law says about the availability of damages for pain and suffering"—cannot establish standing. *Strauss*, 2024 WL 2499922, *2. The record submitted in this case is too sparse for the Court to assess the estate representatives' "power to prosecute claims on the [deceased servicemembers or family members'] behalf," and thus the fourteen named estate plaintiffs, as well as Janice Powers Treadway, Chandra Lynn Wheaton, and Willard Lee Wells, "cannot maintain a claim for [their] estate[s]." *Dobbins*, 2026 WL 1943314, at *19. For this reason, the deceased plaintiffs' claims, as well as the claims of Janice Powers Treadway, are dismissed without prejudice. *See id.* ("[A]ll FSIA plaintiffs [must] ensure that their motions for default include evidence and argument as to any applicable state law." (alteration in original)

(quoting *Est. of Farhat v. Islamic Republic of Iran*, No. 19-cv-3631 (RCL), 2024 WL 706971, at *16 (D.D.C. Feb. 21, 2024))).

**D. Iran's Liability**

Plaintiffs seek relief under § 1605A(c) of the FSIA, which creates a private right of action for "personal injury or death" and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c); *see also* Compl. ¶¶ 99-150 (citing § 1605A(c) in all six counts of the complaint). In the instant complaint, all plaintiffs bring a claim under 28 U.S.C. § 1605A(c) for intentional infliction of emotional distress ("IIED"). *See* Compl. ¶¶ 107-116 (Count II). In addition, the twenty-four servicemember plaintiffs bring claims for assault and battery, *id.* ¶¶ 117-125 (Count III), seeking compensatory damages for, "*inter alia*, physical pain and suffering, mental anguish, emotional pain and suffering, and/or economic losses," *id.* ¶ 125; the fifty-two family-member plaintiffs bring claims for loss of solatium and/or loss of consortium, *id.* ¶¶ 126-134 (Count IV); the plaintiffs seeking to be represented by their estates also assert survival claims, *id.* ¶¶ 135-143 (Count V); and all seventy-six plaintiffs seek punitive damages, *id.* ¶¶ 144-150 (Count VI). All plaintiffs also include a general damages allegation. *Id.* ¶¶ 99-106 (Count I). As discussed above, the deceased plaintiffs, who sought to be represented by representatives of their estates, failed to demonstrate standing as to the deceased servicemember or family member, so their claims—including all survival claims under Count V—are dismissed without prejudice. *See* Part III.C.[9]

Despite creating a private right of action that allows for the recovery of "economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c), Section

[9] Although unclear whether plaintiff Janice Powers Treadway is deceased and seeking to be represented by her estate, or whether she is seeking or to be represented by her son for another reason, she likewise failed to establish that Robert Morris Treadway Jr. has standing to bring claims on her behalf, and her claims are also dismissed without prejudice. *See* Treadway Second Decl. ¶¶ 2, 4-5.

1605A(c) contains no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages. As a result, courts evaluating such claims "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see also Est. of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 24-26 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability). The availability of these claims for each plaintiff is discussed below.

**1. Servicemember Plaintiffs**

Other than the estate of servicemember Frederick Antonio Robinson, which is dismissed without prejudice for lack of standing, the twenty-three remaining servicemember plaintiffs were members of the U.S. Armed Services at the time of the attack and, therefore, are expressly covered by, and entitled to bring claims under, Section 1605A(c)(2). Each basis for liability—battery, assault, and IIED—as to the servicemember plaintiffs is discussed *seriatim*.

*a. Assault and Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results." Restatement (Second) of Torts § 13 (A.L.I. 1965). "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76-77 (D.D.C. 2010) (defining these terms). Iran acted with the intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing. *See, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 101-02 (D.D.C. 2017) (defining material support for terrorist attacks as an act intending to cause harm). Twenty of the remaining twenty-three servicemember plaintiffs in this case aver that

some harmful physical contact resulted from the explosion of the bomb, which evidence is sufficient to prove that defendant is liable to these plaintiffs for battery.[10] Servicemember plaintiffs Christine Ann Locke, Tonya Catrice McCurdy and Roy Edgar Smith, on the other hand, have provided no evidence that any of them suffered a harmful or offensive contact against themselves from the bombing to support a battery claim. *See generally* Locke Decl.; McCurdy Decl.; Smith Decl.

Assault, meanwhile, occurs when a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault. *Murphy v. Islamic Republic of Iran*, 740 F.

[10] *See* Jackson Decl. ¶¶ 8, 10, 13 (describing being thrown across the room, severe bruising, lacerations along his arms from glass and debris, and ringing in his ears); Barile Decl. ¶¶ 9, 14 (describing ringing in his ears, hearing loss, tinnitus, and asthma from inhaling blast debris); Bergstrom Decl. ¶ 7 (describing abrasions to the bottoms of her feet from shattered glass); Bradshaw Decl. ¶¶ 7-8 (describing lacerations to her face and left toe from shattered glass, and inhaling dust and debris); Branch Decl. ¶¶ 10, 13 (describing being hurled into a wall, bruising, lacerations to his legs from flying debris, and ringing in his ears); Bryant Decl. ¶ 19 (describing persistent tinnitus from the explosion); Coleman Decl. ¶ 11 (describing bleeding scrapes and scuffs to both hands and wrists after tripping over rubble); Dolinar Decl. ¶¶ 8-9 (describing deep lacerations and glass and shrapnel embedded all over his back); Innmon Decl. ¶¶ 7-8 (describing damaged hearing, twisting his ankle, tearing his palms, and shredding his kneecap and shin while sprinting during the immediate aftermath); Jautakis Decl. ¶¶ 5-7 (describing being thrown into the air, chest and throat bruises, a fractured jaw, temporary vision loss, and leg injuries including lacerations, embedded metal shrapnel, and leaking joint fluid); Ladtkow Decl. ¶¶ 8-11 (describing being hurled backward into a wall, numerous lacerations and bruises, bleeding from his head, arms, legs, and feet, and embedded glass injuries); Mello Sr. Decl. ¶¶ 9, 11 (describing being thrown into a wall by the force of the blast, scrapes on his hands and back, and lasting tinnitus and breathing problems); Morelock Decl. ¶¶ 8, 11-13 (describing a heavily-bleeding head wound, bruising, nerve damage, and numerous lacerations causing permanent scarring to his head, face, neck, and side); Romero Decl. ¶¶ 6-7 (describing being knocked backward, violent ringing in his ears, cuts to his knees, face, and head, and glass shards embedded throughout his body); Rouse Decl. ¶¶ 9, 13 (describing being knocked backward, hitting his head, a severe concussion, back injuries, and tinnitus); Spivey Decl. ¶¶ 7, 10 (describing being thrown onto his bed, twisting both ankles while fleeing, tinnitus, and asthma from inhaling dust and debris); Stehley Decl. ¶¶ 9, 15-16 (describing being thrown into a wall, lacerations from shattered glass, permanent hearing loss, and chronic tinnitus); Treadway Decl. ¶¶ 8, 13 (describing being thrown to the floor, intense ringing in his ears, and puncture wounds from sharp shards of glass embedded in his chest and abdomen); Wagar Decl. ¶¶ 7, 10 (describing being thrown against the stairs, a severe concussion, brain bleeding, and bone chips in both elbows); Wells Decl. ¶¶ 16, 25 (describing lacerations across his back from shattered glass, ringing in his ears, and a foot injury from stepping on a nail in the rubble).

Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same). Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." Restatement (Second) of Torts § 29 cmt. b. All remaining twenty-three servicemember plaintiffs, including those three who did not produce evidence of harmful physical contact, were at Khobar Towers at the time of the bombing, which was clearly within striking distance, given the impacts of the bomb on the whole Khobar Towers complex, and thus "were in imminent apprehension of harm," meaning that Iran is liable to those twenty-three servicemember plaintiffs for assault. *Aceto*, 2020 WL 619925, at *15.[11]

*b. IIED*

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress. Restatement (Second) of Torts § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same). Here, the remaining twenty-three servicemember plaintiffs have demonstrated that they suffered severe emotional and psychological distress as a result of the Khobar Towers attack and may recover for IIED.[12]

---

[11] *See* Jackson Decl. ¶ 8; Barile Decl. ¶ 9; Bergstrom Decl. ¶ 7; Bradshaw Decl. ¶ 7; Branch Decl. ¶¶ 9-10; Bryant Decl. ¶ 7; Coleman Decl. ¶ 8; Dolinar Decl. ¶ 7; Innmon Decl. ¶ 7; Jautakis Decl. ¶ 5; Ladtkow Decl. ¶ 8; Locke Decl. ¶ 8; McCurdy Decl. ¶ 9; Mello Sr. Decl. ¶ 9; Morelock Decl. ¶¶ 7-8; Romero Decl. ¶ 6; Rouse Decl. ¶ 9; Smith Decl. ¶ 8; Spivey Decl. ¶ 7; Stehley Decl. ¶ 9; Treadway Decl. ¶ 8; Wagar Decl. ¶ 7; Wells Decl. ¶¶ 14-16.

[12] *See* Jackson Decl. ¶¶ 14, 17; Barile Decl. ¶¶ 15-17; Bergstrom Decl. ¶¶ 10-11, 14; Bradshaw Decl. ¶¶ 11-13; Branch Decl. ¶¶ 18-19; Bryant Decl. ¶¶ 13-15, 21; Coleman Decl. ¶¶ 15-16; Dolinar Decl. ¶¶ 13-15; Innmon Decl. ¶¶ 12-16; Jautakis Decl. ¶ 9; Ladtkow Decl. ¶¶ 16-17; Locke Decl. ¶¶ 11-13; McCurdy Decl. ¶¶ 17-19; Mello Sr. Decl. ¶¶ 15-20; Morelock Decl. ¶¶ 14-17; Romero Decl. ¶¶ 9-10, 14; Rouse Decl. ¶¶ 14, 17, 24-25; Smith Decl. ¶¶ 11-13; Spivey Decl. ¶¶ 11-14; Stehley Decl. ¶¶ 17-22; Treadway Decl. ¶¶ 16-18; Wagar Decl. ¶¶ 11-14; Wells Decl. ¶¶ 26-33, 40.

**2. Family Member Plaintiffs**

The other fifty-two plaintiffs seek damages as family members of servicemembers present in Dhahran, Saudi Arabia, for the Khobar Towers bombing. As discussed above, the claims of the sixteen family members seeking to be represented by their estates, or in Janice Powers Treadway's case, by her son, are dismissed without prejudice for failure to establish standing, so only thirty-six family member plaintiffs' claims remain. *See* Part III.C.

The family members request, under separate counts, compensatory damages for loss of solatium and IIED, *see* Compl. ¶¶ 107-116 (Count II, IIED), ¶¶ 126-134 (Count IV, loss of solatium), contending that they "may assert a cause of action" for each, Compl. ¶¶ 116, 134. "[I]n the context of a suit under the FSIA," however, "courts in this Circuit have found IIED and solatium claims to be 'indistinguishable,' and because, '[w]here there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of . . . theories which the plaintiff pursues,' the Court considers only the IIED count" with respect to Iran's liability to all the remaining family member plaintiffs and discusses solatium as a remedy authorized by the FSIA below. *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 44 n.35 (D.D.C. 2020) (internal citations omitted); *see also Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 37 n.9 (D.D.C. 2001) (observing that 28 U.S.C. § 1605 "clearly contemplates solatium recovery as a measure of *damages*, not as an independent cause of action").

The thirty-six remaining family members assert IIED claims via the private right of action afforded in 28 U.S.C. § 1605A(c). *See* Compl. ¶¶ 108-09. The Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present," and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp.

2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FSIA for IIED to "members of the victim's household" who were "viewed as the functional equivalents of immediate family members"); *see also* Restatement (Second) of Torts § 46, cmt. l (leaving "open the possibility of situations in which presence . . . may not be required").

Whether all family members are "immediate family members" or the functional equivalent is discussed first, followed by Iran's liability for IIED.

*a. Functional Equivalents of Family Members*

Thirty-three of the thirty-six remaining family member plaintiffs in this case are plainly immediate family members—parents, siblings, spouses, and children—of servicemember victims injured in the Khobar Towers attack. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)). Three of the plaintiffs—Martha Gray Innmon, Thomas Leopold Moya, and Mary Thaggard Treadway—do not fall neatly into these traditional categories, but nonetheless each is the "functional equivalent[]" of an immediate family member and may therefore maintain a claim for IIED. *St. John*, 2026 WL 1532818, at *43 (quoting *Bettis*, 315 F.3d at 337).

Martha Gray Innmon and Thomas Leopold Moya are stepparents of injured servicemembers but can recover as a parent would because they "were members of the victim's household, and they were viewed as the functional equivalents of immediate family members." *Bettis*, 315 F.3d at 337. Martha Gray Innmon knew Lonnie Duane Innmon, her injured stepson, since he "was only around 12 years old," Innmon "lived with [her], alternating with his mother,

for the remainder of his childhood," and they "had a great relationship." M. Innmon Second Decl. ¶ 6. Likewise, Thomas Leopold Moya "raised" Christopher Howard Romero, his injured stepson, "for his entire life since he was two, and [Romero] has always considered [Thomas] his father." Moya Decl. ¶ 5.

At the time of the attack, Mary Thaggard Treadway was engaged to be married to servicemember Robert Morris Treadway Jr. *See* M. Treadway Decl. ¶ 6. Although they did not legally marry until after the attack, the couple "had been together for over four years," "spoke every day," and Mary "was listed as [Treadway's] emergency contact" while he was overseas. *Id.* They "had completed all of the planning and were simply waiting for [Treadway] to return home so [they] could finally get married." *Id.* Mary Thaggard Treadway has therefore put forth sufficient evidence that she was the "functional equivalent" of Treadway's spouse. *St. John*, 2026 WL 1532818, at *43-44 (quoting *Bettis*, 315 F.3d at 337).

*b. Iran's Liability to the Family Member Plaintiffs for IIED*

Iran is thus liable for IIED to the thirty-six self-represented family-member plaintiffs. Iran's conduct in materially supporting Saudi Hezbollah was "sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] [wa]s not present," such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress. *Heiser II*, 659 F. Supp. 2d at 27 (quoting DOBBS, *supra*, § 307); *see Schooley*, 2019 WL 2717888, at *73 (concluding the same); *Akins*, 332 F. Supp. 3d at 37-38 (same). Finally, the family member plaintiffs have shown, through their uncontested declarations, that they suffered

significant emotional consequences from the attack, both in the days spent waiting for news of their loved ones and in the years after the attack.[13]

* * *

All remaining twenty-three servicemember plaintiffs and thirty-six family member plaintiffs have thus established Iran's liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress, as outlined above.

**E. Damages**

Turning to the allowable damages, plaintiffs seek to recover pain and suffering, solatium, and punitive damages. *See* Pls.' Mem. at 41 (asserting entitlement to "pain and suffering and solatium damages"); *id.* at 44 ("Punitive damages are appropriate here and should be awarded to all Plaintiffs."). The damages awards to which each plaintiff is entitled are described below.

**1. Legal Standard for Damages under Section 1605A(c)**

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). To recover, the plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Roth*, 78 F. Supp. 3d at 402 (internal

[13] *See* Lewis Decl. ¶¶ 1-21; M. Jackson Decl. ¶¶ 11, 14-16; S.A. Jackson Decl. ¶¶ 13, 15-18; Sierra Jackson Decl. ¶¶ 11-15, 17; R. Jackson Decl. ¶¶ 14-16; Simmons Decl. ¶¶ 14-18; Kowalczyk Decl. ¶¶ 12, 17-19; J. Branch Decl. ¶¶ 11-13; Gandert Decl. ¶¶ 10, 12-13; J. Gandert Decl. ¶¶ 8-10; McSparran Decl. ¶¶ 9-10, 14; M. Innmon Second Decl. ¶¶ 8, 11-14; P. Jautakis Decl. ¶¶ 10-11; A. Ladtkow Decl. ¶¶ 11, 18-23; Mello Jr. Decl. ¶¶ 15-18; R. Mello Decl. ¶¶ 16-17; A. Mello Decl. ¶¶ 13-17; M. Robinson Decl. ¶¶ 12-14; Boone Second Decl. ¶¶ 13-14; Evans Decl. ¶¶ 11-12; C. Robinson Decl. ¶¶ 12-13; O. Robinson Decl. ¶¶ 7-9; Moya Decl. ¶¶ 8-13, 16; Casey Decl. ¶¶ 10, 12-14, 19; J. Spivey Decl. ¶¶ 13-14, 16; Hermalik Decl. ¶¶ 17-19; Barr Decl. ¶¶ 14-16; Harshberger Decl. ¶¶ 12-14; T. Stehley Decl. ¶¶ 10-11; M. Treadway Decl. ¶¶ 10, 17-18; Coats Decl. ¶¶ 15-19; Holloway Decl. ¶¶ 20-22; S.Wells Decl. ¶¶ 20-22; M. Wells Decl. ¶¶ 16-18, 23; N. Wells Decl. ¶¶ 7, 20-26; S.H. Wells Decl. ¶¶ 8-9, 12-13.

quotation marks omitted) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005)); *see also Fraenkel*, 892 F.3d at 353 (stating the same). Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213-14 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were the intended consequences of Iran's material support of Saudi Hezbollah. *See Dobbins*, 2026 WL 1943314, at *20 (concluding the same); *Est. of Johnson*, 2024 WL 3225954, at *13 (same); *Schooley*, 2019 WL 2717888, at *74 (same); *Akins*, 332 F. Supp. 3d at 39 (same). Having concluded this, whether plaintiffs have shown the amount of pain and suffering and solatium damages by a reasonable estimate will be considered next.

**2. Pain and Suffering**

As previously discussed, *see supra* Part III.D.1, defendant is liable to all twenty-three of the living servicemember plaintiffs for a combination of battery, assault, and IIED, but the bar on multiple recoveries allows these plaintiffs to recover only under one theory, for the single underlying harm. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited."). Within this single-recovery framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism exception is that "persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Kaplan v. Hezbollah*,

213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). This baseline, in turn, may be adjusted either upward or downward, based on individual circumstances. An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, . . . or were mistaken for dead.'" *Id.* at 35-36 (quoting *Valore*, 700 F. Supp. 2d at 84). A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify. In *Schooley*, this Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each service member plaintiff." *Schooley*, 2019 WL 2717888, at *74. That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotation marks omitted). As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014) ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007))). *Schooley*'s basic rubric is adopted in this case for the seventeen living servicemember plaintiffs with relevant VA disability ratings. Under this rubric, servicemember plaintiffs rated by the VA up to 30% disabled due to their service injuries stemming from the Khobar Towers attack receive a baseline award of

$5,000,000; plaintiffs rated 40 to 60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and servicemember plaintiffs rated 70 to 100% disabled by the VA will receive a further upward departure, for a total of $7,000,000. *See, e.g.*, *Schooley*, 2019 WL 2717888, at *75; *Dobbins*, 2026 WL 1943314, at *21 (using this approach); *Est. of Johnson*, 2024 WL 3225954, at *14 (same); *Thole*, 2024 WL 2208208, at *14 (same); *Gration*, 2023 WL 5221955, at *30 (same); *Ackley*, 2022 WL 3354720, at *51 (same); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same). The six remaining servicemember plaintiffs who have not provided a VA disability rating will be awarded damages based on the descriptive and documentary evidence presented about their injuries. *See Schooley*, 2019 WL 2717888, at *75 (adopting the same approach); *Akins*, 332 F. Supp. 3d at 40-41 (same).

Twelve servicemember plaintiffs—Sammy Lee Jackson Jr., Robert Edward Bryant, Michael J. Dolinar, Mark Edwin Ladtkow, Wayne Mello Sr., Michael David Morelock, Christopher Howard Romero, Donald Wayne Rouse, Roy Edgar Smith, Jeffery Dean Spivey, Timothy Paul Stehley, and Christopher Thomas Wagar—can recover in the 70-100% disabled category. *See supra* Part I.C (describing plaintiffs' disability ratings). Each of these 12 plaintiffs will therefore receive an award of $7,000,000. Five servicemember plaintiffs—Russell Davin Barile, Laura Susanne Bergstrom, Benjamin Scott Coleman, Lonnie Duane Innmon, and Harald Robert Jautakis—can recover in the 40-60% disabled category. *See id.* Each of these plaintiffs will receive an award of $6,000,000.

Six remaining servicemember plaintiffs—Jessica Francine Bradshaw, Lawrence Henry Branch, Christine Ann Locke, Tonya Catrice McCurdy, Robert Morris Treadway Jr., and Matthew A. Wells—did not provide VA disability ratings, but review of their declarations demonstrate that they are each entitled to the baseline award of $5,000,000. Jessica Francine Bradshaw attests that

she "breathe[d] in dust and fine particles of debris," suffered "several lacerations on [her] face and left toe from shattered glass," and was diagnosed with asthma and PTSD, with lasting symptoms that "profoundly affected [her] relationships." Bradshaw Decl. ¶¶ 7-8, 11, 16-17. Lawrence Henry Branch was "pushed . . . roughly into [a] wall," leaving him with "bruising over [his] body" and "lacerations to [his] leg" from flying debris, and he suffers from "permanent damage to [his] hearing," "anxiety," "depression," and daily "flashbacks and nightmares." Branch Decl. ¶¶ 10-13, 18-19. Christine Ann Locke "felt the shockwave" from the bombing, spent the following days "addressing the immediate injuries and identifying bodies," and developed PTSD, paranoia, and hypervigilance that created lasting friction in her marriage and emotional distance from her children. Locke Decl. ¶¶ 8, 10-12, 14. Tonya Catrice McCurdy narrowly avoided being critically injured when glass "blew out over [her] head," experienced a "burn[ing]" scalp from having to wash relaxer out of her hair with pool water, suffers from "anxiety" and "panic attacks," and was diagnosed with PTSD. McCurdy Decl. ¶¶ 9, 11, 16-19. Robert Morris Treadway Jr. was "thr[own] . . . to the floor," struck in the "chest and abdomen" by "sharp shards of glass," experienced "problems with [his] hearing," and worked "nonstop for more than twenty-four hours after the attack" treating the wounded, resulting in "anxiety," social withdrawal, difficulty sleeping, "flashbacks," and other symptoms that caused him to abandon his military career. Treadway Decl. ¶¶ 8-13, 16-19. Matthew A. Wells sustained lacerations "across [his] back" from "shards of glass flying through the air," and a foot injury from stepping on a nail in the rubble while helping "to care for more than 400 casualties," and he was left with "nightmares," "anxiety," "depression," alcohol abuse, and PTSD that contributed to the dissolution of his first marriage. Wells Decl. ¶¶ 16, 24-28, 33-40. These injuries make a baseline award of $5,000,000 appropriate.

**3. Solatium**

"Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on the family members' claims of IIED thus will be discussed as claims for solatium.

The thirty-six self-represented family member plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of servicemember victims. "[S]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society." *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)). The D.C. Circuit has explained that solatium "'began as a remedy for the loss of a spouse or a parent. It has since expanded to include the loss of a child[,]' . . . [a]nd in some circumstances, it can include the loss of a sibling." *K.E.F.V. by & through Vickers v. Islamic Republic of Iran*, 135 F.4th 988, 991-92 (D.C. Cir. 2025) (quoting *Fraenkel,* 892 F.3d at 356). Two factors are considered in calculating solatium: "The first is the injury to the feelings of a family member caused by the circumstances of the decedent's death," and "[t]he second is the loss of the decedent's comfort and society." *Id.* (internal quotations and citations omitted). "Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356-57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

The *Heiser I* framework for solatium damages has been used as a guide in this Court for purposes of consistency, *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)), though this framework is not at all mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted."). Indeed, "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damages awards." *Id.* at 362 (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017)). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011).

Blunt application of the *Heiser* framework can fail "to assess each plaintiff's injuries individually." *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065 (JDB), 2022 WL 2817730, at *43 (D.D.C. July 19, 2022). Ensuring that "individuals with similar injuries receive similar awards," *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (quoting *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012)), requires adjustments so that awards reflect differences in the degree of injury. For example, servicemembers directly injured in terrorist attacks should receive substantially more than their own spouses, who suffer none of the physical injuries and whose emotional injuries—while often undoubtedly severe—are generally less acute. *See Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014); *Davis*, 882 F. Supp. at 15-16. Even outside of a single-family unit, family members of surviving servicemembers should generally not receive more than other

servicemember victims injured in the same attack. To the extent deviations from the *Heiser* framework are needed to accomplish commonsense proportionality between awards, such deviations promote courts' "primary consideration" of overall consistency and common sense. *Moradi*, 77 F. Supp. 3d at 70.

The damages awards for plaintiff-spouses are addressed first, followed by parents and children, and then siblings.

*a. Spouses*

Seven of the family member plaintiffs were spouses, or, in Mary Thaggard Treadway's case, the functional equivalent of a spouse, of servicemember victims at the time of the bombing: Anita Cason Lewis, Pamela Barbara Jautakis, Andrea Dora Ladtkow, Rose Marie Mello, Eileen Patricia Casey, Mary Thaggard Treadway, and Angela Sue Holloway. Each spouse has described fear for her husband's physical well-being in the immediate aftermath of the bombing, as well as the toll that the impacts of the bombing have taken in the years since. *See* Lewis Decl. ¶¶ 11-13, 14-23; P. Jautakis Decl. ¶¶ 7, 10-11; A. Ladtkow Decl. ¶¶ 10-12, 16-19; R. Mello Decl. ¶¶ 8-12, 16-17; Casey Decl. ¶¶ 7-10, 13-15; M. Treadway Decl. ¶¶ 8-10, 15-18; Holloway Decl. ¶¶ 10-14, 20-22.

Although the *Heiser* framework would award a baseline of $4,000,000 to each of these spouses of surviving victims, *see Schooley*, 2019 WL 2717888, at *77, deviations are appropriate to make their awards proportional to the injuries and associated awards of their spouses. As a baseline, each spouse will receive half the award that their servicemember spouse received, to ensure that people whose servicemember spouses returned grievously injured or entirely disabled receive a larger award than those whose spouses, while injured in the Khobar Towers attack, continued to be able to function afterward. *See Breezee*, 2025 WL 2719250, at *31.

Some of these plaintiffs have since been divorced from their injured servicemember spouses: Anita Cason Lewis and Sammy Lee Jackson Jr. divorced in 2001, approximately five years after the attack. *See* Lewis Decl. ¶¶ 22-23. Angela Sue Holloway and Matthew A. Wells divorced when their daughter was three years old, "a couple years after the attack." Holloway Decl. ¶ 23; *see* S.A. Wells Decl. ¶ 11. Eileen Patricia Casey and Donald Wayne Rouse divorced after Rouse's alcoholism and volatile behavior escalated, though the evidence does not specify the exact year. *See* Casey Decl. ¶¶ 17-19 (noting that "it took a bit of time" for the effects of the attack on their marriage to "become apparent"). Downward deviations from the baseline may be appropriate when "attenuation in [the] relationship has occurred," *Gration*, 2023 WL 5221955, at *34, and "there is no evidence that the two have remained close, or even in touch," *Aceto*, 2020 WL 619925, at *21. "Divorce need not diminish a plaintiff's award," however, "particularly where the after-effects of the attack were a primary cause of the divorce." *Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-cv-2248 (CRC), 2025 WL 2410090, at *19 (D.D.C. Aug. 20, 2025) (quoting *Akins*, 332 F. Supp. 3d at 44).

Here, three of the spouse plaintiffs are divorced from the servicemember plaintiffs and potentially subject to a downward departure. Such a downward deviation is appropriate for Angela Sue Holloway, whose marriage "collapsed quickly after the attack" because her ex-husband was often away on deployment, causing them to become "emotionally distant," and who has not shown evidence of a continuing relationship with her ex-husband. Holloway Decl. ¶¶ 18-20; *see Aceto*, 2020 WL 619925, at *21 (awarding $1,500,000 in solatium damages to plaintiff whose servicemember former spouse received $3,000,000, because they divorced "a few years" after the attack). A downward departure is not warranted for Anita Cason Lewis, however, because she ended her marriage after being "brutally sodomize[d]" by her ex-husband, an assault that required

hospitalization and was something "the [husband] that existed before the attack never would have done." Lewis Decl. ¶¶ 19-22; *see Akins*, 332 F. Supp. 3d at 44 n.15 (explaining that downward deviation is not appropriate "where the after-effects of the attack were a primary cause of the divorce"). Nor is a downward deviation appropriate for Eileen Patricia Casey, who was "married to [her] ex-husband for almost thirty years" and ended the relationship after an intense after-effect of the attack where her ex-husband let her "son hold one of his rifles" then "threatened to kill himself." Casey Decl. ¶¶ 17-19; *see Gration*, 2023 WL 5221955, at *34 (declining to reduce former spouses' awards because their declarations described "emotional anguish" in the period after the attack and prior to divorce).[14]

After adjusting for the specific injuries of these plaintiffs' injured servicemember spouses and for downward deviations, Anita Cason Lewis, Andrea Dora Ladtkow, Rose Marie Mello, and Eileen Patricia Casey will receive $3,500,000 (half of their spouses' $7,000,000 awards); Pamela Barbara Jautakis will receive $3,000,000 (half of her spouse's $6,000,000 award); Mary Thaggard Treadway will receive $2,500,000 (half of her spouse's baseline $5,000,000 award); and Angela Sue Holloway will receive $1,500,000 (half of her spouse's $5,000,000 award, adjusted downward to account for her divorce and attenuated relationship). *See St. John*, 2026 WL 1532818, at *48 (adjusting one former spouse's award from $3,500,000 baseline to $2,500,000, when she and her servicemember spouse divorced in 2000).

---

[14] Plaintiffs argue that both Lewis and Casey are entitled to upward departures to account for their unusually severe suffering, Pls.' Proposed Findings of Fact & Conclusions of Law at ¶¶ 6, 153, but this argument fails to acknowledge the general appropriateness of downward departures in awards to divorced spouses of injured servicemembers, and the exacerbated circumstances of the harm suffered by these two divorced spouses is recognized with no downward departure.

*b. Parents*

Nine of the remaining thirty-six family member plaintiffs will receive awards as parents or stepparents of servicemembers who were injured at the Khobar Towers attack: Minnie Lee Jackson, Virginia Lee Simmons, Frederick Joe Kowalczyk, Joseph Ralph Branch, Patricia Diane McSparran, Martha Gray Innmon, Thomas Leopold Moya, Patricia Karen Hermalik, and Margaret Kaye Wells. These parents have attested to their panic upon learning about the attack and in the days and years following as they struggled with increased anxiety over their children's safety and witnessing their children deal with the psychological after-effects of the attack.[15] These harms are consistent with those suffered by many parents of victims of terrorism. *See Valencia*, 774 F. Supp. 2d at 16.

The parents and stepparents of injured and surviving servicemembers are each entitled to a baseline award of $2,500,000, and that baseline is appropriate here. *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured servicemembers).[16]

*c. Children*

Seven of the family member plaintiffs are children of servicemembers injured in the Khobar Towers bombing: Samuel Aaron Jackson, Sierra Alexandria Jackson, Wayne Mello Jr., Anthony Mello, Marquell Demetrae Robinson, Jalissa Denise Spivey, and Sara Ashley Wells. These plaintiffs describe confusion or fear in the immediate aftermath of the bombing and

---

[15] *See* M. Jackson Decl. ¶¶ 9-10, 12, 16; Simmons Decl. ¶¶ 8-10, 13-15; Kowalczyk Decl. ¶¶ 10-11, 15-16; J. Branch Decl. ¶¶ 8-9; McSparran Decl. ¶¶ 7-11, 14; M. Innmon Second Decl. ¶¶ 8, 11-12; Moya Decl. ¶¶ 7-9, 13, 15; Hermalik Decl. ¶¶ 8-9, 13-15; M. Wells Decl. ¶¶ 12-17, 21.

[16] Although plaintiffs argue for an "upward departure in the compensatory damages award to Joseph Ralph Branch," Pls.' Proposed Findings of Fact & Conclusions of Law at 47, "given the importance of consistency across cases, deviations are generally not warranted absent evidence of 'unusual' circumstances," *Heching v. Syrian Arab Republic*, No. 17-cv-1192, 2025 WL 2959909, at *4 (D.D.C. Oct. 20, 2025) (citing *Roth*, 78 F. Supp. 3d at 405), and Joseph's alcohol abuse, depression, and grief over the loss of his wife, "[w]hile serious, . . . are less severe than those found to warrant a significant damages enhancement on their own," *Braun*, 228 F. Supp. at 85.

difficulties in their relationships with their servicemember parents that they attribute at least in part to the impacts of the bombing.[17] Although Sierra Alexandria Jackson, Marquell Demetrae Robinson, Jalissa Denise Spivey, and Sara Ashley Wells were too young at the time of the bombing to remember the events firsthand, *see* Sierra Jackson Decl. ¶¶ 4-5; M. Robinson Decl. ¶¶ 4-5; J. Spivey Decl. ¶¶ 4-5; S.A. Wells Decl. ¶¶ 4-5, this lack of awareness does not lessen the distress they experienced from growing up with a parent suffering from psychological symptoms from the attack, *see* Sierra Jackson Decl. ¶¶ 6-10, 14-15; M. Robinson Decl. ¶¶ 6-11; J. Spivey Decl. ¶¶ 6-11, 13; S.A. Wells Decl. ¶¶ 8-9, 12-15; *see also, e.g.*, *St. John*, 2026 WL 1532818, at *49 (holding the same); *Aceto*, 2020 WL 619925, at *22 (same); *Schooley*, 2019 WL 2717888, at *78 (same); *K.E.F.V.*, 135 F.4th at 992 (allowing child who "was not yet born when Iran helped the Taliban kill her father" to "recover solatium for the loss of her father's comfort and society").

"Children of a surviving victim receive $1.5 million on average" under the *Heiser* framework, *Spencer*, 71 F. Supp. 3d at 28, and that baseline amount is appropriate here since each servicemember parent was awarded at least $5,000,000, meaning no downward departure for proportionality is required. Plaintiffs argue for an "upward departure" in the compensatory damages awards to Samuel Aaron Jackson, Sierra Alexandria Jackson, and Jalissa Denise Spivey, *see* Pls.' Proposed Findings of Fact & Conclusions of Law at 11, 15, 162, but no such departure is warranted. These three plaintiffs were very young at the time of the Khobar Towers bombing, *see* S.A. Jackson Decl. ¶ 4 (nearly six years old); Sierra Jackson Decl. ¶ 4 (two months old); J. Spivey Decl. ¶ 4 (two years old), and their injured fathers were absent from their family homes for much of their upbringing, *see* S.A. Jackson Decl. ¶ 14 (noting that Jackson left the house about four years after the attack); Sierra Jackson Decl. ¶ 7 (same); J. Spivey Decl. ¶ 7 (noting that she "can count

[17] *See* S.A. Jackson Decl. ¶¶ 7-11, 15-16, 19; Sierra Jackson Decl. ¶¶ 6-10, 14-15, 18; Mello Jr. Decl. ¶¶ 8, 11-13; A. Mello ¶¶ 7-15; M. Robinson Decl. ¶¶ 6-11; J. Spivey Decl. ¶¶ 6-11, 13; S.A. Wells ¶¶ 8-9, 12-15.

on two hands the total number of times [she] ha[s] seen [her] father face-to-face"). Although Samuel and Sierra witnessed or experienced verbal and physical abuse from their father before his departure, precipitating their behavioral issues and anxiety, and Jalissa engaged in self-destructive behavior as a result of her father's absence, *see* S.A. Jackson Decl. ¶¶ 12-13, 15; Sierra Jackson Decl. ¶¶ 6-11, 17; J. Spivey Decl. ¶¶ 11-14, such suffering, though serious, does not represent "unusually severe mental anguish" warranting a significant damages enhancement on its own, *Heching*, 2025 WL 2959909, at *15.

Since upward deviations for special circumstances are not appropriate, Samuel Aaron Jackson, Sierra Alexandria Jackson, Wayne Mello Jr., Anthony Mello, Marquell Demetrae Robinson, Jalissa Denise Spivey, and Sara Ashley Wells will each receive $1,500,000.

*d. Siblings*

Finally, thirteen of the family member plaintiffs are siblings of servicemember plaintiffs: Rosalyn Shantell Jackson, Teodoro Anthony Gandert, James Gandert, Tonya Rena Boone, Kawam Mwangi Evans, Cedric Camino Robinson, Osa Lee Robinson, Tabatha Ann Barr, Tanya Karen Harshberger, Tammy Lee Stehley, Roberta Treadway Coats, Nicholas Wells, and Stephen Hutchinson Wells. Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[18] These harms are consistent with those suffered by many siblings of victims of terrorism. *See Akins*, 332 F. Supp. 3d at 45.

---

[18] *See* R. Jackson Decl. ¶¶ 9-11, 13, 17; Gandert Decl. ¶¶ 8-10; J. Gandert Decl. ¶¶ 8-12; Boone Second Decl. ¶¶ 9-12, 15; Evans Decl. ¶¶ 7-12; C. Robinson Decl. ¶¶ 8-12; O. Robinson Decl. ¶¶ 6-9; Barr Decl. ¶¶ 9-15; Harshberger Decl. ¶¶ 9-13; T. Stehley Decl. ¶¶ 8-12; Coats Decl. ¶¶ 8-10, 14; N. Wells Decl. ¶¶ 7, 10, 12-17; S.H. Wells. Decl. ¶¶ 7-12.

Within the *Heiser* framework, these siblings of injured servicemembers are each entitled to an award of $1,250,000. *See id.* (awarding a baseline amount of $1,250,000 to siblings of injured service members).[19]

**4. Punitive Damages**

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. § 1605A(c). *See* Compl. ¶¶ 144-150 (Count VI). The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in [other] methods" for determining punitive damages. 2020 WL 3606273, at *27. Specifically, *Christie* determined that this method avoided the pitfalls of "a singular focus on deterrence," "elevat[ing] superficial similarities over meaningful ones," and "skim[ming] over analysis of the plaintiffs' precise harms," and does not "yield an excessive award." *Id.* at *28. Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.*, "'the compensatory damages for the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive

---

[19] Although plaintiffs argue that Roberta Treadway Coats is entitled to an "upward departure" in her compensatory damages award because the attack contributed "in part" to "a decades-long struggle with infertility and over ten miscarriages," Pls. Proposed Findings of Fact & Conclusions of Law at 187, plaintiffs failed to put forward sufficient proof that Coats's infertility struggles "were legally attributable to Iran's actions as proximately caused by those actions." *Spencer*, 71 F. Supp. at 29. Thus, no upward departure is appropriate.

award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *29.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, and that plaintiffs urge the Court to adopt this calculation, *see* Pls.' Mem. at 44, the *Christie* punitive damages approach, which has likewise been applied in other cases in this Court, *see, e.g.*, *Blank*, 2021 WL 3021450, at *13; *Ackley*, 2022 WL 3354720, at *60; *Gration*, 2023 WL 5221955, at *36; *Thole*, 2024 WL 2208208, at *17; *Est. of Johnson*, 2024 WL 3225954, at *16, will also be applied here. Accordingly, a punitive damages award equal to the compensatory damages awarded in this case is most appropriate.

Plaintiffs are therefore entitled to a total punitive damages award of $214,250,000, to be apportioned among plaintiffs according to their compensatory damages.

**F. Post-Judgment Interest**

Finally, plaintiffs seek the award of post-judgment interest. *See* Pls.' Mem. at 45. Post-judgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Schooley*, 2019 WL 2717888, at *79. Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and "[s]uch interest shall be calculated from the date of the entry of judgment." 28 U.S.C. § 1961(a). When post-judgment interest is sought, application of Section 1961(a) is mandatory, not discretionary. *See, e.g.*, *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 165; *Selig v. Islamic Republic*

*of Iran*, 573 F. Supp. 3d 40, 78 (D.D.C. 2021). Plaintiffs will therefore be awarded post-judgment interest at the statutory rate set out in 28 U.S.C. § 1961.[20]

## IV. CONCLUSION

Plaintiffs' motion for default judgment as to liability and damages is granted in part with respect to the fifty-nine self-represented plaintiffs and denied in part as to the seventeen plaintiffs who are seeking to be represented by their estate or a named representative. Iran is liable for the pain and suffering inflicted on the twenty-three self-represented servicemember plaintiffs and for the emotional distress inflicted on the thirty-six self-represented family member plaintiffs.

Monetary damages are awarded to plaintiffs in the following amounts, with post-judgment interest at the rate set out in 28 U.S.C. § 1961:

- Servicemember plaintiffs Sammy Lee Jackson Jr., Robert Edward Bryant, Michael J. Dolinar, Mark Edwin Ladtkow, Wayne Mello Sr., Michael David Morelock, Christopher Howard Romero, Donald Wayne Rouse, Roy Edgar Smith, Jeffery Dean Spivey, Timothy Paul Stehley, and Christopher Thomas Wagar are each awarded $7,000,000 in pain and suffering damages and $7,000,000 in punitive damages, totaling $14,000,000 each;
- Servicemember plaintiffs Russell Davin Barile, Laura Susanne Bergstrom, Benjamin Scott Coleman, Lonnie Duane Innmon, and Harald Robert Jautakis are each awarded $6,000,000

[20] Plaintiffs request pre-judgment interest in their complaint, *see* Compl. at 45, but not in their motion for default judgment, *see generally* Pls.' Mot.; Pls.' Mem. To the extent they seek such interest, that request is denied. Whether to award pre-judgment interest "is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi*, 879 F. Supp. 2d at 58; *see also, e.g.*, *Oldham v. Korean Air Lines Co., Ltd.*, 127 F.3d 43, 54 (D.C. Cir. 1997); *Akins*, 332 F. Supp. 3d at 45-46; *Thole*, 2024 WL 2208208, at *17. In FSIA cases, most Judges on this Court who have considered this issue have concluded—as this Court did in *Akins*—that "pain and suffering and solatium damages are both designed to be fully compensatory" and pre-judgment interest is therefore unwarranted as to those categories of damages. *Barry*, 437 F. Supp. 3d at 60 (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (Lamberth, J.)); *see also Akins*, 332 F. Supp. 3d at 46 (same).

in pain and suffering damages and $6,000,000 in punitive damages, totaling $12,000,000 each;

- Servicemember plaintiffs Jessica Francine Bradshaw, Lawrence Henry Branch, Christine Ann Locke, Tonya Catrice McCurdy, Robert Morris Treadway Jr., and Matthew A. Wells are each awarded $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages, totaling $10,000,000 each;
- Plaintiff-spouses and ex-spouses Anita Cason Lewis, Andrea Dora Ladtkow, Rose Marie Mello, and Eileen Patricia Casey are each awarded $3,500,000 in solatium damages and $3,500,000 in punitive damages, totaling $7,000,000 each;
- Plaintiff-spouse Pamela Barbara Jautakis is awarded $3,000,000 in solatium damages and $3,000,000 in punitive damages, totaling $6,000,000;
- Plaintiff-spouse Mary Thaggard Treadway is awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages, totaling $5,000,000;
- Plaintiff-ex-spouse Angela Sue Holloway is awarded $1,500,000 in solatium damages and $1,500,000 in punitive damages, totaling $3,000,000;
- Plaintiff-parents and stepparents Minnie Lee Jackson, Virginia Lee Simmons, Frederick Joe Kowalczyk, Joseph Ralph Branch, Patricia Diane McSparran, Martha Gray Innmon, Thomas Leopold Moya, Patricia Karen Hermalik, and Margaret Kaye Wells are each awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages, totaling $5,000,000 each;
- Plaintiff-children Samuel Aaron Jackson, Sierra Alexandria Jackson, Wayne Mello Jr., Anthony Mello, Marquell Demetrae Robinson, Jalissa Denise Spivey, and Sara Ashley

Wells are each awarded $1,500,000 in solatium damages and $1,500,000 in punitive damages, totaling $3,000,000 each;

- Plaintiff-siblings Rosalyn Shantell Jackson, Teodoro Anthony Gandert, James Gandert, Tonya Rena Boone, Kawam Mwangi Evans, Cedric Camino Robinson, Osa Lee Robinson, Tabatha Ann Barr, Tanya Karen Harshberger, Tammy Lee Stehley, Roberta Treadway Coats, Nicholas Wells, and Stephen Hutchinson Wells are each awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages, totaling $2,500,000 each.

Thus, the total compensatory damages award is $214,250,000 and the total punitive damages award is $214,250,000, for a total damages award against Iran of $428,500,000.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: September 9, 2026

**BERYL A. HOWELL**
United States District Judge